**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**(Broward County Circuit Court Case No. CACE 26-008429)**

MIA D. JONES,

     Plaintiff,

     v.

LENNAR HOMES, LLC,
ALL PHASE ROOFING, INC.;
OSCAR AIR CONDITIONING, INC.;
ABC DRYWALL, CORPORATION; and
BUILDER SERVICES GROUP, INC. d/b/a
GALE INSULATION,

     Defendants.

_____/

**<u>LENNAR HOMES, LLC'S NOTICE OF REMOVAL</u>**

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1332(d), 1441, 1446, and 1453, Defendant LENNAR HOMES, LLC ("Lennar") hereby removes the action entitled *Mia D. Jones v. Lennar Homes, LLC*, et al., pending in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, Case No. CACE-26-008429 (the "State Court Action"), to the United States District Court for the Southern District of Florida, on the following grounds.

### I.    PROCEDURAL HISTORY

1.    On May 20, 2026, Plaintiff Mia D. Jones on behalf of a putative class of individual tribe members and others filed this State Court Action against Lennar Homes, LLC; All Phase Roofing, Inc.; Oscar Air Conditioning Inc.; ABC Drywall, Corporation; and Builder Services Group, Inc. d/b/a Gale Insulation.

2.	Lennar (through counsel) received the Complaint and a request to waive service of process on May 28, 2026. On June 10, 2026, Lennar's counsel executed the Waiver of Service of Process. A copy of the executed Waiver is attached as **Exhibit A**.

3.	This Notice of Removal is timely under 28 U.S.C. § 1446(b) because it is filed within thirty days of the date on which Lennar executed the Waiver of Service of Process. *See Edwards v. Apple Computer, Inc.,* 645 F. App'x 849, 852 (11th Cir. 2016) *(*"A defendant's time to remove is triggered by service of the summons and complaint, or receipt of the complaint through service or otherwise, and not by receipt of the complaint 'unattended by any formal service.'") (quoting *Murphy Bros. v. Michetti Pipe Stringing, Inc.,* 526 U.S. 344, 347–48 (1999) ("[W]e hold that a named defendant's time to remove is triggered by simultaneous service of the summons and complaint, or receipt of the complaint, 'through service or otherwise,' after and apart from service of the summons, but not by mere receipt of the complaint unattended by any formal service.")).

4.	The Seventeenth Judicial Circuit in and for Broward County, Florida is located within the Southern District of Florida. 28 U.S.C. § 89(c). Therefore, removal to this Court is proper under 28 U.S.C. § 1441(a); *see also* 28 U.S.C. § 1332(d) (providing original jurisdiction where CAFA requirements met).

## II.	NATURE OF THE ACTION

5.	This putative class action is brought on behalf of Plaintiff and a proposed class of individuals who allegedly occupied, leased, or rented rent-to-own homes within a residential development constructed by Lennar and certain subcontractors for members of the Seminole Tribe of Florida. The Complaint defines the proposed class as "[a]ll natural persons who are or were occupants of Leased Homes and Rent-to-own Homes in the Development." Compl. ¶ 73.

2

6.      According to the Complaint, the homes were designed and constructed with allegedly systemic defects that resulted in water and moisture intrusion, excess humidity, mold growth, dust-mite proliferation, and related property damage. Compl. ¶¶ 1, 5–7. These alleged conditions purportedly caused members of the proposed class to sustain personal injuries, damage to personal property, loss of use, displacement, and other consequential harm. Compl. ¶¶ 8, 19–22, 71, 188–89, 197–98.

7.      The proposed class allegedly encompasses "over 900 occupants dispersed across multiple reservations and developments," whose identities and residential histories can purportedly be ascertained from project, leasing, and occupancy records maintained by Defendants and STOF. Compl. ¶ 76. The Complaint further avers that more than 1,000 Tribal members have been, or soon will be, displaced, including more than 900 proposed class members who resided in Leased Homes and Rent-to-Own Homes. Compl. ¶ 7.

8.      Notwithstanding that asserted overlap, Plaintiff characterizes this action as distinct from the Seminole Tribe litigation, *Seminole Tribe of Florida v. Lennar Homes, LLC*, Case No. CACE-25-003574, pending in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida (hereinafter "*Seminole Tribe v. Lennar*"). According to Plaintiff, this action seeks recovery only for alleged bodily injuries, personal-property damage, loss of use, displacement, and other damages purportedly belonging to individual occupants, rather than to the Tribe. Compl. ¶¶ 8, 71.

9.      On that basis, the Complaint asserts claims against Lennar for civil liability under Section 553.84, Florida Statutes, based on alleged violations of the Florida Building Code; negligence; breach of the implied warranty of constructability; breach of the implied warranty of habitability; and contractual indemnity. Compl. ¶¶ 180–218.

10. Lennar denies the Complaint's material allegations and any resulting liability. It further denies that Plaintiff or any putative class member sustained harm attributable to Lennar and disputes that the claims are suitable for class treatment. Lennar preserves all defenses, objections, and rights, including the right to compel arbitration, seek dismissal, oppose class certification, move to strike the class allegations, seek disqualification of Plaintiff's counsel, pursue joinder or impleader of appropriate parties, and assert any other available defense.

### III.   REMOVAL IS PROPER UNDER THE CLASS ACTION FAIRNESS ACT

11. This action is within the original jurisdiction of this Court, and removal is proper under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). Under CAFA, federal district courts have original jurisdiction over putative class actions where (1) the proposed class consists of at least 100 members; (2) the citizenship of at least one proposed class member is different from that of at least one defendant; and (3) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. *See* 28 U.S.C. §§ 1332(d)(2), (d)(5)(B), (d)(6).

12. As the party invoking federal jurisdiction, Lennar bears the burden of establishing the jurisdictional facts by a preponderance of the evidence. *See McCormick v. Aderholt*, 293 F.3d 1254, 1257 (11th Cir. 2002). Each of CAFA's jurisdictional requirements is satisfied here.

13. Removal is also procedurally proper under CAFA's removal statute, 28 U.S.C. § 1453. Section 1453(b) permits removal without regard to whether any defendant is a citizen of the forum state and authorizes any defendant to remove without obtaining the consent of the remaining defendants. Lennar therefore may remove this action without the consent of the other Defendants and notwithstanding the forum-defendant rule.

### A.  Putative Class Action

14.     This action meets the CAFA definition of a class action, which is "any civil action filed under Rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure." 28 U.S.C. §§ 1332(d)(1)(B), 1453(a) & (b). Plaintiff expressly seeks class certification under Florida Rule of Civil Procedure 1.220 and alleges that the proposed class satisfies Rule 1.220(a), Rule 1.220(b)(1)(B), Rule 1.220(b)(3), and Rule 1.220(d)(4). Compl. ¶¶ 72, 80–84.

### B.  Class Consisting of More than 100 Members

15.     The proposed class readily exceeds CAFA's 100-member threshold. The Complaint alleges that the class comprises "over 900 occupants dispersed across multiple reservations and developments." Compl. ¶ 76. It further alleges that more than 1,000 Tribal members have been, or soon will be, required to relocate, including more than 900 proposed class members who resided in Leased Homes and Rent-to-Own Homes. Compl. ¶ 7. Accepting those allegations for jurisdictional purposes, the proposed class contains substantially more than the 100 members required by 28 U.S.C. § 1332(d)(5)(B).

### C.     Amount in Controversy

16.     Lennar bears the burden of establishing the amount in controversy, but "is not required to prove the amount in controversy beyond all doubt or to banish all uncertainty about it." *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 754 (11th Cir. 2010).

17.     CAFA requires aggregation of the proposed class members' claims in determining whether the amount in controversy exceeds $5,000,000, exclusive of interest and costs. *See* 28 U.S.C. §§ 1332(d)(2), (d)(6). The jurisdictional inquiry therefore turns on the aggregate value of the relief placed at issue by the Complaint, not the amount attributable to Plaintiff individually.

18.     The Complaint places more than $5,000,000 in controversy. Plaintiff seeks recovery on behalf of more than 900 proposed class members for alleged personal injuries, pain and suffering, mental anguish, medical expenses, aggravation of preexisting conditions, damage to personal property, loss of use, displacement, and incidental and consequential damages. Compl. ¶¶ 76, 188–89, 197–98, 204, 212, 216–18. With a proposed class exceeding 900 members, an average amount in controversy of approximately $5,556 per class member would satisfy CAFA's jurisdictional threshold. The categories of individualized bodily-injury, medical, property, displacement, and loss-of-use damages alleged in the Complaint place more than that amount at issue on an aggregate basis.

19.     The breadth of the alleged harm reinforces that conclusion. Plaintiff alleges that the conditions affected occupants across multiple reservations and developments and resulted in widespread relocation, bodily injuries, medical-related expenses, personal-property losses, and loss of use. Compl. ¶¶ 7, 19–22, 76, 188–89, 197–98.

20.     As an additional example of the amount-in-controversy, in the pending related action brought by the Tribe against Lennar, *Seminole Tribe v. Lennar*, the Tribe seeks (a) over $300 million and counting in indemnity for the same claims; (b) $115 million in healthcare costs, about $25 million for a medical-monitoring program, roughly $4.6 million for personal property replacement, and more than $11.4 million for temporary housing and relocation. *See Seminole Tribe v. Lennar,* Pl.'s Initial Disclosures at 7–8 (Sept. 17, 2025), a copy of which is attached as **Exhibit B**; *see also* Hr'g Tr. 42:24–43:10 (Oct. 21, 2025), a copy of which is attached as **Exhibit C**.

21.     Taken together, those allegations establish by a preponderance of the evidence that the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

6

22.      Lennar denies liability and disputes that Plaintiff or any proposed class member is entitled to recover. Those merits disputes do not diminish the amount in controversy. For jurisdictional purposes, the relevant question is the value of the claims and relief Plaintiff has placed at issue, not the amount, if any, that Plaintiff or the proposed class ultimately may recover.

### D. CAFA Diversity

23.      CAFA's minimal-diversity requirement is satisfied when "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). An individual is a citizen of the state in which the individual is domiciled. *See McCormick*, 293 F.3d at 1257–58 ("Citizenship is equivalent to 'domicile' for purposes of diversity jurisdiction."). Domicile requires both physical presence in the state and an intent to remain there indefinitely. *See id.*

24.      Under CAFA, Lennar is a citizen of Florida because "limited liability companies are treated as unincorporated associations for jurisdictional purposes[,]" and "for the *CAFA*'s jurisdictional purposes, an unincorporated association is a citizen of the state in which it is organized and the state of its principal place of business." *Alvarez v. Loancare LLC*, 2021 WL 184547, at *7 (S.D. Fla. Jan. 19, 2021) (emphasis in original) (citing 28 U.S.C. § 1332(d)(10)). Lennar is organized under Florida law and maintains its principal place of business in Miami, Florida. Compl. ¶ 32. Therefore, Lennar is a citizen of Florida. *See* 28 U.S.C. § 1332(d)(10).

25.      The Complaint alleges that each Subcontractor Defendant is incorporated in Florida and maintains its principal place of business in Florida. Specifically, All Phase Roofing, Inc. allegedly maintains its principal place of business in Lake Park, Florida; Oscar Air Conditioning Inc. in Miami, Florida; ABC Drywall, Corporation in Margate, Florida; and Builder Services

Group, Inc. d/b/a Gale Insulation in Daytona Beach, Florida. Compl. ¶¶ 56, 59, 62, 65. Each is therefore alleged to be a Florida citizen.

26.     For example, at least two proposed class members are domiciled outside Florida. Natomah B. Robbins falls within the proposed class definition because she occupied a Leased Home or Rent-to-Own Home in the Development during the relevant period identified in the Complaint. Compl. ¶ 73. Robbins has nevertheless resided in California and regarded it as her fixed and permanent home since approximately August 2025.

27.     "[D]omicile (or citizenship) consists of two elements: residency in a state and intent to remain in that state." *See Smith v. Marcus & Millichap*, Inc., 991 F.3d 1145, 1149 (11th Cir. 2021). Although residence is relevant evidence of domicile, residence alone is not enough; domicile requires both physical presence, couple with an intent to make the state a home. *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1341-42 (11th Cir. 2011). "[U]nder any manner of proof, the jurisdictional facts that support removal must be judged at the time of the removal." *Pretka*, 608 F.3d at 773.

28.     The record establishes both elements here. Investigative records associate Robbins with a Los Angeles, California address during the period since her occupation of a residence placed at-issue in the putative class action complaint, based on third-party databases compiling bank-header data, utility records, and credit-reporting information. The investigation also identified California-based educational and career indicators, including Robbins's attendance at Cinema Makeup School in Los Angeles in 2025, her subsequent identification as an alumna of that institution, and social-media activity reflecting ongoing employment and professional work in the Los Angeles area.

29.     Significantly, Robbins remained in Los Angeles after completing her studies and continued developing her professional activity there. Her continued presence is further corroborated by social-media activity throughout 2026 placing her at locations across the Los Angeles area. Considered together, this evidence establishes that Robbins remained in California after graduation and made Los Angeles the center of her personal and professional life.

30.     Some historical records do reflect ties to Florida, including a Florida driver's license, voter registration, and vehicle registration. Those records, however, do not outweigh the more recent and substantial evidence of Robbins's California domicile. No single factor controls the domicile inquiry. *See Eastep v. Newman*, No. 1:12-CV-102 WLS, 2013 WL 1721609, at *4 (M.D. Ga. Apr. 22, 2013). Nor must a person immediately obtain a new driver's license or vehicle registration to affect a change in domicile. *See id.* ("As numerous courts have held, however, possessing a driver's license and car registration from your state of citizenship are not necessary conditions to changing domicile."); *see also Sunseri v. Macro Cellular Partners*, 412 F.3d 1247, 1249 (11th Cir. 2005) (affirming a finding of California domicile based on the record as a whole, notwithstanding evidence of ties to Nevada, including Nevada voter registration). Robbins's vehicle registration also predates her relocation to California and therefore provides little evidence of her domicile at the time of removal.

31.     Accordingly, Robbins's California residence, education, professional activity, and other objective indicia establish by a preponderance of the evidence that she was domiciled in California when this action was removed. Robbins is therefore a California citizen for purposes of CAFA's minimal-diversity requirement.

32.     Other putative class members—including former occupants of the at-issue homes—may also be domiciled in other states.

9

33.     Jose Valle is one such former occupant. Plaintiff's proposed class encompasses all current and former occupants of Leased Homes and Rent-to-Own Homes in the Development, without any temporal limitation or restriction based on membership in the Seminole Tribe of Florida. Compl. ¶ 73. Valle falls within that definition because he formerly occupied one of the covered homes. His status as a nonmember of the Tribe does not place him outside the class as pleaded.

34.     A separate investigation establishes that Valle is domiciled in New York. Third-party investigative databases have associated him with a Brooklyn address since approximately September 2021, and he is currently registered to vote in New York at that same address. His LinkedIn profile likewise identifies him as based in Brooklyn and reflects continuous employment in the New York metropolitan area since September 2021. Multiple social-media posts from 2025 and 2026 further corroborate his continued presence in New York City.

35.     The investigation identified no active driver's license for Valle, and his most recent Florida driver's license expired on July 2, 2024. Any residual Florida connection is outweighed by the substantial and current evidence of his New York domicile, including a longstanding Brooklyn address, current New York voter registration, continuous employment in the New York metropolitan area, and ongoing public activity in New York City. These facts establish that Valle is domiciled in New York at the time of removal. Valle is therefore a New York citizen and supplies an additional, independent basis for CAFA minimal diversity.

36.     Lennar and the Subcontractor Defendants, by contrast, are citizens of Florida. Thus, the record demonstrates by a preponderance of the evidence that at least one proposed class member is a citizen of a state different from at least one Defendant, satisfying CAFA's minimal-diversity requirement.

10

## IV.    CONCLUSION

37.    For all the reasons stated above, this action is within the original jurisdiction of this Court pursuant to 28 U.S.C. § 1332(d). Accordingly, removal is procedurally proper under 28 U.S.C. §§ 1441, 1446, and 1453. Lennar therefore removes this action from the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, to the United States District Court for the Southern District of Florida.

DATED: June 26, 2026

/s/ Benjamin J. Widlanski
Harley S. Tropin (FBN 241253)
Email: HST@kttlaw.com
Benjamin J. Widlanski (FBN 1010644)
Email: BWidlanski@kttlaw.com
Katherine A. Mitchell (FBN 1018647)
Email: KMitchell@kttlaw.com
KOZYAK TROPIN & THROCKMORTON, LLP
2525 Ponce de Leon Blvd., Floor 9
Coral Gables, FL 33134
Telephone: (305) 372-1800

C. David Harper (FBN 089583)
Primary email:  CHarper@foley.com
Secondary email: ECFilings_CDH@foley.com
FOLEY & LARDNER LLP
100 North Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone:  813.229.2300
Facsimile:  813.221.4210

Attorneys for Lennar Homes, LLC

11

# EXHIBIT A

Filing # 250052549 E-Filed 06/10/2026 01:30:18 PM

**IN THE CIRCUIT COURT OF THE 17th JUDICIAL CIRCUIT OF FLORIDA IN AND FOR BROWARD COUNTY, FLORIDA**

MIA D. JONES, on behalf of herself
and all others similarly situated,

       Plaintiff,

v.

LENNAR HOMES, LLC; ALL
PHASE ROOFING, INC.; OSCAR
AIR CONDITIONING INC.; A B C
DRYWALL, CORPORATION; and
BUILDER SERVICES GROUP,
INC. d/b/a GALE INSULATION,

       Defendants.

_____/

Case No.: CACE-26-008429

## WAIVER OF SERVICE OF PROCESS

**To:**    **Adam M. Moskowitz, Esq.**
       **William R. Scherer, Esq.**

I acknowledge receipt of your request that I waive service of process in the lawsuit of MIA D. JONES, on behalf of herself and all others similarly situated, v. LENNAR HOMES, LLC; ALL PHASE ROOFING, INC.; OSCAR AIR CONDITIONING INC.; A B C DRYWALL, CORPORATION; and BUILDER SERVICES GROUP, INC. d/b/a GALE INSULATION, in the Circuit Court of the Seventeen Judicial Circuit in and for Broward County, Florida.

I have received a copy of the complaint and a copy of this waiver, and a means by which I can return the signed waiver to you without cost to me.

I agree to save the cost of service process and an additional copy of the complaint in this lawsuit by not requiring that I, (or the entity on whose behalf I am acting), be served with judicial process in the manner provided by Fla. R. Civ. P.1.070.

If I am not the defendant to whom the notice of lawsuit and waiver of service of process was sent, I declare that my relationship to the entity or person to whom the notice was sent and my

authority to accept service on behalf of such person or entity is as follows: Benjamin Widlanski, Esq., as Counsel for Defendant, Lennar Homes, LLC.

I (or the entity on whose behalf I am acting), will retain a full reservation of all rights, defenses, or objections other than any objection based on a defect in the summons or the service of the summons.

I understand that a judgment may be entered against me, (or the party on whose behalf I am acting), if a written response is not served upon you on or before July 27, 2026, which is 60 days from the date I received the notice of lawsuit and request for waiver of service of process.

/s/ Benjamin J. Widlanski
Benjamin J. Widlanski
FBN 1010644
Email: BWidlanski@kttlaw.com
**KOZYAK TROPIN & THROCKMORTON, LLP**
2525 Ponce de Leon Blvd., Floor 9
Coral Gables, FL 33134 Telephone:
(305) 372-1800

# EXHIBIT B

**IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT OF FLORIDA IN AND FOR BROWARD COUNTY, FLORIDA**

CASE NO.: CACE 25-003574

**SEMINOLE TRIBE OF FLORIDA,**
for itself and for the benefit of its
tribal members,

Plaintiff,

v.

**LENNAR HOMES, LLC,**

Defendant.

_____/

## INITIAL DISCLOSURES

Pursuant to Florida Rule of Civil Procedure 1.280(a), Plaintiff Seminole Tribe of Florida ("Plaintiff") hereby provides its initial disclosures (the "Disclosures"). The Disclosures are based solely on the information available to Plaintiff at this time following a reasonable search and investigation, and are made without prejudice to Plaintiff's right to present additional evidence, including, but not limited to, evidence obtained through discovery or through continued investigation in this action. Plaintiff expressly reserves the right to supplement or amend the Disclosures.

In addition, information or materials protected by the attorney-client privilege and/or the work product doctrine will not be disclosed as a part of these Disclosures. Plaintiff reserves the right to object in this action to the production and/or introduction into evidence of these Disclosures, any document within the categories described below, and/or testimony by any of the disclosed potential witnesses on any proper ground, and reserves the right to object on any proper

ground to any discovery request or proceeding involving or relating to the subject matter of these

Disclosures.

**(A) The name and, if known, the address, telephone number, and e-mail address of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;**

Pursuant to Florida Rule of Civil Procedure 1.280(a)(1)(A), Plaintiff identifies the following individuals. Plaintiff does not limit in any way its right to depose such individuals on other relevant topics and/or to call them to testify on other relevant topics.

1. Agustin, Evelio
   c/o Conrad & Scherer, LLP

   Mr. Agustin has knowledge of STOF's residential construction and development and work performed by Lennar under the CDA.

2. Bavouset, Jim
   Metro Development Group
   2502 North Rocky Point Dr.
   Suite 1050 Tampa, FL 33607

   Mr. Bavouset, who previously worked at Lennar, has knowledge of the CDA.

3. Flynn, Jamie
   c/o Conrad & Scherer, LLP

   Ms. Flynn has knowledge of STOF's residential construction and development and work performed by Lennar under the CDA.

4. Gabor, Steve
   239-707-0347
   steve.gabor@lennar.com

   Mr. Gabor has knowledge of work performed by Lennar under the CDA in southwest Florida.

5. Gonzalez, Carlos
   786-412-4954
   carlos.gonzalez@lennar.com

2

Mr. Gonzalez has knowledge of work performed by Lennar under the CDA in southeast Florida, particularly Seminole Park.

6.  Healey, Dennis
    c/o Conrad & Scherer, LLP

    Mr. Healey has knowledge of STOF's residential construction and development and work performed by Lennar under the CDA.

7.  Jackson, Kadeja
    c/o Conrad & Scherer, LLP

    Ms. Jackson has knowledge of STOF's housing at the Hollywood reservation and work performed by Lennar under the CDA.

8.  Jimenez, Giselle
    786-419-0958
    giselle.jimenez@lennar.com

    Ms. Jimenez has knowledge of work performed by Lennar under the CDA in southeast Florida, particularly Seminole Park.

9.  Johnson, Eric
    813-781-2606
    eric.johnson@lennar.com

    Mr. Johnson has knowledge of work performed by Lennar under the CDA in the Tampa region.

10. Kershaw, Ray
    239-707-0347
    ray.kershaw@lennar.com

    Mr. Kershaw has knowledge of work performed by Lennar under the CDA in southwest Florida.

11. Kiswani-Barley, Vandhana
    c/o Conrad & Scherer, LLP

    Dr. Kiswani-Barley has knowledge of the health impacts of residents living in the homes built by Lennar.

12. Koger, Derek
    c/o Conrad & Scherer, LLP

Mr. Koger has knowledge of STOF's community development initiatives, STOF's residential construction and development, housing, the CDA, and work performed by Lennar under the CDA.

13. McMurray, Darin
239-872-1166
darin.mcmurray@lennar.com

Mr. McMurray has knowledge of work performed by Lennar under the CDA in southwest Florida.

14. McSwain, Shermeka
c/o Conrad & Scherer, LLP

Ms. McSwain has knowledge of STOF's residential construction and development and work performed by Lennar under the CDA.

15. Melton, Delmar
c/o Conrad & Scherer, LLP

Mr. Melton has knowledge of STOF's residential construction and development and work performed by Lennar under the CDA.

16. Metheny, Mark
813-574-5711
mark.metheny@lennar.com

Mr. Metheny has knowledge of work performed by Lennar under the CDA in the Tampa region.

17. Meyers, David
239-229-0792
david.meyers@lennar.com

Mr. Meyers has knowledge of work performed by Lennar under the CDA in southwest Florida.

18. Paz, Anthony
230-478-4927
anthony.paz@lennar.com

Mr. Paz has knowledge of work performed by Lennar under the CDA in southwest Florida.

19. Quintana, Armando
305-282-2821

armando.quintana@lennar.com

Mr. Quintana has knowledge of work performed by Lennar under the CDA in southeast Florida, particularly Seminole Park.

20. Rabideau, James
c/o Conrad & Scherer, LLP

Mr. Rabideau has knowledge of STOF's residential construction and development and work performed by Lennar under the CDA.

21. Rioseco, Luis
c/o Conrad & Scherer, LLP

Mr. Rioseco has knowledge of STOF's residential construction and development and work performed by Lennar under the CDA.

22. Roig, Rita
786-412-4705
rita.roig@lennar.com

Ms. Roig has knowledge of worked performed by Lennar under the CDA in southeast Florida, particularly Seminole Park.

23. Rothman, Fred B.
99 SE Mizner Boulevard, Suite 120
Boca Raton, FL 33432
Telephone: 561-998-9200
Email: fred.rothman@lennar.com

Mr. Rothman has knowledge of the CDA.

24. Schmit, John
813-613-4230
john.schmit@lennar.com

Mr. Schmit has knowledge of work performed by Lennar under the CDA in the Tampa region.

25. Serrate, Phil
786-236-5972
phil.serrate@lennar.com

Mr. Serrate has knowledge of work performed by Lennar under the CDA in southeast Florida, particularly Seminole Park.

5

26. Smith, Chris
813-523-6833
chris.smith@lennar.com

Mr. Chris Smith has knowledge of work performed by Lennar under the CDA in the Tampa region.

27. Smith, Derrick
c/o Conrad & Scherer, LLP

Mr. Derrick Smith has knowledge of STOF's community development initiatives, the CDA, and work performed by Lennar under the CDA.

28. Smith, Steve
813-574-5740
steve.smith@lennar.com

Mr. Steve Smith has knowledge of work performed by Lennar under the CDA in the Tampa region.

29. Snider, Val
val.snider@lennar.com

Mr. Snider has knowledge of worked performed by Lennar under the CDA in southeast Florida, particularly Seminole Park.

30. Strassner, Joseph
c/o Conrad & Scherer, LLP

Mr. Strassner has knowledge of STOF's residential construction and development and work performed by Lennar under the CDA.

31. Tacher, Jack
786-362-3513
jack.tacher@lennar.com

Mr. Tacher has knowledge of work performed by Lennar under the CDA in southeast Florida, particularly Seminole Park.

32. All Lennar sub-contractors that worked on the homes built by Lennar.

33. All current and prior residents of the homes built by Lennar.

**(B)  A  copy—or  a  description  by  category  and  location—of  all  documents, electronically  stored  information,  and  tangible  things  that  the  disclosing  party  has  in  its possession,  custody,  or  control  (or,  if  not  in  the  disclosing  party's  possession,  custody,  or control,  a  description  by  category  and  location  of  such  information)  and  may  use  to  support its claims or defenses, unless the use would be solely for impeachment;**

1. Communications between STOF and Lennar regarding the CDA, which are in the possession of STOF and Lennar.

2. Documents related to work performed by Lennar under the CDA, which are in the possession of STOF and/or Lennar.

3. Documents related to defects in the homes built by Lennar under the CDA, which are in the possession of STOF and/or Lennar.

4. Documents related to costs incurred by STOF as a result of the defects in the homes built by Lennar under the CDA, which are in the possession of STOF.

5. Non-privileged reports and other documents created by consultants related to their inspection of the homes built by Lennar under the CDA, which are in the possession of STOF and/or Lennar

**(C)  A  computation  for  each  category  of  damages  claimed  by  the  disclosing  party  and a  copy  of  the  documents  or  other  evidentiary  material,  unless  privileged  or  protected  from disclosure,  on  which  each  computation  is  based,  including  materials  bearing  on  the  nature and  extent  of  injuries  suffered;  provided  that  a  party  is  not  required  to  provide  computations as  to  noneconomic  damages,  but  the  party  must  identify  categories  of  damages  claimed  and provide supporting documents; and**

STOF provides the following preliminary computations:

1. Damages to the homes: more than $305.6 million, based on the following component parts.

   a. Construction costs: approximately $250-$300 million

   b. Redesign costs (architects, engineers, consultants, etc.): approximately $50 million

   c. Costs of construction operation and management: approximately $5.6 million

   d. Pre-litigation costs to investigate the defects: STOF will provide a computation for this sub-category of damages in supplemental initial disclosures following additional investigation and analysis.

      i. Note: This sub-category will not include (a) any attorneys' fees from any time period or (b) costs from January 13, 2025 onward, both of which will be included in Category 7 (Attorneys' fees and costs).

   e. Pre-litigation costs to remediate the defects: STOF will provide a computation for this sub-category of damages in supplemental initial disclosures following additional investigation and analysis.

7

2. Damages for the costs of remediating or replacing personal property: approximately $4.6 million

3. Damages for the costs of temporary housing and relocation: more than $11.4 million, based on the following component parts.

    a. Hollywood: STOF will provide a computation for this sub-category of damages in supplemental initial disclosures following additional investigation and analysis.

    b. Brighton (mobile home relocation): approximately $8.2 million

    c. Big Cypress (mobile home relocation): approximately $3.2 million

    d. Lakeland: STOF will provide a computation for this sub-category of damages in supplemental initial disclosures following additional investigation and analysis.

4. Damages from the costs of establishing, administering, and operating a medical monitoring program: approximately $25 million

5. Damages from healthcare costs: approximately $115 million

6. Attorneys' fees and costs

    a. Because the CDA contains a prevailing party fee and cost provision, and because fees and costs are continuing to be incurred as this litigation proceeds, fees and costs will be determined in post-trial proceedings, so a computation is not required by Rule 1.280(a) at this time.

7. Prejudgment interest

    a. Prejudgment interest will be determined in post-trial proceedings, so a computation is not required by Rule 1.280(a) at this time.

**(D) a copy of any insurance policy or agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

1. None.

CASE NO.: CACE 25-003574

*Respectfully submitted September 17, 2025.*

By: *s/ Adam Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280
adam@moskowitz-law.com
Joseph M. Kaye
Florida Bar No. 117520
joseph@moskowitz-law.com
Leo A. Wiesinger
Florida Bar No. 1058780
leo@moskowitz-law.com
**THE MOSKOWITZ LAW FIRM PLLC**
*Co-Counsel for Plaintiff*
P.O. Box 653409
Miami, FL 33175
Office: (305) 740-1423
Direct: (786) 309-9561
http://www.moskowitz-law.com

**SMITH CURRIE OLES LLP**
*Co-Counsel for Plaintiff*
101 Northeast Third Avenue
Suite 1910
Tel: (954) 761-8700 | Fax: (954) 524-6927
Joseph R. Young, Esq.
Florida Bar No. 92168
Email: jryoung@smithcurrie.com
Secondary: lcherubin@smithcurrie.com

**CONRAD & SCHERER, LLP**
*Counsel for Plaintiff*
614 South Federal Highway
Fort Lauderdale, Florida 33301
Tel: (954) 738-8335 | Fax: (954) 463-9244
By: */s/ William R. Scherer*
    William R. Scherer, Esq.
    Florida Bar No.: 169454
    wscherer@conradscherer.com
EService: EKreiling@conradscherer.com
            JLira@conradscherer.com
            eservice@conradscherer.com

**LEVINE KELLOGG LEHMAN
SCHNEIDER& GROSSMAN LLP**
*Co-Counsel for Plaintiff*
100 Southeast Second Street
Miami Tower, 36th Floor
Miami, Florida 33131
Tel: (305) 403-8788 | Fax: (305) 403-8789
Jason K. Kellogg P.A.
Florida Bar No. 0578401
Email: jk@lklsg.com
Secondary: ame@lklsg.com

**SCOTT N. GELFAND, P.A.**
*Co-Counsel for Plaintiff*
1073 Hillsboro Mile
Suite 6-N
Hillsboro Beach, FL 33062
Tel: (954) 255-7900
Fax: (954) 255-7905
Florida Bar. No. 0538711
Email: scott@gelfandpa.com
Secondary Email: daniela@gelfandpa.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 17, 2025, a true and correct copy of the

foregoing was served on counsel for Defendant Lennar Homes, LLC via email.

By: */s/ Adam Moskowitz*

9

# EXHIBIT C

Page 1

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT

IN AND FOR BROWARD COUNTY, FLORIDA

_____

SEMINOLE TRIBE OF FLORIDA, for

Itself and for the Benefit of

its Tribal Members,

      Plaintiff,

  v.                          Case No.

LENNAR HOMES, LLC,              CACE 25-003574

      Defendant.

_____

HEARING

DATE:         Tuesday, October 21, 2025

TIME:         1:32 p.m.

BEFORE:      Honorable Judge David A. Haimes

LOCATION:    Broward County Courthouse

              201 Southeast 6th Street

              Courtroom 17150

              Fort Lauderdale, FL 33301

REPORTED BY:  Judy L. Brown

JOB NO.:     7666334

Page 2

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF SEMINOLE TRIBE OF FLORIDA:

    ADAM M. MOSKOWITZ, ESQUIRE

    JOSEPH M. KAYE, ESQUIRE

    HOWARD "HOWIE" M. BUSHMAN, ESQUIRE

    The Moskowitz Law Firm

    P.O. Box 653409

    Miami, FL 33265

    adam@moskowitz-law.com

    joseph@moskowitz-law.com

    howard@moskowitz-law.com

    (305) 740-1423

    JOSEPH R. YOUNG, ESQUIRE

    Smith Currie Oles LLP

    101 Northeast 3rd Avenue, Suite 1910

    Fort Lauderdale, FL 33301

    jryoung@smithcurrie.com

    (954) 761-8700

Page 3

A P P E A R A N C E S (Cont'd)

ON BEHALF OF PLAINTIFF SEMINOLE TRIBE OF FLORIDA:

ELIZABETH A. SCHERER, ESQUIRE

Conrad & Scherer

614 South Federal Highway

Fort Lauderdale, FL 33301

escherer@conradscherer.com

(954) 462-5500

JASON K. KELLOGG, ESQUIRE

Levine Kellogg Lehman Schneider & Grossman, LLP

100 Southeast 2nd Street, Floor 36

Miami, FL 33131

jk@lklsg.com

305-403-8788

SCOTT GELFAND, ESQUIRE

Scott N. Gelfand, P.A.

1073 Hillsboro Mile, Apartment 6N

Hillsboro Beach, FL 33062

scott@gelfandpa.com

(954) 255-7900

Page 4

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANT LENNAR HOMES, LLC:

    BENJAMIN J. WIDLANSKI, ESQUIRE

    HARLEY S. TROPIN, ESQUIRE

    KATHERINE A. MITCHELL, ESQUIRE

    Kozyak Tropin & Throckmorton, LLP

    2525 Ponce de Leon Boulevard, Floor 9

    Coral Gables, FL 33134

    bwidlanski@kttlaw.com

    hst@kttlaw.com

    kmitchell@kttlaw.com

    (305) 372-1800

    CHARLES DAVID HARPER, ESQUIRE

    CRYSTAL B. CARSWELL, ESQUIRE

    Foley & Lardner, LLP

    P.O. Box 3391

    Tampa, FL 33601

    charper@foley.com

    ccarswell@foley.com

    (813) 229-2300

    (305) 482-8437

Page 5

A P P E A R A N C E S (Cont'd)

ALSO PRESENT:

Barbara Perez, Plaintiff's Counsel, Observing

Farola Saint-Remy, Paralegal, Kozyak Tropin &

Throckmorton, LLP (by videoconference)

Brian Cummins, Champion Legal Graphics and Video,

LLC

Tina Osceola, Representative of Seminole Tribe of

Florida

Page 6

E X H I B I T S

NO.             DESCRIPTION                    ID/EVD

(None marked.)

P R O C E E D I N G S

THE COURT:  All right.  We're on the record of case CACE 25-3574.  It's Seminole Tribe of Florida vs. Lennar Homes, LLC.  Can I get appearances? Let me start with the plaintiff.

MR. MOSKOWITZ:  Good afternoon, Your Honor.  On behalf of the plaintiff; Adam Moskowitz. And with me here are my partners, Joey Kaye, and Howie Bushman, and Barbara Perez.  And I'm going to apologize for Mr. Scherer.  As you know, he's at his opioid trial that's going on now --

THE COURT:  Right upstairs.

MR. MOSKOWITZ:  -- and you'll meet some people from his firm that are here.

THE COURT:  Okay.

MR. YOUNG:  Good afternoon, Your Honor. Joseph Young, from Smith Currie; on behalf of the Tribe.

THE COURT:  All right.  Morning [sic], Mr. Young.

Let me get -- there's a few names I don't have on here, so I think you all probably came a little bit later, but okay.  All right, Mr. Young. And -- all right.

MS. SCHERER:  Hi, Judge.  Liz Scherer;

Page 8

for the Tribe.

THE COURT:  All right.  Good morning, Ms. Scherer.

MR. KELLOGG:  Good afternoon, Judge. Jason Kellogg, with Levine Kellogg; on behalf of the Seminole Tribe.

THE COURT:  Yeah, they were on -- okay. Good afternoon, Mr. Kellogg.

MR. GELFAND:  Good afternoon.  Scott Gelfand; on behalf of the Tribe as well.

THE COURT:  All right.  Good afternoon, Mr. Gelfand.

All right.  I think that's everybody; right, over here?

All right.  Can I get appearances on behalf of the defense?

MR. WIDLANSKI:  Good afternoon, Your Honor.  Ben Widlanski, Harley Tropin, Katherine Mitchell, from Kozyak Tropin; on behalf of Lennar. With us is our superstar paralegal, Farola Saint-Remy.

Co-counsel?

THE COURT:  All right.  Good afternoon, Mr. Widlanski, Ms. Mitchell, and Mr. Tropin.

MR. HARPER:  Hello, Judge.  David Harper; with Foley & Lardner.  To my right is Crystal

Page 9

Carswell, also with Foley & Lardner.

THE COURT:  All right.  Good afternoon, Mr. Harper and Ms. Carswell.

MS. CARSWELL:  Good afternoon.

THE COURT:  I can't remember the last time I've heard Foley & Lardner.  Y'all are from the Midwest; right?

MR. HARPER:  Correct.

THE COURT:  Cleveland?

MR. HARPER:  Milwaukee.

THE COURT:  Or Milwaukee, okay.

MR. HARPER:  Yes.

THE COURT:  I see.  All right.  We are here for Lennar's motion to compel arbitration.  I know there was also a motion for judicial notice.

There's kind of a little side issue, but I'm not really sure that's much of an issue; right?  Because I know everybody agrees those documents are admissible.  I'm not sure -- the Court taking judicial notice of those documents or if they're coming in as documents or whatnot, I don't know if it really makes a difference.  Is there any difference if it's judicial notice or if they're just admitted as documents which you stipulate to?

MR. WIDLANSKI:  Your Honor, from the

Page 10

defendant's perspective, there is -- we're not, you know, obviously we can argue about the legal -- the legal importance of them, but we see no reason why there needs to be judicial notice.

THE COURT:  And is that agreed, Mr. Moskowitz?

MR. MOSKOWITZ:  Yes, Your Honor.  We're ready to begin.

THE COURT:  All right.  So we'll just jump right into the motion to compel arbitration.  How do you want me to do this?  You want me to give you a time limit and then you -- reserve time or -- I have the rest of the afternoon so we're not on a time crunch.

MR. WIDLANSKI:  Your Honor, given that it sounds like we're all in agreement that these documents are coming in, I think we can make a presentation, no more than 45 minutes or so.  And then Mr. Moskowitz can take the presentation over, because we don't need to -- I don't think we need to put a witness on if we're -- reading the documents.

THE COURT:  Okay.

And then I take it you want some time for a rebuttal?

MR. WIDLANSKI:  That would be

Page 11

wonderful, Your Honor.

THE COURT:  Okay.  All right.

MR. MOSKOWITZ:  But, Your Honor, I will state this -- and I think Ben just clarified something maybe.  We don't need to take judicial notice, obviously, of resolutions, et cetera.  But I'm -- presume that they've called the witness here.  This is an evidentiary hearing.

So if they're going to present a witness, we do think that's different than the Tribe's resolutions.  And that's why in our disagreement we said you can't take judicial notice of a affidavit. We presume you're calling that witness, and we'll have a chance to cross-examine her if we'd like to so --

THE COURT:  All right.

MR. MOSKOWITZ:  -- with that said --

THE COURT:  For what reason would you need that?  I mean, at the end of the day, this is -- it's a contract; right?  They're relying on the contracts, and you're saying that the contracts don't apply; that it's a different contract that has no arbitration provision.

MR. MOSKOWITZ:  Right.  I have no idea what this witness is going to testify --

THE COURT:  It seems like it's all a

Page 12

legal argument. I don't -- is there any -- I don't know if there's any factual dispute that the Court has to resolve. I think this is going to be mostly legal.

MR. MOSKOWITZ: We agree with you, Your Honor. There is no factual issue here at all.

MR. WIDLANSKI: Yeah, Judge, we don't need the affidavit. The documents are the documents. That's what we're talking about.

THE COURT: That would be my understanding so --

MR. MOSKOWITZ: Great. That's perfect for us.

THE COURT: So as long as there's no factual dispute that the Court has to make some kind of factual findings, I don't see the need for witnesses. And documents are all -- if you want them in evidence, you want them judicially noticed, whatever it is, you can argue them. All right?

MR. MOSKOWITZ: Thank you, Your Honor.

THE COURT: So on behalf of the defense, did you want to -- first of all, did you have a --

MR. WIDLANSKI: We have a PowerPoint for Your Honor.

THE COURT: Okay. That's what I

Page 13

figured.  So which -- where are you plugged in?

MR. WIDLANSKI:  Right here, Judge.

THE COURT:  All right.

MR. WIDLANSKI:  And I believe Mr. Moskowitz is also going to do a slide presentation.

THE COURT:  Yeah, I can switch it over to you after so --

MR. WIDLANSKI:  I have a courtesy copy.

THE COURT:  All right.  That would be great.

MR. WIDLANSKI:  -- also provide a courtesy copy.

MR. MOSKOWITZ:  Maybe, if it'll be just logistics, after Ben is done, if we can maybe take a five-minute break, we'll switch over the things, and get things in order?

THE COURT:  Okay.

MR. MOSKOWITZ:  Thank you, Your Honor.

MR. WIDLANSKI:  All right.

THE COURT:  Oh, gosh.  You had people appearing by Zoom; correct?

MS. CARSWELL:  Yes.

THE COURT:  I mean, there's a lot of people in here, but I -- well, let me pull up the Zoom first.

Page 14

MR. WIDLANSKI:  Adam, when that turns on, can you see if it's working?  Otherwise, we'll turn this around.

MR. MOSKOWITZ:  Okay.

MR. WIDLANSKI:  Just let me know if it turns on.

MR. MOSKOWITZ:  Or this one; right?

MR. WIDLANSKI:  I think it makes more sense for this one so that we're looking at the Court.

MR. MOSKOWITZ:  Aren't all the monitors going to turn on?

MR. WIDLANSKI:  I don't know if that one's going to turn on or --

THE COURT:  Yeah --

MR. MOSKOWITZ:  Okay.  Let's see.

THE COURT:  Unfortunately, the cart -- the electronic cart, that monitor is not hooked up to all the other monitors.  It's, kind of, a spare one.

MR. WIDLANSKI:  We'll turn this one on, and we can use this, both of --

MR. MOSKOWITZ:  Both of us.  Yeah, that sounds great.

MR. WIDLANSKI:  Judge, you don't need this one; right?

THE COURT:  No.

Page 15

MR. MOSKOWITZ:  Are we going to be able to see that on these too?

MR. WIDLANSKI:  I think you guys will be up there.

THE COURT:  Yeah.  Why don't you put it -- pull it up first just to make sure, because we were having a problem with the monitors earlier.  I'm not sure what they did to fix it, but it was working.  It wasn't working this morning, then it was working, and I don't -- here, let me just see if it is working.

Yeah, it's working.  So right now, it's hooked up to my computer.  But here, let me do this real quick so you all know who's on Zoom.

All right.  Good afternoon to everybody on Zoom.  I apologize, I forgot to pull up the Zoom. We have a whole courtroom full of people.  And I'm going to go ahead and switch the camera around in a second so you can see everybody -- that everyone on Zoom can see everybody in the courtroom.

But I've got all the appearances from the attorneys here in the courtroom, and there's been a stipulation that the documents that were the subject of a judicial notice, they're all in evidence or they're all being judicial noticed.  And everyone agrees there's no factual disputes to be resolved so

Page 16

this is going to be a legal argument, essentially.

Are there any appearances you need me to take from anybody on Zoom?

MR. MOSKOWITZ:  No, Your Honor.

THE COURT:  Not for the plaintiff?

How about from the defense?  Is there anybody on Zoom that I would need to take an appearance from?

MR. WIDLANSKI:  No, Your Honor.

THE COURT:  So they're all just observers.  All right.  So let me do this so they're not looking at me the whole time.  I am going to put on the bridge camera so -- yeah, I think that's going to rotate around.  But anyway, they can look at the courtroom so -- all right.

With that, are you hooked up now?

MR. WIDLANSKI:  Yes, Judge.

THE COURT:  Yeah.  You know what? "Video out."

MR. WIDLANSKI:  Do you want help, Brian?

MR. CUMMINS:  Do you want to unplug and plug it back in?

MS. CARSWELL:  Oh, something just happened.

Page 17

THE COURT:  Yeah, actually, I just -- I want to do something here, because that camera's now, like, rotating around.

MR. CUMMINS:  No charge.

THE COURT:  Okay.

MR. WIDLANSKI:  Is it showing up on yours, Judge?

THE COURT:  Yes, it is.  All right.  Gallery.  Oh, gosh.  You know what?  Let me do this.

MR. WIDLANSKI:  Turn it on and off.

THE COURT:  All right.  They're just going to be listening.

All right.  On Zoom, you're going to have to just listen then.

All right.  So you turned yours off; right?  The --

MR. WIDLANSKI:  The screen just went black.

THE COURT:  Yeah, that's definitely something on your end.

MR. WIDLANSKI:  It was showing up before, Judge.  There we go.  It's on --

MS. CARSWELL:  Yes.

THE COURT:  Okay.  It's definitely your input there.  There it goes.  Now it's up.  Okay.

Page 18

All right.  And if you wanted people on Zoom to be able to see what's on screen, I would have to share screen and you'd also have to go in, but I don't think you need to worry about that; correct?

MR. MOSKOWITZ:  That's -- I don't think so, Your Honor.

THE COURT:  Okay.

MR. WIDLANSKI:  Yeah, I think we're good on that, Judge.

THE COURT:  All right.  So they're just going to be listening, who's on Zoom.  And I think there's somebody else there as well.  Okay.

UNIDENTIFIED SPEAKER:  [No audible response.]

THE COURT:  What's that?

UNIDENTIFIED SPEAKER:  [No audible response.]

THE COURT:  Yeah, you can keep track, but I -- they'll have as much time as they need, so I'm not too worried.  But yeah, just so I have a general idea though.

Okay.  All right.  We are here on your motion to compel arbitration.  You may proceed.

MR. WIDLANSKI:  May it please the Court, Your Honor, Lennar's motion to compel

Page 19

arbitration should be granted because as the amended complaint makes clear, their amended complaint, this entire case is about defects and any resulting damages from those defects in completed homes.  And these completed homes are covered by a limited warranty, a warranty that the Tribe not only agreed to, it is actively suing under in this case.

And that limited warranty, as Your Honor can see on the screen in front of you, on the first page -- that's the one on the left -- has big, bold letters that say "this is a binding arbitration agreement."  And further in, the document itself has an entire dispute resolution provision that says "there is a mandatory arbitration agreement."  And, Your Honor, we know that courts around the country, particularly in Florida, give great deference to the agreements of the parties as to arbitration.

The warranty, in addition to being provided at every single home in closing and being accepted by the Tribe, was also specifically referred to and contemplated by the community development agreement.  That's the CDA, and imagine you're going to hear those acronym -- that acronym a bunch today.

The CDA governed the pre-closing construction process.  The Tribe's general counsel

Page 20

reviewed and approved the CDA and all the attachments to it -- that's in their resolution; you will also see that -- which includes the warranty.  So the warranty and the arbitration provision that it contains controls the disputes of post-closing homes.

This also, by the way, disposes of the Tribe's effort to evade the arbitration provision through their sovereign immunity argument.  Because in addition to the fact that they initiated this litigation, and thus sovereign immunity doesn't really even apply, the Tribe itself also approved the CDA, and it approved the exhibits to the CDA, which include the warranty.  And thus, they've waived any argument they might have had about sovereign immunity.

Now, Judge, when they attach the CDA to the complaint in this case, the amended complaint, they didn't attach the warranty, even though it is an exhibit to the CDA, and even though it was expressly identified within the body of the CDA.  And importantly, even though they are suing for breach of express warranty, they're making numerous allegations throughout the document, throughout their amended complaint, about the warranty, citing verbatim, in fact, to the warranty in paragraph 90 of their complaint.

Page 21

But, Judge, you don't just get to, sort of, not attach it, and ignore it, and pretend it doesn't exist if you don't like the language.  You have to read all of the provisions of the contracts.  You have to harmonize those provisions.  That's what the Tribe asks you to do.  And you do have to do that, as opposed to just, sort of, eliminating, ignoring the pieces of the contracts that you -- maybe you don't like as much.

Judge, once the Tribe began this suit, expressly premised on the warranty claims associated with post-closing homes, they don't get to pick and choose which provisions from that warranty they want to enforce.  It has to live -- the Tribe has to live with the entirety of the contract, including the arbitration clause.

Now, we cited a wealth of case law in our papers on this, including Judge Moreno's well reasoned opinion in the Seminole Tribe vs. Raymond James case, and including United States Supreme Court law on this point.  If this was a pre-closing dispute, Judge, there would be no arbitration arguments.  The CDA would govern completely, and we wouldn't be here.  But it's not that.  This is a post-closing dispute, and it's governed by the terms of the warranty.

Page 22

Now, let me pause on that for just a second, because at root, that's why we're here; right? The CDA governs pre-closing disputes under the CDA --

THE COURT:  There was no warranty pre-closing; correct?

MR. WIDLANSKI:  No warranty pre-closing.  And the CDA cases are to be brought in the state court in Broward.  But once the closing takes place, the CDA is no longer the contract at issue.  Closing occurs, the property is transferred, and the warranty controls, and the warranty has an arbitration agreement.

The agreements of the parties, clear public policy, and the overwhelming weight of case law make this undeniable.  Judge, we're going to establish in this presentation, and we already have established in our papers, why arbitration is required.  And that's because the claims are based on alleged construction defects.  And those defects are governed by contracts the Tribe negotiated and approved.

And finally, we will discuss why sovereign immunity is not implicated and why they've waived any arguments in support of it.  What is this course -- what is this case about?  What is this case about, Judge?  It's about post-closing homes; homes

Page 23

that were built, constructed, and sold to either the Tribe or its individual members.

Now, the Tribe concedes, at length, in the amended complaint, that this case is about all of the homes already built.  Already built; past tense, all of the homes.  Now, I got to take a moment again to pause and provide some clarity on this, because the amended complaint, I think, kind of muddies the waters, perhaps intentionally, maybe unintentionally.  It does make it a little murky.

Lennar built two separate groups of homes here; there were the member homes, the homes that they built and sold directly to Seminole Tribe members, and there were the lease pool homes that were sold to the Tribe, and then the Tribe leased it to its members.  All of those collectively were built under the CDA.  And "lease pool" and "member pool" are terms that you've probably seen in our papers.

Why is that important?  That's important, Judge, because in the member pool closing process -- and you've seen this in our attachments and I'm going to talk about it more -- but in the member purchase agreements, there is additionally another arbitration clause separate from the warranty.  And that purchase agreement also has the big, bold letters

Page 24

with the same incredibly broad arbitration provision. It also has the warranty attached to it; right?  So the warranty governs all the homes; lease pool, member pool alike.  The member purchase agreement only governs the member-purchased homes.

Now, I don't think you're going to hear any dispute about anything I've said so far, by the way, from the Tribe either.  It's not in their response, it's their complaint we're talking about, so I don't think they're going to dispute this.  And I think if you look at page 1 of their complaint, paragraph 1, that's why they say in the opening line, "this lawsuit is between two named parties, the Tribe and Lennar."  They want to ignore the member home agreements because they want to ignore the provisions in that contract.

It's all artful pleading; right? Unfortunately, it's not completely effective because if you look elsewhere in the complaint, like, I don't know, a couple paragraphs later, in paragraph 9, they specifically say that they are suing for damages in all tribal-owned and member-owned units.  It's right there in their complaint.

So the member home purchase agreement is implicated, and the arbitration clause therein is

Page 25

implicated.  But we are getting a little bit before -- ahead of ourselves.  Let's go back to the complaint again and talk about paragraph 8, where it says that the Tribe owns almost all the homes that Lennar built before it was terminated from the project before it was terminated from the CDA, and that it seeks a recovery of damages incurred to all units.

So these two paragraphs, 8 and 9, that are on the screen right now, Judge, there are a couple important things to take away from it.  One, the Lennar is being sued by the Tribe for all the homes they built; member homes, tribal-owned alike.  Second, it is for post-closing issues after the homes were transferred.  That is the root of this dispute.

Now, I could take you, Judge -- and I'm sure you've been -- through the entirety of this amended complaint, and you would see a litany of allegations very similar to the ones I've just described.  I'm not going to do that.  It's a waste of your time; it's a waste of our time.  But the Tribe is suing for defects in completed homes, the damages related to those defects, and they're suing for damages in member pool homes and lease pool homes.

Let's go back to paragraph 105 again.  This nicely sums up the point; right?  "All of the

Page 26

homes already built, according to the Tribe, have construction defects." Couldn't be much clearer than that. That's pretty clear; right? But, of course, we're lawyers so we always have to go above and beyond. We always have to, sort of, belt-and-suspenders everything we can, and the Tribe does that.

If we go to paragraph 171, you'll see that in 171, the Tribe repeats the word "all" of the units, "all the units." And then, they helpfully define it with an exhibit, Exhibit 2. Now, Exhibit 2 -- and this, by the way, this is a representative. This is not the entirety of Exhibit 2. Exhibit 2 had hundreds and hundreds of homes.

But in Exhibit 2, which is attached to their amended complaint, which they say they are suing for damages associated with these homes, we've highlighted, Judge, just on these few rows, these three columns, homes that are member pool homes. They've attached this as their exhibit to their complaint. They're suing for member home damages.

And that, Judge, brings me to the third thing that is obvious about their complaint from the face of their complaint, and that's that they're suing about warranties; right? Paragraph 89 says that

Page 27

"Lennar was required to provide the same warranty for homes ultimately purchased by members as it was to the Tribe itself."

Now, Judge, if you go to one paragraph later, paragraph 90, this lays out a list of things that the Tribe says the warranty covers.  Where did they get these language from?  Where did they get these 21 different things?  Judge, as I'm going to show you later, this is from the warranty itself.  This is from the warranty.  They're suing under the warranty.  And, Judge, that warranty has an arbitration clause, broad as day, bold as life.

Let's take a look at paragraphs 115 and 121.  Again, we're in their complaint.  We're operating within their complaint right now.  Paragraphs 115 and 121.  What do they say?  That "Lennar systematically violated for all the residences these warranties in contract"; it's their language, Judge.  It's a contract that they are suing under.

But again, we're lawyers.  Nothing subtle about what we do; right?  And if you go to the counts of the complaint, count 4; what is it?  It's a breach of express warranty.  Express warranty.  They are pleading it.

And if you look at paragraph 220 within

Page 28

their complaint, their amended complaint, the one that they tried to tailor to avoid being subject to arbitration, it says: "Lennar provided STOF," that's the Seminole Tribe of Florida, "with a home warranty consistent with the warranty provided by Lennar. The customer is outside tribal residential lands." This is a count within their complaint.

Now, it's not just the breach of warranty claim; right, that is -- they're suing under, they've got a bunch of counts. But every single claim in their amended complaint is premised on the defects associated with completed homes and damages thereto. And those warranty claim -- those warranty provisions, the arbitration provisions within the warranty and the member home agreements, they are broad. They cover all disputes, any disputes.

I don't think the Tribe can dispute this, Judge. I don't think there's any factual disagreement between what I've said and what's in their complaint because it's their complaint. And while they try to suggest that this is a dispute solely under the CDA, between the Tribe and Lennar, Judge, a cursory glance through the amended complaint, like we've done so far, betrays that position, puts it to lie.

Page 29

And even if you take the words they say and give them full effect; right?  The Court has an obligation to look at the gravamen of the claim and the relief the Tribe is seeking.  That's the Cornerstone case from the 5th DCA.  And, Judge, it's directly on point.

Now, with the exception of this case cite that's on the screen in front of you right now, everything you've seen, all of those sections of the complaint are from their complaint; right?  This is their language, their pleading.  It's their warranty claims that they've been making.  But I'd like to go a little beyond just their complaint, and I want to talk about some of the other documents at issue.

So to be clear, the Tribe passed a resolution; right?  They passed a resolution, a number of resolutions, in fact, approving the post-closing documents, which include the warranty, and the CDA, and it includes the member home purchase agreement.

The CDA was attached.  The member home purchase agreements were attached to the CDA, and the warranties were attached to the member home purchase agreements.  And there are signed acknowledgements from the Tribe that they read, understood, and signed the warranty provisions.

Page 30

So let's start with resolution 57 -- 55.7.19.  "The resolution -- this resolution supports the parties' understanding that subsequent purchase agreements," which would be warranties, member home purchase agreements, bills of sale, "will be reviewed, negotiated, and approved by the tribal general counsel's office, all for review and approval by the general counsel's office of the Tribe."

Those documents are subject -- the approval of the CDA was subject to the subsequent receipt of those agreements.  And they were drafted under the auspices of the general counsel's office. Judge, this is their resolution.

Now, these are sophisticated parties doing a large deal.  This isn't a commercial transaction where you buy something online and are bound at click -- there are contracts.  There's language in these documents that is negotiated between the parties.  And importantly, in resolution 55.7.19, it says that "the general counsel's office negotiated, and approved, and accepted the CDA and its exhibits."

Now, one of the exhibits, Exhibit H to the CDA, was the purchase agreement for the member homes.  And within the purchase agreement for the member homes, there's a reference to Exhibit C.  What

Page 31

is Exhibit C?  Exhibit C is the Lennar limited warranty.

We looked at this before, Judge; great big, bold letters right at the beginning.  This is a document that was approved by the Tribe and accepted by the Tribe at closing.  And again, you don't have to take my word for it, Judge, it's in their complaint; right?  This is what they say, that Lennar was required to provide the warranties for homes.

Now, we've been talking a lot about the CDA.  We haven't looked at it yet, so let's look at it.  The CDA, as set forth in the resolution, was premised on the receipt and approval of these post-closing documents, which include the mandatory arbitration provisions in the warranty and the member home agreements.  And they've -- I've showed you the pieces of their complaint where they've acknowledged that they received the warranties, that they were the same.  I've showed you those.

And we talked about this a little bit at the beginning of the presentation, Judge, but it's worth spending some more time on it now.  The CDA, essentially, was a large planning document.  It was designed and negotiated to govern the pre-closing processes associated with this very large deal between

Page 32

Lennar and the Tribe.  But even as the CDA spells out, it never -- it doesn't speak to post-closing disputes.

The CDA has a dispute resolution provision.  It talks about defaults; right?  And what does it say?  There are remedies for defaults.  And some of those remedies include assigning the ongoing construction or finishing it.  "And upon completion and closing of said homes," last line here that's highlighted, "this agreement shall terminate and neither party shall have any further liability"; this agreement, the CDA.

Now, while we're at this section of the CDA, Judge, I just want to knock out one of the two arguments, one of the only two arguments raised by the Tribe in their response, and that's that the CDA expressly prohibits arbitrations.  And it's a couple paragraphs after this in the CDA; it's 13.04.  So let's look at it quickly, and then we can move on because I don't think this is a particularly serious argument.

Judge, it's important to read this provision that they cite to, and read for what it is and what it's not.  "Nothing in this agreement," in the CDA, "nothing in this agreement shall be deemed or construed to constitute consent on the part of the

Page 33

Tribe or the builder to arbitrate."  But a provision that says we're not agreeing to arbitrate here is not the same thing as a provision that says we're never going to agree, we never will.  This speaks to this document, the pre-closing document.

It doesn't have anything to say about the contemplated documents in this document, the contemplated post-closing documents, the member home purchase agreement and the warranties.  And this doesn't conflict in any way, shape, or form with the member home purchase agreements or the warranties.  You can read that and this together, harmoniously, which is the law.  That's the law cited to you by the Tribe, and we adopt that law.  You are supposed to read the provisions of contracts harmoniously.

Only my reading, only my suggested reading to you, Judge, allows you to do that; allows you to take the CDA, and the member home purchase agreements, and the warranties together and read them at the same time.  They want you to just ignore parts of the member home purchase agreements and the warranties that were negotiated and that were approved.

So I think we can, sort of, move on because I don't think there's anything more to say

Page 34

about that argument.  Now, the CDA does also set forth the processes for subsequent contracts and transactions like we've talked about.  That's the closes; right?  When you build a home, you turn it over to the purchaser, and you close.  And it says, in section 9.01 A and 9.01 B, what happens for the lease pool homes and the member homes.  It talks about them, Judge.  And there are warranties contemplated in this document, already proved.  And as we've talked about and as you've seen, Judge, the Tribe did in fact close and they did in fact accept those closes.

But before we talk about that, let's talk about the member home purchase agreement.  This is the member home purchase agreement, Judge.  The member home purchase agreement -- remember, that's Exhibit H to the CDA -- also has a specific mandatory arbitration provision separate from the warranty; right?  Separate from the warranty, within the member home purchase agreement, there is also an arbitration provision; very broad.

"Any dispute claim or controversy," bolded provision, whether contract warranty, tort, statutory, or otherwise, any and all controversies arising under or related to this agreement, the member home purchase agreement; right?  Not the CDA; this

Page 35

agreement.  The construction of the home; this is broad.

And it wasn't just within the body here; right?  It was also in a warranty.  And the warranty was an exhibit to the member home purchase agreement, Exhibit C to Exhibit H.  And that warranty, Judge, was provided to every single purchaser at home at issue in this case, individual members and the Tribe itself.

We know that because the resolution stated it, because the CDA said it, because the complaint -- the amended complaint says it.  They say it; paragraph 220.  "Lennar provided the Tribe with a home warranty."  Paragraph 89, section 9.01 C required Lennar to provide the same warranty for homes as it did for the member homes and the lease pool homes.

Now, earlier, we talked about how the Tribe actually quoted the warranty language in paragraph 90 of it's complaint.  Where did we get that from?  Where did they get that from?  Well, the warranty itself has a nearly identical arbitration provision to that member home purchase agreement has.  It's a very broad provision, but beyond this, it goes farther; right?  The warranty goes beyond just this broad arbitration provision.

Page 36

At -- and this is at pages 14 through 55, Judge, of Exhibit B to our motion to compel.  It begins there at -- on the right side of our screen, and continues.  And if you compare that chart, starting at pages 14, to their complaint, paragraph 90, you'll see that it's almost identical.  They are suing under the contract.

There is no question about it.  And there's -- there can be no serious argument that they aren't taking this seriously; right?  They're -- this is in -- they're citing.  They think it's important enough to cite in their complaint.

Now, notably, Judge, neither the member home purchase agreement nor the warranty, as we mentioned, was attached to the complaint, the amended complaint.  But just because they didn't attach it, Judge, doesn't mean they aren't suing under it; right?  It doesn't mean they aren't bound by it.  They want to bind Lennar to the warranty; they have to also be bound by it.

So, so far, where are we?  The resolution that set forth these purchase agreements was negotiated and approved by the Tribe, approval of the CDA's condition upon it.  The resolution also sets forth that the CDA and all its exhibits are approved.

Page 37

One of those exhibits is Exhibit H.  That's the member home purchase agreement, which has, itself, a binding arbitration clause and applies to about 100 homes at issue here.

Separately, attached to that is the form warranty, Exhibit C, which applies to all of the homes; not just the member home purchase agreements.  And finally, the CDA, as approved by the resolution, sets forth the proceedings for each subsequent purchase agreement, the closings, which specifically require that the purchasers receive the warranty, whether it's a tribal member or the Tribe itself.

Judge, we could stop here and we'd win.  But let's keep going.  The amended complaint admits -- it admits that the Tribe received the warranty; not only received it, it required it.  Now, though they've, sort of, kind of, tried to subtly say that they're not bound by it, or that it was a secret, or something like that.  I don't know how you can say that, given the language in the complaint.

Everything that we've showed you, Judge, was mandated.  It was in the resolutions in the CDA, and they quoted from it, and they're suing under it.  It required general counsel approval.

And of course, they signed

Page 38

acknowledgements at closing; right?  Saying that they accepted the warranty; they read and understood the limited warranty.  And this is in our, you know, you've got a copy of this attached, Judge.  They don't dispute it.  It's not in their response that they dispute it.  It -- I don't think they can dispute it.

So from the beginning to the end, we've got these documents; right, that all talk about closing and they all talk about what happens at closing.  And the closing documents all talk about arbitration.  At every single step, the Tribe is aware of, approved, received, and was bound by these provisions, Judge.

I mean, they quote it.  They're suing under it, and they quote it.  So what do they say in response?  Well, their response focuses basically on two arguments.  The first is a sovereign immunity argument, and the second is that the CDA has that express provision -- prohibition on arbitration.  Now, we've already dealt with the second argument, so we don't need to talk about it again.

I don't know that we really need to spend that much time on the sovereign immunity argument either.  They don't deny that the warranty applies to every single home at issue.

Page 39

THE COURT:  All right.  Do you want to let them make their argument, and then save time to reply to their argument?  Or do you want to make their argument for them and then respond to it?  I know they filed their response and whatnot, but sometimes it's awkward when you get up there and you start when they haven't even given their presentation yet.

MR. WIDLANSKI:  Whatever, Your Honor prefers.

THE COURT:  Probably easier; let's hear what they have to say first.

MR. WIDLANSKI:  Okay.

THE COURT:  All right?

MR. WIDLANSKI:  Happy to.

THE COURT:  So anything further then?

MR. WIDLANSKI:  Yeah, I'll just say one final point --

THE COURT:  Okay.

MR. WIDLANSKI:  -- and then I'll respond to respond to them on this, Judge.

Judge, the -- what the Tribe is doing here, right, is they are saying to Your Honor, there are these aggressive claims of defects and damages associated with the defects in completed homes that they are suing under the warranties; right?

Page 40

Aggressive claims.  But what they're doing is, while on the one hand saying, we're suing Lennar for a breach of contract, breach of express warranty, quoting that express warranty in their complaint, they are simultaneously saying that, you know, it's not important.  You can ignore the piece of the arbitration clause; you can ignore the piece of the contract that we don't like.

You can just ignore it, Judge.  That's not how contract law works.  That's not how any of the law works.  It cannot be how the law works, Judge, and you must reject that out of hand.

So I'll reserve my response on the sovereign immunity until after they speak.  Thank you, Judge.

THE COURT:  All right.  And we'll take five minutes, you said?

MR. MOSKOWITZ:  Yes, Your Honor.

THE COURT:  All right.  Let me switch this over and make sure that you're good before I -- let me -- just hang on one second.

MR. MOSKOWITZ:  And I can share the screen on Zoom if it's --

THE COURT:  Yeah, I've enabled.  Did you want to see if it pulls up or do you want -- okay.

Page 41

Yeah, I think you're good.

All right.  Let's take a five-minute -- why don't we take a ten-minute break?  We'll come back and then --

MR. MOSKOWITZ:  Perfect, Your Honor.

(Off the record.)

THE COURT:  We are back on the record of case CACE 25-3574 Seminole Tribe of Florida vs. Lennar Homes, LLC.  Let the record reflect the attorneys are all present still.  And I don't know if -- are any of your client reps here?  They're all probably here as well; right, but you just don't need appearances for them.

All right.  So we are now onto Plaintiff's argument/response.  Did you have a courtesy copy, or no?

MR. MOSKOWITZ:  I don't have it yet, because I'm not sure exactly which slides I'm going use.

THE COURT:  Okay.

MR. MOSKOWITZ:  But when I do, when we're finished, we'll give the Court a courtesy copy, and of course we'll give --

THE COURT:  Okay.  All right.

MR. MOSKOWITZ:  -- to the defense.

Page 42

THE COURT:  All right.  So let me slide over here so I have a better view of the monitor.

UNIDENTIFIED SPEAKER:  [No audible response.]

THE COURT:  They're 45, so -- yeah.

MR. MOSKOWITZ:  How much time was left?  I forgot to -- okay.  They have --

THE COURT:  Yeah, you have as much time as you want.  There's --

MR. MOSKOWITZ:  I'm not going to take that much time, Your Honor.

THE COURT:  And then you all have time for your rebuttal.

All right.  You may proceed.

MR. MOSKOWITZ:  Good afternoon, Your Honor.  Adam Moskowitz; and my law firm is honored to represent the Seminole Tribe of Florida here today.  I think, from listening to Ben's argument, after I'm done, I think there's going to be a question of why would Lennar go to such lengths to prevent this case from proceeding?  And we're all going to ask that question.

One answer is in the initial disclosures that were just served.  This case is about a half a billion dollars in damages.  It's a massive

Page 43

case; 600 homes, and you've got all these people that are --

THE COURT:  I saw 200 million; I didn't see 500.  So it's up to 500?

MR. MOSKOWITZ:  Well, we've got 300 million in construction costs, 50 million in redesign costs, and that doesn't get yet to the health effects of these tribe members who have been injured.  So it's going to get up there.  I don't know what the number's going to be, but it's going to be a big case.

THE COURT:  All right.  Let me ask you two questions right off the bat that -- and kind of, address a little bit of what you just mentioned. First of all, depending on the Court's ruling, either -- I think either way, no matter what the Court does here, it's probably getting appealed; right? Obviously, if I grant the motion to compel, there's a right to appeal?

MR. MOSKOWITZ:  Right.

THE COURT:  I think if I deny, there's also a right to appeal; correct?

MR. MOSKOWITZ:  There is, Your Honor. And then it'll be discretion for Your Honor to stay the case or not.

THE COURT:  Okay.

Page 44

MR. MOSKOWITZ:  So we would ask if the --

THE COURT:  Or to the 4th to stay as well.

MR. MOSKOWITZ:  Right.

THE COURT:  Even if I were to deny a stay, the 4th could also grant a stay?

MR. MOSKOWITZ:  Correct, Your Honor.

THE COURT:  All right.  So it sounds like probably be an appeal either way, so it looks like that's going to delay anyway.

MR. MOSKOWITZ:  I would think so, but we would hope after I make my presentation that you wouldn't stay the case pending an appeal.

THE COURT:  Okay.  I guess the other thing you said, you know, delay resolution.  I know it's not the process you want, but if the case ended up going to arbitration, it's not as though there's no place to get a remedy.  The -- it's just it's from a different forum.  You're going to an arbitrator instead of going to a jury or the Court; right?

MR. MOSKOWITZ:  No, Your Honor, and I'll explain.  Because what they would like you to do is to require 585 individual tribe members to bring their own arbitration --

Page 45

THE COURT:  Got you.

MR. MOSKOWITZ:  -- against Lennar. This is their M.O.  I mean, I've got thousands of cases around the country who've called us, and most of them have lost.  I --

THE COURT:  Can't they do joint arbitrations, or they're saying that because each house is unique and --

MR. MOSKOWITZ:  They said each person has signed their own agreement and you know -- and that's why I was interested to see --

THE COURT:  All right.  I'm glad I asked that question now then.

MR. MOSKOWITZ:  Sure.  So let me start, Your Honor.  This is a massive project.  I think that they told you this isn't one house.  And what you'll see in the video here, this is the Hollywood Reservation Seminole Park today.  And I'm going to have some video of what it looks like today, because I don't think you could even comprehend what happened here.

This is just one of the six projects which Lennar was building 550 homes.  It was going to be up to 650 homes.  They're all built.  Ben is right; they're all built.  They're all defective.  The people

Page 46

that live there are all being relocated.

Now, the people who've hired us and who approve every contract is the Seminole Tribal Council. In fact, we have Tina Osceola, who's here with us today, who's our client representative. Her grandfather is Chief Osceola. This council has to approve every contract. And we're going to get to the law, and it's very clear; there has to be a tribal resolution for each of the contracts.

So let me, kind of, explain to you, because I'm like you, I just got into the case and I'm just trying to figure out exactly where we are. Let me tell you why I joined the case, why I was approached. After four or five months of mediation -- and you're going to see the mediation that Lennar and the Tribe had to do. Under the CDA, first, you have to do four or five months of direct negotiation, then you have to do mediation, and then you can sue in state or federal court. Very clear procedure; it says that in the CDA.

THE COURT: Okay.

MR. MOSKOWITZ: So I wasn't involved in all of that, but I have a lot of class action experience so what the Tribe said is, what do we have to do now? You know, we've got these 580 homes.

Page 47

Should it be a class action?  Should we have to name each of the individual owners who had warranties?

We thought about this, you know, how can we do the case?  And I've been doing for two years opioid litigation for both the Miccosukee and the Seminole Tribe.  So I know that the Tribes themself suffer significant damages as a result of these incidents, just like opioid.  The Seminole Tribe filed a claim for millions of dollars for the benefit of their members, because they have to take care of their members; it's actual law.  Not only do they have to take care of the homes, they have to take care of their health.

So when I called Mr. Tropin and Ben, before we filed our case, I said, "let's talk about this," because in opioid, there's never an issue that the Tribe sues for all of their members.  And it's been handled very efficiently, it's been done for two and a half years, billions of dollars have been paid.  So it works well.  If you have any questions, let me know.

Also Mr. Tropin and I did the Surfside case, and that was amazing.  In less than a year, we resolved all of the claims, which were much bigger than this case, had all these defendants.  So we went

Page 48

in and we revised the complaint, and we specifically filed the complaint the way we have it.

The crazy part, Your Honor, is there's no dispute that the CDA is the only contract between the Tribe and Lennar.  There's only one contract. They could say that there are other warranties or other things that were sent at a later date, but it's all part of the CDA.  There's no dispute there.

And the CDA is amazing because it says right at the top:  "Nothing contained in this agreement shall be deemed or construed to constitute consent on any part of STOF or the builder to arbitrate any matter or dispute.  Any controversy or claim arising out of this or relating to this agreement or the alleged breach shall be resolved in the manner set forth below."

And that's state court or federal court; okay?  This is the form agreement that the Seminole Indian Tribe enters in every construction contract.  Every single one of them.  I went back and talked to all of their lawyers.  This is from a form that we have.  And the Tribe passed a resolution, which they said, "We approve the CDA."  And, Your Honor, you know why they approved it?  They said, "Because it says 'no arbitration.'"

Page 49

We don't want arbitration as a tribe. We like state or federal court because there's appeals and all the parties can have due process. So we'll agree to this CDA, and it's called limited sovereign immunity. It's a waiver of limited sovereign immunity. Because in every case -- and I have law -- the articles, you know -- the kazoo -- when you negotiate with a tribe, you know they're going to have limited sovereign immunity because you can't sue them unless they do. That's the first thing, 101; a law student would know that.

So you sit down with them. And the Tribe, they don't want to haul the people into tribal court; right? Lennar's not going to do business with them if they do. So the Tribe knows "I got to have limited waiver." And the limited waiver in this case was very specific.

It's, we will only go -- we're allowing you as Lennar, sue us. Sure. You don't have to go to tribal court. Sue us in state court if you think we owe you money. Sue us in federal court, in the Southern District of Florida, but we're not going to go to arbitration. You're never going to see a case where the actual contract at question says on its face, "no arbitration." You'll never see that.

Page 50

You'll see other cases where the Tribe owes money and somebody sues them, like Raymond James -- We're going to get to that case -- and it says "arbitration."  The only contract here is the CDA.  And the reason that's important is if you look at that provision right before that -- oh this is going back.  Let me see.  Let me go back.  Okay.

Here.  And this is -- Ben cited this. "Section B.  Any controversy or claim arising out of or relating to this agreement or the alleged breach thereof shall be resolved in this manner."  Why is that language put in there?  And I asked the lawyers. Because anything that comes up, anything, any subsequent issue, any dispute, anything that relates to the CDA has got to go to arbitration.  That's why it's there.  It means something, B.

So what you're going to see, Your Honor, is when they did the CDA, they said we'll never agree to arbitration, number one; it's not disputed. Number two, anything related to the CDA can't be arbitrated.  It's just, like, Your Honor, every class action I ever have where there's arbitration demands and they say "it relates to your transaction."

It's a pretty wide range of relating. Of course this relates to the CDA.  There is no other

Page 51

contract.  There is no other tribal council resolution besides the one resolution that Ben showed you that said "the CDA does not allow arbitration."

Now, he's right.  One of the sections says, you know, and later you're going to give us warranties; right?  Of course.  You're going to sell us 600 homes.  The people and the Tribe are going to get a warranty to be decided later.  We're going to get a warranty.  There's no doubt about that.

THE COURT:  All right.  I didn't ask this earlier, but the contracts, the closing contracts --

MR. MOSKOWITZ:  Yes?

THE COURT:  -- and the individual homeowners, those are, in many instances, those are individual, or families, or -- of Seminole tribal members; right?  It's not -- the contract's not between Seminole Tribe of Florida and Lennar -- the closing contract is not; correct?

MR. MOSKOWITZ:  Right.

THE COURT:  Who would be the named buyer, I guess, of those?

MR. MOSKOWITZ:  The Tribe -- the CDA governs everything.

THE COURT:  No, the CDA.  I understand

Page 52

that.

MR. MOSKOWITZ:  Right.

THE COURT:  The CDA's between Seminole Tribe of Florida and Lennar.

MR. MOSKOWITZ:  Right.

THE COURT:  Now, you go to closing on an individual home; who's listed as the buyer and seller?

MR. MOSKOWITZ:  Their name, the individual tribe member.

THE COURT:  Okay.  It's never "Seminole Tribe of Florida"?

MR. MOSKOWITZ:  It says "pursuant to the CDA and the Tribe" -- because the thing is this, Your Honor.  The Tribe owns on the land; right?

THE COURT:  Okay.

MR. MOSKOWITZ:  So the Tribe, at the end of the day, is the owner, because it's just a structure you're building on the Tribe's land.  And it's reservation land, so it can never be sold to anybody else.  It's got to be reservation land.

THE COURT:  So the land, but the building on it; it's kind of, like, the 99-year leases here in Broward County?

MR. MOSKOWITZ:  Yeah.  It does name --

Page 53

THE COURT:  You own your property?

MR. MOSKOWITZ:  -- it does -- those 40 do name the people, yes.

THE COURT:  Okay.  So it's --

MR. MOSKOWITZ:  Those later agreements that came in do name the people, yes.

THE COURT:  Got you.

MR. MOSKOWITZ:  Okay?

THE COURT:  All right.

MR. MOSKOWITZ:  So -- one second.

THE COURT:  So if -- so for instance, if an individual wanted to bring a claim just as their own individual house, like, this is brought by the Seminole Tribe of Florida as a class action; right?

MR. MOSKOWITZ:  No, not as a class action.

THE COURT:  Not as a class action --

MR. MOSKOWITZ:  This isn't a class action.

THE COURT:  It's not a class action. Okay.

MR. MOSKOWITZ:  This is like opioid, Judge, because it's the Tribe had themselves --

THE COURT:  Okay.

MR. MOSKOWITZ:  -- suffered all the

Page 54

damage already.

THE COURT: But still, it's on behalf of all of them for all the homes in one case. But if one -- say all the homes were great except for one, and one individual owner wanted to bring a lawsuit, they may have consented to -- or they may have agreed to binding arbitration; correct?

MR. MOSKOWITZ: Possibly. But I don't think, when we get to sovereign immunity about the Tribe, I don't think they had the --

THE COURT: So that would be an individual?

MR. MOSKOWITZ: Right. That would be their individual. And they could agree. None of them -- all of them now have said to the Tribe, either we're selling the house to you so you own the claim here, or you're going to help us, you know, indemnify. In the CDA, there's an indemnification agreement.

THE COURT: Okay.

MR. MOSKOWITZ: So the Tribe is responsible to pay for all of these individual homes. That's one of our counts is indemnification. You know, the Tribe is only doing this because -- and I'll get to it when I get to the thing. Let me tell you what the uncontested facts are then.

Page 55

The CDA prohibits arbitration.

THE COURT:  Okay.

MR. MOSKOWITZ:  Right?  We know that you have to give a warranty.  The warranties were provided later.  Each of the 550 warranties, they're saying, was signed by somebody that lived there.  Possibly.  That's not in the record.  That's why I said there's a witness going to come here.  And then finally, Lennar has not shown you that there's a tribal resolution saying we hereby change or alter the CDA; we waive any of that.

The only thing they cite to you -- and you can read the whole papers, Judge, is the Raymond James Case.  They say Raymond James -- Judge Moreno says that regardless of the contractual agreements, you can't do it.  Okay?  And I'm going to get to Raymond James.

I think there was a misspeak by Ben.  This is not attached to the CDA.  The affidavit -- the warranty that you get after you do the closing, that's not in the CDA.  The CDA says you're going to get some type of warranty that we're going to discuss; right?  But it doesn't have it attached to it.  This is something that comes at the very end of the process, and it's, like, on page 78.

Page 56

And it says, welcome to Lennar's family.  Here's your great home.  Then on page 68, by the way, you have a arbitration clause.  This comes later.  Okay?

THE COURT:  Okay.

MR. MOSKOWITZ:  So there's no question here, Judge, and this is why this is a simple issue.  The Tribe sued.  If they want to argue the Tribe doesn't have claims or the Tribe can't sue for the ten people who bought their own home, you know, they can raise those arguments later.  The only plaintiff in this case is the Tribe; just like opioids.  The tribe's suing for everybody.  Okay?

We know what the law says.  In the 11th Circuit in the Sanderlin case, there's no dispute.  They don't dispute this.  The 11th Circuit says in Sanderlin, "waiver of tribal authority cannot be implied on the basis of the Tribe's actions, but must be unequivocally expressed."  Okay?  "The defendant did not show evidence that the Tribe expressly and unmistakably waived its right to sovereign immunity."

This is Sanderlin.  Judge Moreno cites to this case too.  And here, they were saying that Chief Billy did all these things which waived arbitration; Chief Billy signed forms, Chief Billy

Page 57

took money from the federal government for disability, he did all these things.

And the 11th Circuit said, Chief Billy did not have actual or apparent authority to waive voluntarily the Tribe's sovereign immunity.  Chief Billy did not somehow become vested with the power to waive that immunity simply because he had the actual or apparent authority to sign applications.  Extending authority to waive sovereign immunity to a single individual, at least in this context, would be directly contrary to the Supreme Court's clear statement that "a waiver of sovereign immunity cannot be implied but must be unequivocally expressed."

According to the Tribe, a certificate or assurance of compliance given by or on behalf of a Native American tribe with respect to certain laws is not tantamount to a clear and unmistakable waiver. You have to have a tribal resolution.  We all agree. There's never been a tribal resolution in this case.

The fact that they sent 500 of these documents after closing, and on page 58 it said, "I hereby have read this."  And on page 68 of the attachments, it says, "and I hereby agree to arbitration," that is not, under any law, a waiver of sovereign immunity.  And what we cite, Your Honor,

Page 58

which they don't respond to, all the cases, including the Big Valley case says, "because a waiver of immunity is altogether voluntary on the part of a tribe, a tribe may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted."

And I got federal cases as well that say a tribe can say:  "You could sue us in arbitration, but you can't come after these entities. You could sue us for certain claims, and not others. You can sue us in state and federal court, but not in arbitration."  They get to decide because it's their immunity to waive.  So that's crystal clear.  And there's no authority at all that says differently, except this Raymond James Case.  That's the sole authority that they're citing to, and that -- what Ben was going to talk to you about.

So and this is -- I'm showing you, Your Honor -- this is the form contracts of the Tribe. Every single contract that the Tribe enters into has to follow this form.  This is their -- I copied it. This is their form contract.  And it says always, "we will not agree to arbitration," every single one of the contracts of the Tribe.  Okay?

So here, all we have is this Raymond

Page 59

James Case; okay?  I'm going to get to the Raymond James Case in a minute; okay?  Because that's the sole authority that they have, but I want to tell you quickly what this project was about.

You had six different projects throughout the state of Florida to build these 600 homes.  This is massive; this is unprecedented.  If the Seminole Indian tribe didn't make millions and millions, and hundreds of millions of dollars, they couldn't have afforded this.  They had all the other tribes around the country calling them, because there's people that wait their whole lifetime to live on tribal land.  I didn't know any of this.  People wait a lifetime, and they can't get on tribal land. because there's not many homes there.

So in the Seminole Tribune, around this time, this was the biggest news that had come out of the tribal in ten years.  People are like: , "Oh, my God.  I'm going to get to own a home.  I've been on the list for 23 years trying to get on the reservation.  When I was a kid, I dreamed of living on the land, but I couldn't get there because we couldn't build enough homes."

So what happens?  They build the 550 homes, and immediately, in December 19, 2024, Mr.

Page 60

Scherer writes a letter and says:  "You guys are in default.  You're in default of the CDA.  You're in default of the warranties.  Yeah, these places are horrible.  Not just bad, you know, in fact, we're going to have to move.  We're going to have to evict all the people that live there because these homes are leaking."

So for three or four months, Your Honor, before I got involved, they met every day just about.  Lennar came to the Tribe for four months.  You didn't hear any of this from Ben, because the CDA said, "Section B, any controversy or claim arising out of this, of the alleged brief shall be resolved set forth below."  C, you have to participate in this five month direct negotiations; that was done.  D, you have to participate in mediation; that was done.  They've tested hundreds of these properties; they've inspected them.  And then F says, if you can't resolve it, you've got to go to state or federal court.

B, C, and D was done over the last six months.  I never heard from them, "Hey, you can't do what you're doing."  We never heard that.  That's why I'm saying this is preposterous.  We never heard this.  For eight months, Lennar spent millions of dollars coming, inspecting each of the homes, having their own

Page 61

experts.  Each of our people have been tested now for mold.  Some of them are sick.  All this happened for nine months.  Where was their, "Hey, you can't sue us; you got to go to arbitration."  They didn't say that.  They followed B, C, and D.  They did all the joint inspections.

So what did we have to do?  We solicited bids to rebuild 550 homes.  You know how a disaster that's been, that process?  We asked other developers to come in and they're like:  "We're not going to give you a warranty.  Your leaks are defective -- your roofs are defective so you have mold."  There's no dispute.  Like, we all agree these homes are horrible.  "We're not going to rebuild them and give you a warranty.  You got to take them down to the studs."

That's why I told you the numbers were conservative, 200 million.  What happens if you have to bulldoze the 550 homes?  You can't go down.  These people had to be evicted from their homes.  I have sheets that show you exactly the age of these families that we have to meet every week.

Our group of lawyers go every week to these six tribes.  We see hundreds of people; they're furious.  Over the last four months, we say to them,

Page 62

"You got to be evicted; you got to leave."  Where are they going to go?  I'll show you where they're going to go.  because we have to build mobile homes on the side of these six projects so these people and their families and their little kids -- there's hundreds of little kids -- have to leave, because they can't be in there because it's mold infested.

So this is what you see today; okay?  This is my aerial photo about three weeks ago.  I went to see this.  These are the roofs; okay?  This is the enormity of the project.  Now, every single one of these homes has to be evicted, every single home.  Look at this.

It's like a hurricane went through these things.  It gets worse.  Look how beautiful they look; right, on the outside?  This is the Lennar's beautiful picture.  Well, this is where you -- what you see today.

You drive through; it's a ghost town.  Those PODS are there because half of the stuff inside their house is ruined, their tribe -- it's ruined because of all the mold that came down.  This is the enormity.  Six of the properties were sold to all the individuals.

THE COURT:  Right.  I understand.

Page 63

MR. MOSKOWITZ:  You see each individuals --

THE COURT:  This gets to the merits of the case down the road; right?

MR. MOSKOWITZ:  Sure.  We will.

THE COURT:  Where we're at here today is --

MR. MOSKOWITZ:  Okay.  So then we get to Raymond James --

THE COURT:  -- where are we going to address the merits; right?

MR. MOSKOWITZ:  Yeah.  So Raymond James --

THE COURT:  -- in arbitration or --

MR. MOSKOWITZ:  -- is the one case that they cite.  And they cite to it five times in their brief.  They cited page 7, page 8, and all this -- okay?  We asked them to meet about it to do this CMO. We only heard about the Raymond James case six days ago.  It's not in their motion to compel arbitration. It's never mentioned.

And we asked for a CMO because we wanted a briefing schedule.  We didn't get a briefing schedule.  So Your Honor has a procedure, one week before, you got to tell the cases.  So one week before

Page 64

this hearing, we got the Raymond James case.  And what they said is, while it's not binding and it was vacated, we believe the decision is so important; right?  It's been vacated; it's been basically sealed.  The parties wanted it sealed.

Who were the parties?  Mr. Tropin.  Mr. Tropin was the lawyer on the case, and he's saying that you shouldn't reject -- this is their argument.  That you should reject it because regardless of any contractual agreements that state otherwise.  You know why they ruled that way?  Because Judge Moreno said, "you gave me a corporate resolution."  How do I know it?  I joined the firm right after this happened.  I was there.

And what Judge Moreno said is "you gave a tribal resolution" -- tribe, Seminole Tribe to Raymond James, so I think they actually had actual authority; right?  Here's the second resolution saying "we as a tribe are going to withdraw the first tribal resolution we passed, giving Billy the right to do the arbitrations."

THE COURT:  All right.  Is there a case cite for this, or no?

MR. MOSKOWITZ:  Yes, there is.  I will get it for you right after this.  And we have the

Page 65

report, it's -- but as Ben told you this morning, they said, "Judge, you can't find it on Westlaw because it's been vacated, so we'll print out a copy for you." Do you think my client is happy?  Do you think the Seminole Tribe is happy that Mr. Tropin and his firm 20 years ago represented the Tribe against Raymond James, have affidavits in the record, which I have that says "apparent authority is not enough; you can't use a parent authority."

I mean, I have the affidavits from their experts.  It says "you can't do apparent authority."  It's so crucial, the issue of sovereign immunity, that you need actual authority to bind the Tribe.  Here, they're saying just the opposite.

THE COURT:  All right --

MR. MOSKOWITZ:  And the order was vacated because the case was settled, and the Tribe didn't want it out there.  You know, it was settled; it was vacated.  We don't want it reported.  It comes back shoved in their face in this case?

THE COURT:  All right.  At the end of the day, I know Judge Moreno's a federal Judge, he's been around longer than me, but obviously, that's not binding on the Court.

MR. MOSKOWITZ:  Right.

Page 66

THE COURT: But I would --

MR. MOSKOWITZ: I'll get you the decisions, Your Honor, for sure. And --

THE COURT: Yeah. I just want to see what the analysis is.

MR. MOSKOWITZ: And we'll get you all the facts, because I was there. Mr. Ripich, the person who testifies, he says, "Every week, I'd go to the Tribe. Every week, I met with all the Tribe officials. I met with the comptroller; I met with the council; I met with everybody."

They had actual authority. When the issue went up on appeal from Judge Moreno, sovereign immunity wasn't an issue because there's actual authority.

THE COURT: Okay.

MR. MOSKOWITZ: You don't have that here, so that's troubling to us. So the reason that the Tribe went to Lennar, obviously, is they're the largest developer in the country; right? They could do this project. They did this massive construction. From the first time people started to live in the house, they got physically ill. The first time people start living there, they started to feel ill. These are the reported incidents. This is what the pictures

Page 67

show.

THE COURT:  All right.  Again, this goes to the merits.

MR. MOSKOWITZ:  You're right, Your Honor.

THE COURT:  All right.  So at the end of the day, you're saying, look, the contracting party is the Seminole Tribe, and the only contract they're a part of is the CDA.  There's no arbitration provision.

MR. MOSKOWITZ:  The CDA says it relates --

THE COURT:  There's been no waiver to incorporate some warranty and some non-binding -- some other binding arbitration would not be binding on the Seminole Tribe.  They're not the contracting party and --

MR. MOSKOWITZ:  Right, Your Honor.  And there's no evidence --

THE COURT:  There's been no waiver of sovereign immunity  before that --

MR. MOSKOWITZ:  And there's no evidence that tribal council ever adopted it or ever passed a resolution saying -- okay -- which is required under the Sanderlin case --  we hereby agree.

THE COURT:  All right.

Page 68

MR. MOSKOWITZ:  You know, it's never been there.  So what we'd ask, Your Honor, is to deny the motion to compel.  We'd ask you to not stay the case.  In fact, they said we could talk about a CMO if the Judge denies arbitration.  So please, don't stay this for another six months.

Why?  I told you there's hundreds of people that are now being evicted.  This is a big deal.  This is costing millions of dollars.  We don't want the case to stop for another year.  Bifurcate the discovery -- bifurcate the litigation --

THE COURT:  So this was filed March 13th; right?

MR. MOSKOWITZ:  Yes.

THE COURT:  And then you have an amended complaint, not until August 29th.

MR. MOSKOWITZ:  Right.  We had to go through, Your Honor, the six months of let's negotiate, let's do mediation --

THE COURT:  All right.  So all that, that whole nine-month period, that was all done after this case was filed?  Or most of it was done after the case was filed, as opposed to -- I -- see, I was under the impression you had to do all of that stuff first, then you filed in March.

Page 69

MR. MOSKOWITZ:  You did.  The timing was the December until March was all of the negotiation.

THE COURT:  Okay.  And so what's happened since March?

MR. MOSKOWITZ:  We've been begging them to do a CMO.  We've been begging them to have a hearing on this.  I mean, that's what we've been trying to do.  They said:  "We can't do anything, because we'll waive our right to arbitration.  So we're not going to meet you.  We're not going to sign a CMO, we're not going to do a briefing schedule." They wouldn't meet with us until they had this hearing, which, Your Honor, we said on the phone:  "We would like to do it tomorrow.  We don't care when it is."

Remember, in the hearing, I said, "I will do it anytime.  We want to proceed."  We served them with discovery, Your Honor.  We served them the request for production; we served them with interrogatories; we served them with deposition notice --

THE COURT:  But wasn't there a stay? Actually, let's --

MR. MOSKOWITZ:  They wanted a stay.

Page 70

THE COURT:  Okay.  There was.  There was an agreed --

MR. MOSKOWITZ:  Yeah, we agreed.

THE COURT:  I'm sorry.  There was a -- yeah, that's what I thought.

MR. MOSKOWITZ:  It was --

THE COURT:  This was --

MR. MOSKOWITZ:  Once a party seeks arbitration --

THE COURT:  I thought that's what was going on in this case; right?

MR. MOSKOWITZ:  Yeah, there was a stay.

THE COURT:  There was the -- so that you could try and work it out; correct?

MR. WIDLANSKI:  Correct.

MR. MOSKOWITZ:  Before the filing.

THE COURT:  Okay.

MR. MOSKOWITZ:  That's why we said we wrote that, that said --

THE COURT:  No, but even after; right? And I'm looking here now, I'm going through; there was an agreed order on the parties' joint motion, not defense motion --

MR. MOSKOWITZ:  Right.

THE COURT:  -- but joint motion for a

Page 71

stay of proceedings.  And so it was stayed for --

MR. MOSKOWITZ:  Right.

THE COURT:  -- a while.  And then there was a motion to vacate, then we got the motion to compel, and here we are today.

MR. MOSKOWITZ:  Yeah, because what happened is --

THE COURT:  All right.

MR. MOSKOWITZ:  -- we said to Lennar, "please, try to fix it."  Right?  "Try to fix it."

THE COURT:  Okay.

MR. MOSKOWITZ:  Not one single nail has been done by Lennar in the seven months.

THE COURT:  All right.

MR. MOSKOWITZ:  All of the time they could have helped.  So finally, the Tribe's like, "we got to sue you."

THE COURT:  All right.  I'm just -- I'm trying to --

MR. MOSKOWITZ:  Yeah.

THE COURT:  -- a little -- get my hands around a little bit of the time, the chronology of events, but all right.  In any event, I understand. All right.  Anything further?

MR. MOSKOWITZ:  No, Your Honor.  Thank

Page 72

you very much.

THE COURT:  All right.

Response or reply?

All right.  I'm going to ask you my one directed question that I have.

MR. WIDLANSKI:  Yes, Judge.

THE COURT:  All right.  Why, if you wanted all of this to go to mandatory binding arbitration, why wouldn't you just put that in the CDA?  All right.  I'm not -- and then you would know, you would know one way or the other.  If you put that in the CDA and they don't sign it, you know that that's not agreed versus, as opposed to after the fact saying:  "Look, it's all incorporated by reference from a contract.  It's not between this party, but between somebody else."

I understand.  You're absolutely correct that the warranties arise out of the post-closing contracts on these construct -- but you have a separate contract with a different entity, and you don't address arbitration in there.  Well, you do.  You say that -- and I agree, it's not as broad as they make it seem, that we don't agree to arbitration.  But the flip side, it doesn't say that we do agree to arbitration.

Page 73

So at the end of the day, Lennar could have put in a CDA, "all -- any claims for defects, or under the express warranties, the parties shall submit to arbitration."  And it's not in there; correct?

MR. WIDLANSKI:  Correct, Judge.  And there's a reason for that.

THE COURT:  All right.

MR. WIDLANSKI:  And the reason is, it's a negotiation; right?  There's -- these are sophisticated parties, and in the process of construction, things happen.

THE COURT:  Correct.

MR. WIDLANSKI:  Things globally could happen.  And that was why -- I mean, look, I wasn't there.  I didn't participate in those negotiations.  So I can't say -- and I can't speak at all --

THE COURT:  All right.  Going forward, Lennar may want to do that.

MR. WIDLANSKI:  Yeah.  I can't --

THE COURT:  All right?  So we don't end up here.  You know one way or the other; right?

MR. WIDLANSKI:  But, Judge, what I do want to say -- and I got to correct a few things --

THE COURT:  Okay.

MR. WIDLANSKI:  In fairness to Mr.

Page 74

Moskowitz, he was not part of the case at this point. So maybe he just got a little mixed up on the facts. The tribe is the purchaser for the lease pool homes. Okay?  And this is an important fact; right?  He said that the individual --

THE COURT:  Which pool?  Does he have the --

MR. WIDLANSKI:  Yeah.

THE COURT:  -- member pool, and you have the lease pool?

MR. WIDLANSKI:  The lease pool.  The member pool is about 100 homes.

THE COURT:  All right.

MR. WIDLANSKI:  100 homes?  About 100 homes?

MR. MOSKOWITZ:  Yeah.

MR. WIDLANSKI:  About 100 homes owned by tribal members.  Those individuals signed the member home purchase agreement; right?  That's exhibit H.  That one has, in it, an arbitration clause, and as an attachment to it, it also has the warranty.  That's 100 individuals who, in line 1 of their complaint, they're saying they're not sued on behalf of.

Then, all the other homes, all the other ones, every other home was purchased by the

Page 75

Tribe; not by individuals.  And tribal members acting for the Tribe went through the tribal -- the closing process.  The exhibit that we've attached, Judge in our motion was executed on behalf of stuff.  It says "stuff" in there.  That was a closing between Lennar and the Tribe.  And all of the lease pool homes that were owned -- that are owned by the Tribe are then leased.  They're rented.

THE COURT:  All right.  Do you have one of those to pull up?

MR. WIDLANSKI:  It's -- I mean, I can -- yeah.

THE COURT:  All right.  You don't have that on the computer; right?

MR. WIDLANSKI:  Yeah, we've got it somewhere, Judge.  I -- it's -- I've got it on the computer and in hardcopy.

THE COURT:  Okay.  All right.  Let me --

MR. WIDLANSKI:  So that's one --

THE COURT: All right.  So you're showing me what's been marked as Defense Exhibit D, and this is to the motion to compel?

MR. WIDLANSKI:  Is this -- this is Exhibit C to our motion to compel.  We marked it as

Page 76

Exhibit D for purposes of today.

THE COURT:  Okay.  It was Exhibit C.
Now, is this a member pool or a lease pool contract?

MR. WIDLANSKI:  Lease pool.

THE COURT:  This is a lease pool
contract.

MR. WIDLANSKI:  Correct.

THE COURT:  All right.  And so it says
"homeowner name, Seminole Tribe of Florida."  That is
the plaintiff in this case; correct?

MR. WIDLANSKI:  Correct.  So, Judge,
that's the -- that's -- I've got to correct the --
some of the presentation from Mr. Moskowitz; right?

THE COURT:  All right.

MR. WIDLANSKI:  Lennar is not trying to
force 600 individuals into arbitration.  That's not
what we're trying to do.

THE COURT:  So let me ask you, if I
were to grant the motion to compel arbitration, it
would be one arbitration for all of the lease pool
homes; correct?

MR. WIDLANSKI:  For the lease pool
homes owned by the Tribe.

THE COURT:  Altogether.

MR. WIDLANSKI:  Correct.

Page 77

THE COURT:  All right.  For the member pool, I guess you do agree with Mr. Moskowitz; they would be individual arbitrations for each member?

MR. WIDLANSKI:  I mean, unless we can work out a -- as is the agreement of the parties; right?  Unless we can work out a more -- a facile process; right?  Like, the -- that's the goal of arbitration, Judge.  It's speed.  That's why people enter into arbitration provision.

They want to resolve matters quickly, efficiently, and without, you know, many, many -- listen, Judge, we're all lawyers.  We know how hard it is to get on calendar.  We know how hard it is to go to trial.  Arbitration just moves the process along.  It's an efficient process.

And there's a public policy motivation in favor of it.  That's -- I mean, that -- there's case law from the Supreme Court on down -- of the United States on down.  So that's one thing I do need to correct for Mr. --

THE COURT:  All right.  So the -- if I look at page -- this says "buyer Seminole Tribe of Florida, signed by Seminole Tribe of Florida."  I'm not sure why there's not an individual for it, but I don't think anybody's contesting -- that's not the

Page 78

issue of the case; right, whether Seminole Tribe signed it or didn't sign it?

MR. MOSKOWITZ:  We don't know who signed it, Your Honor.  We -- that's why --

MR. WIDLANSKI:  Seminole Tribe.

MR. MOSKOWITZ:  -- we asked if the witness is going to -- definitely it's from -- it could be somebody from the Tribe.  Of course.

THE COURT:  Yeah, this was definitely approved by -- I mean, you have a closing.  I'm sure if there's --

MR. MOSKOWITZ:  But not tribal council. I just want to make that clear, because that law is clear.  It's not tribal council.  The fact that somebody wrote -- just like the Sanderlin case that I read, Billy, as the chief doesn't have the authority to bind the Tribe.  Just writing "STOF" is not a tribal resolution.

THE COURT:  All right.  Then how is this not an actual -- you know, you're trying to distinguish on the one hand Seminole Tribe vs. Raymond James, saying there's no express authority, yet --

MR. MOSKOWITZ:  Because --

THE COURT:  -- how would this not be express authority?

Page 79

MR. MOSKOWITZ:  Because in Raymond James, you had a tribal authority.  You didn't have just Mr. Cox [ph] signing it.  And what the Sanderlin case, the 11th Circuit says is, even if Billy signs it -- like, if Billy signed these, Billy doesn't have the authority to waive the Tribe's sovereign immunity.  Only a tribal resolution can waive sovereign immunity.

So an individual -- the case actually says that.  It says the word "individual can't bind the Tribe."  You need a tribal resolution.  Those four people that I showed you need to get together, as they did for the CDA, and they have to pass a tribal resolution saying "we'll waive immunity."  It can't be someone with a docu-stamp a year later signing 550 of these, going "STOF, STOF, STOF."  That's not waiving tribal immunity.

It's so important, the Supreme Court has said, you can't implicitly do it.  You can't do it by act, you can't do it by conduct, you got to do it by a tribal resolution.  And they knew that, because when we did the CDA, they said, "you got to go get a tribal resolution."  And we did, and we amended it.

Each time we amended the CDA, we got a tribal resolution.  We never got a tribal resolution to amend for the warranty.  Why if we did five

Page 80

amendments to the CDA, and after each one they said, "Hey, you got to go get a tribal resolution," and we did, why didn't they say on the sixth one, "Hey guys, this is a big deal" --

THE COURT:  So you want them to get, for every individual --

MR. MOSKOWITZ:  No.  One resolution that just says, "we hereby, on behalf of everybody, on behalf of the Tribe, agree to arbitrate these warranties."

THE COURT:  Well, not to arbitrate; we agree to sign this contract?

MR. MOSKOWITZ:  But we agree -- the specific issue is sovereign immunity.  How can you waive sovereign immunity?  So yes --

THE COURT:  But you signed -- somebody on behalf of Seminole Tribe agreed -- they entered into the contract.  So you're saying that this contract's void?

MR. MOSKOWITZ:  No, I'm saying that --

THE COURT:  So then there's no warranty?

MR. MOSKOWITZ:  -- a year --

THE COURT:  You understand what I'm saying?

Page 81

MR. MOSKOWITZ:  I do, and that's why the CDA says --

THE COURT:  So are you saying there's no warranty because there was no authority to sign this?

MR. MOSKOWITZ:  There is a warranty, Your Honor.

THE COURT:  Of course.

MR. MOSKOWITZ:  We're suing under the warranty.  The only question is, when you waive sovereign immunity.  This argument applies to everybody in the country who's just a homeowner who buys from Lennar.  And then they send you this warranty a year later.  Congratulations, you're part of the Lennar family.  Now, you're stuck.

That argument doesn't work in 80 years of history because a tribe, a Seminole Tribe is a government, and they only waive sovereign immunity when they pass a tribal resolution.  So the warranty applies.  I'm not saying the warranty doesn't apply. I'm saying you can't -- you can't force me a year later --

THE COURT:  So all of the things that go against Lennar in this contract, it's a binding contract, but anything that goes against the Tribe,

Page 82

even though it's signed by the Tribe, doesn't apply because there's been a waiver of sovereign immunity?

MR. MOSKOWITZ:  No.  Just jurisdiction. Just what is the jurisdiction of the Court?

THE COURT:  Which would be just about anything that --

MR. MOSKOWITZ:  That sole issue.  I'm not saying anything else.  Every other warranty defense that they want to raise, of course, raise it. They've already said to us, when Bill Scherer wrote that first letter in December, they said, "Okay, the warranty is applicable but you don't -- you can't collect because the people lived in the house and they misused it."  Right?  Whatever defense they have under the warranty, they have it.  But you can't waive sovereign immunity from one tribe member signing an "STOF" on a form.  You just -- that's the law.

There's no other law, except for Raymond James.  And we saw in Raymond James, they had a tribal resolution, which they actually showed to Raymond James, a tribal resolution.  Judge Moreno said, "I'm looking at a resolution."  On appeal to the 11th Circuit, they said sovereign immunity wasn't even an issue because there was actual authority.  They had two tribe resolutions.

Page 83

THE COURT:  All right.  I understand.

MR. WIDLANSKI:  All right.

MR. MOSKOWITZ:  All right.  Thank you, Your Honor.

THE COURT:  All right.  So rebuttal. We'll start over.

UNIDENTIFIED SPEAKER:  -- Your Honor?

THE COURT:  No, that's all right.  You can turn it off.

MR. WIDLANSKI:  Thank you, Judge.  So a couple other just, sort of, clarifications of the record so it's abundantly clear.  In the joint motion to stay proceedings, as Your Honor noted at the beginning of this case, right, it was pursuant to chapter 558, which is a construction law that allows the parties to work through the defects and try and resolve them; right?  It is -- it exists for the purpose of resolution.  It's a statute.

We were complying with the statute. That's what we were doing.  We weren't trying to delay anything, but Mr. Tropin, my partner, spoke with Mr. Scherer, and we wanted to include language in this order saying that it wasn't waiving our rights to assert arbitration.  Mr. Scherer did not want that.

So what did we say?  Line 7, "This

Page 84

motion is made with the express agreement that the stay shall be without prejudice to any party's rights."  We agreed on that because it --

THE COURT:  All right.  I don't think that's, the end of the day, what they're arguing so --

MR. WIDLANSKI:  No, it's not.  But I just want to --

THE COURT:  We're not here because --

MR. WIDLANSKI:  Yeah, I just want to make sure that --

THE COURT:  They're not saying, "Yeah, you know, we have a binding arbitration clause, but you've waived it."  Although I guess, it's an alternative argument, but that's not the main --

MR. WIDLANSKI:  No, it's not, Judge. And I do -- a couple other things I want to correct is that we only cite one case in our papers, and our -- I mean, our reply is full of cases.  And I'm sure Your Honor read it.

THE COURT:  There's probably not a whole lot of them that involve tribes.

MR. WIDLANSKI:  No, they all were talking about the tribes.  And in fact, we cite to a United States Supreme Court, the C&L case, which is in our papers.  And the C&L case, which was a

Page 85

construction case, the Supreme Court held that a construction contract's arbitration provision that requires all claims or disputes arising out of or relating to the contract to be cited by arbitration, it's clear enough to constitute a waiver of sovereign immediate.

Judge, I mean, I think Your Honor hit this on the head; right? They want their cake, and they want to eat it. They want the good stuff from the warranty, but they don't want the bad stuff. Why would we give them the good stuff if we don't get the bad stuff for them? And it's not bad stuff for them, it's our rights. It's what we agreed to. It's what we negotiated.

Because again, I got to refer back to the CDA and the resolutions that contemplate the post-closing documents. Mr. Moskowitz is suggesting that these documents were figments of somebody's imagination, and no one ever conceived of them until years later. But that's just not true. It's in the paper that it was discussed, and contemplated, and negotiated; right?

The question Your Honor asked me about why Lennar didn't include an arbitration provision in the CDA is equally applicable; right? Why did Lennar

Page 86

sign these documents?  Why -- or why did the Tribe accept these warranties, sign these warranties that had them?  They could've said "no," they could've negotiated them; they didn't.  They signed them.

And now, Judge, to your point, they're suing under them.  They're suing under the contracts, and they call them contracts.  Sovereign immunity is not implicated; right?  Sovereign immunity is about whether Lennar can sue them.  They have initiated this litigation.  They are the plaintiffs.  Lennar is just here defending itself.  Lennar is defending itself and seeking the appropriate forum for the adjudication of their disputes.

Mr. Moskowitz, in one of his very first things he said, Your Honor, was that Lennar is trying to evade their responsibilities.  And there was a lot of discussion about the merits of this case, and a lot of discussion about things that have nothing to do with this case, like, previous contracts between the Tribe and somebody else.  That's not why we're here. We're talking about contracts at issue in this case.

And the contracts at issue in this case must be read harmoniously.  That's their case, Judge. That's their case, the Johnson case from the Florida Supreme Court, that they cite on page 24 of their

Page 87

brief. "We rely upon the rule of construction requiring courts to read provisions of a contract harmoniously in order to give effect to all portions thereof." Harmoniously, Judge.

There are arbitration clauses and contracts that they are suing under and that they agreed to. How does one read it harmoniously? Just by redlining through it because they don't like it. That is not a harmonious reading of the contract.

This is, frankly, a pretty straightforward issue, Judge. There's a contract that they agreed to, that they're suing under, that has language they don't like, and they're trying to ignore it. All Lennar wants is the benefit of the bargain that it struck. Lennar will defend itself. If Lennar was wrong, Lennar will pay. But Lennar deserves the benefit of the bargain that it struck when it agreed to these contracts with the Tribe that the Tribe is now suing under.

Does Your Honor have any additional questions?

THE COURT: No. Other than if I were to grant it, you're saying that you would do all arbitrations, at least for the lease pool properties, all together? The member ones, you could, I guess,

Page 88

discuss something, but I guess, you could even --
would you even agree to do all of them together?

MR. WIDLANSKI:  I don't know.  It's not
something that we've discussed, Judge, and we have
not -- they didn't ask us.  Right?  I don't know.

THE COURT:  All right.

MR. WIDLANSKI:  Part of the reason why
you have individual arbitrations, obviously, is
because the issues are different; right?  So there may
be an issue over here that doesn't exist over here.
There may be an issue in that home that doesn't exist
in that home.  So I just don't know.

I can certainly tell you Lennar is
not -- it has no interest in dragging out process.
Right?  If there is a way to be efficient and
expedient, I'm sure Lennar will explore it.

THE COURT:  All right.  Let me ask Mr.
Moskowitz.  I guess, the flip side is, if I were to --
I mean, if I were to deny it, there's probably an
appeal and it's going to drag everything out.  If I
were to grant it, I guess it's up to you if you wanted
to -- if you file an appeal, it's going to drag it
out.

And I mean, at the end of the day, I --
it may not be the forum you want, but it sounds like

Page 89

time is of the essence.  I know you wanted to get into all the details of all the problems that they're having.  I'm pretty quick.

MR. MOSKOWITZ:  Yeah.

THE COURT:  But I would think you'd probably get an arbitration decision before you would get a jury verdict here.

MR. MOSKOWITZ:  Right.  Your Honor, we --

THE COURT:  And you understand that?

MR. MOSKOWITZ:  Yeah, absolutely.

THE COURT:  Okay --

MR. MOSKOWITZ:  We 100 percent want to be before Your Honor.  That's what the Tribe wanted.  That's the form contract that the Tribe always enters into.  We do not want to go to arbitration.  In fact, it says there, there's no appellate rights.  You know, to get an order, an arbitration order vacated --

THE COURT:  So let me ask the question then, the flip side that I asked Lennar.  You know, Lennar should have requested to put in a binding arbitration provision in the CDA.  Why didn't you require a lease for the contracts signed by the Seminole Tribe of Florida that they strike out the mandatory arbitration provision there?

Page 90

MR. MOSKOWITZ:  Good question, Your Honor.  We understand what the law is.  And we know the Raymond James case, we know all the cases; right?  The only time that you can waive sovereign immunity is by tribal resolution.

THE COURT:  So it's a "got you"?  So it's like --

MR. MOSKOWITZ:  It's -- this is a "got you."  Absolutely, because --

THE COURT:  No, but the flip side.  So you're saying -- all right, Seminole, we know that this arbitration clause doesn't apply.  They don't, but they should know it so we're not going to strike it out --

MR. MOSKOWITZ:  No, no.  Your Honor, let --

THE COURT:  But you understand what I'm saying; right?

MR. MOSKOWITZ:  I absolutely do.

THE COURT:  You have a contract.  I understand.  Your argument is that there's no trial resolution, so there -- it has no --

MR. MOSKOWITZ:  But I'm saying more than that, Your Honor.

THE COURT:  But it's there.

Page 91

MR. MOSKOWITZ:  You're --

THE COURT:  It's there in the hundreds of --

MR. MOSKOWITZ:  The facts are the facts.  I don't run away from the facts.  You're right.  100 percent.  When I got into this case, I said, "what are the facts"; right?  The facts are, a year later when they close on these, they DocuSign -- they send an e-mail to Ms. Jones, and they say:  "Hey, good -- thank you for getting a Lennar home.  Can you check these 14 boxes"; right?

What does a normal Ms. Jones do?  She clicks the boxes.  She doesn't sit there and say, "well, what is section" -- because it doesn't even say in what she checked.  She checked a box that said, "I looked at the other thing."  So she --

THE COURT:  So you're saying that --

MR. MOSKOWITZ:  It's a "got you." You -- she doesn't even --

THE COURT:  -- there's 500 contracts that they just filed away, and nobody ever looked at them?

MR. MOSKOWITZ:  No, they didn't.  They didn't, Your Honor.  And the fact that they didn't, later, when this was raised, we said, "we don't want

Page 92

these 'got yous,'" so we put in the CDA, "anything that relates to this needs to be arbitrated so if something comes up later"; right?  Because we did say we're going to get a warranty.

Your Honor, I admit we did say we're going to -- you don't get 600 homes without a warranty.  But it didn't mean that we're going to stick on page 480 in a DocuSign, binding arbitration.  How could you do that?  We just negotiated a CDA for 500 million bucks that says "no arbitration."

It's not even like we're deciding should you have arbitration or not.  The CDA itself says "no arbitration," so that's where we are.  You got to change that.  You're telling me that when you DocuSign 400 of these things saying, "thank you, welcome to the Lennar home, check here" -- you know how you do it.  I do it all the time.  You check the boxes.

That somehow is a knowing waiver of a sovereign nation?  It's just -- there's no case that's even close to this.  His cites to Florida Supreme Court cases don't talk about sovereign immunity.  Sovereign immunity is a government's right not to be held into court.  And the cases that I read, Your Honor, you can do it any way you want.

Page 93

How is it unfair for Lennar to come into state or federal court?  Lennar, the largest developer in the country with the best law firms they could pay.  How is it unfair for them to come into state court -- or come into federal court and sue the Tribe?  They've already had the money.  That's why this is a crazy case.

Ben's client has the 300 million.  We already paid for the homes.  The homes are defective. They don't have to do anything.  They've won; you know?  So we as the Tribe, we went through -- and Your Honor, you raised this point.  We did five --

THE COURT:  All right.  Where in the contract is the binding arbitration provision?

MR. WIDLANSKI:  Well, the -- so --

MR. MOSKOWITZ:  It's not.  It says "look at something else," and that's what it says. That's where it got the --

MR. WIDLANSKI:  Judge, the first page of the limited warranty -- I'm -- what --

THE COURT:  So here's the contract.

MR. MOSKOWITZ:  Yeah.

THE COURT:  So this the --

MR. WIDLANSKI:  Okay.  That's the buyer's acceptance --

Page 94

THE COURT:  This is the closing for the property located at 5860 Vine Street, Hollywood, Florida 33021.  All right.  Homeowner name, the buyer is Seminole Tribe of Florida.

MR. WIDLANSKI:  Next page, Judge, on the, I guess, 3rd page.  It's the number 2.

THE COURT:  All right.  "We have read and understand the limited warranty, and agree that only those items covered under the limited warranty will be addressed after my closing.  And that request can be made through our regional call center at eastcustomercare@lennar.com."

MR. MOSKOWITZ:  An individual tribe member's supposed to know that?

MR. WIDLANSKI:  And, Judge, if I may?

THE COURT:  Where does it say "and any disputes shall be" --

MR. WIDLANSKI:  Well, that's in the warranty itself.

MR. MOSKOWITZ:  Exactly.

MR. WIDLANSKI:  That's in the warranty itself, which they received.  And I know --

THE COURT:  And signed off on?

MR. WIDLANSKI:  Yeah.  That -- this document --

Page 95

THE COURT:  Where is it?

MR. WIDLANSKI:  -- says it's signed off on.  This is the warranty, Judge.  I mean, it's in the --

THE COURT:  All right.  Give me the warranty that applies to this contract.

MR. MOSKOWITZ:  -- never signed a warranty -- contract --

UNIDENTIFIED SPEAKER 2:  It's an acknowledgement of receipt.

MR. MOSKOWITZ:  Right.  It's not a contract; it's an acknowledgement of receipt.  I got 50,000 papers.

MR. WIDLANSKI:  And I would note a couple things on that.

THE COURT:  So where is the --

MR. WIDLANSKI:  So the first page of this document has the bold language, "this limited warranty includes a requirement that all disputes be submitted to finding arbitration."

THE COURT:  Yeah, but this isn't a contract.

MR. WIDLANSKI:  This is the warranty.

THE COURT:  Yeah.

MR. MOSKOWITZ:  It's not the contract.

Page 96

MR. WIDLANSKI:  This is --

THE COURT:  So in other words, the cases that usually have mandatory arbitration, there's a --

MR. MOSKOWITZ:  Yeah.

THE COURT:  -- arbitration provision that's clear, and it's part of the contract.  It says --

MR. WIDLANSKI:  This -- so this is the warranty that they accepted --

THE COURT:  It's incorporated by reference?

MR. WIDLANSKI:  Yeah, they accepted this contract when they accepted the warranty.

THE COURT:  This is not the contract.  The -- this is the contract over here --

MR. MOSKOWITZ:  Right.

THE COURT:  -- that has -- that's signed by Seminole Tribe of Florida.  It doesn't say you should be aware that "the limited warranty includes the requirement that all disputes are submitted to binding arbitration."  Then there's initials, or signed, or whatnot.

MR. MOSKOWITZ:  It's not.

MR. WIDLANSKI:  Judge --

Page 97

THE COURT: It doesn't even reference in the contract that --

MR. MOSKOWITZ: It doesn't.

THE COURT: -- this other document; does it?

MR. WIDLANSKI: Yes, it does. "I have read and received the limited warranty." It says it right there on number 2. And I would note a couple things about this --

THE COURT: I -- "we have read and understand the limited warranty and agree that only those items covered under the limited warranty will be addressed after my closing. And that request can be made through our regional call center at eastcustomercare@lennar.com."

MR. MOSKOWITZ: That's going to --

THE COURT: Didn't it say right there that in any disputes --

MR. WIDLANSKI: Right. That's in the warranty --

THE COURT: -- shall be --

MR. WIDLANSKI: -- itself, that they accepted by saying that.

THE COURT: But they haven't initialed --

Page 98

MR. WIDLANSKI:  A couple things on this, Judge, if I may?

THE COURT:  All right.  Is that the only spot it's in, is on that first page?  The --

MR. MOSKOWITZ:  That's it.

MR. WIDLANSKI:  In the buyer's completion acceptance?

THE COURT:  Yeah.

MR. WIDLANSKI:  Well, it's the only place it's in this document, Judge.  But it is also, as we've talked about, it's in the CDA that the warranty is going to be given.  And it is an attachment to the member home purchase agreement, which is also an exhibit.  And all of that, Judge, was approved.  And also --

THE COURT:  All right.  But it was in all the general case law and just motions to compel arbitration in general.  They require an -- a clear and express waiver of your --

MR. WIDLANSKI:  But, Judge, they're suing under this document.  They agreed that this contract exists.  You asked Mr. Moskowitz that.  They agreed that this contract exists.  They agreed that they accepted it.  They're suing under it.

THE COURT:  But there's a --

Page 99

MR. WIDLANSKI:  This docket --

THE COURT:  No, I understand that. They're -- they agree that there's a -- everybody agrees there's warranties when you buy something.

MR. MOSKOWITZ:  Right.

THE COURT:  So the question is, is there a --

MR. WIDLANSKI:  Express warranties, Judge.

THE COURT:  All right.

MR. WIDLANSKI:  They're agreeing that they sued under an express warranty.

MR. MOSKOWITZ:  Right.

MR. WIDLANSKI:  They are suing under this document, Judge.  They're quoting this document. I showed you that in the presentation.

THE COURT:  No, I understand that.  But they're not --

MR. MOSKOWITZ:  You got it.

THE COURT:  All righty.

MR. WIDLANSKI:  And it -- by the way, Judge, not for nothing, but the Supreme Court of the United States, the case that I cited, C&L says that arbitration provisions have a real-world objective; right?

Page 100

THE COURT:  Absolutely.

MR. WIDLANSKI:  They're not just a ministerial exercise.

THE COURT:  I mean, we've had some recent 4th DCA opinions on it.

MR. WIDLANSKI:  Yes.

THE COURT:  All right.  What --

MR. WIDLANSKI:  What we have here is a contract, the member home purchase agreement, and the warranty, both of which were approved.  Under the resolution, it said they were "drafted under the auspices of the general counsel's office."  That's what it says.  And, Your Honor, if I may provide you this so you have the whole thing in hardcopy, go to the 2nd page of this document.  The 2nd page of this document has strikethrough language.  It has strikethrough language on the 2nd page because --

MR. MOSKOWITZ:  Your Honor, I'd just object now.  If we're going to have evidentiary record, this is why I said you need to call a witness under oath.  Ben can't testify what a document says --

THE COURT:  All right.  These are all -- in any event, these were all, I guess, stipulated in judicial notice --

MR. MOSKOWITZ:  -- if it's redline, who

Page 101

did it, who did what.

THE COURT:  All right.  But it says here, it's struck -- you're saying "if you are an owner, other than the original purchaser of the home, you are bound by all the terms and conditions of the Lennar limited warranty, including, but not limited to claims procedures, and the requirement to submit any disputes that arise under the Lennar limited warranty to binding arbitration."

So they struck out the binding arbitration --

MR. WIDLANSKI:  For anybody other than the original owner.  The original owner here, Judge, is the Tribe.

THE COURT:  That's for transferability?

MR. WIDLANSKI:  Right.

THE COURT:  All right.  Hang on --

MR. WIDLANSKI:  If you go to the page 5 --

THE COURT:  And so if it's transferred --

MR. WIDLANSKI:  Yeah, if it's transferred.

THE COURT:  All right.  But that's -- oh, man.  All right.  Let me --

Page 102

MR. WIDLANSKI:  But then then the warranty --

THE COURT:  -- I'm going to -- just so we're -- I'm going to take it under advisement.  I need to look at a few more things on this --

MR. WIDLANSKI:  Judge, I think, if Your Honor would like, we're happy --

THE COURT:  -- but it's --

MR. WIDLANSKI:  -- I'm sure it's -- to submit competing proposed orders.

THE COURT:  As long as they're short.  Yeah, I don't need a 230-page --

MR. WIDLANSKI:  How short would you like, Judge?

THE COURT:  Well, I mean, it's really about the law on this.  All right.  So again, I think it's clear.  I think we're all in agreement that in order -- I understand you have the sovereign immunity issues, but whether there's a valid -- so in order to compel arbitration, there has to be, one, a valid written agreement to arbitrate, and whether an arbitrable issue exists, and whether the right to arbitration was waived.  So I think we're all in agreement, it's three; whether it's been waived or not.  And so in order to be -- right?

Page 103

MR. MOSKOWITZ:  No, no.  Your Honor, that's why we start with sovereign immunity.  We don't start with we're just a typical Lennar buyer.  We start with sovereign immunity.

THE COURT:  But there is a valid -- well, anyway, there's an arbitration provision.  I guess it's whether it's a valid written agreement --

MR. MOSKOWITZ:  But it's not in anything attached to the CDA.  The CDA doesn't have this.

THE COURT:  Okay.  No, I understand.  So your questioning one as well.

MR. MOSKOWITZ:  Yeah.

THE COURT:  All right.

MR. WIDLANSKI:  Judge, they call it a contract; right?  They sue -- they said, in their complaint, their document, that they are "suing for breaches of express warranty in contract."  That's their language.  They're the ones that call it a contract.

MR. MOSKOWITZ:  Your Honor, the CDA is the only contract here.  There's just no dispute.  The CDA says "no arbitration" so how are you going to change that by saying that a year later --

THE COURT:  It doesn't actually say "no

Page 104

arbitration."  It just says that there's nothing in here as agreed to arbitration.

MR. MOSKOWITZ:  Well, I showed you the Tribe Resolution, which was passed as a result.  It said you do step one --

THE COURT:  No, I understand.  You're saying that --

MR. MOSKOWITZ:  -- two, and three --

THE COURT:  -- you haven't agreed to this document that has an arbitration that's --

MR. MOSKOWITZ:  It was never attached to the CDA.  It was sent to them later when you close --

THE COURT:  All right.  I think you have a little bit more difficulty if on the front page of the actual contract, it says, you know, "the warranties and" --

MR. MOSKOWITZ:  Right.  But it doesn't. There's nothing in the CDA, there's nothing in the actual contract signed "STOF" that even mentions the word "warranty" --

MR. WIDLANSKI:  That's not true, Judge.

MR. MOSKOWITZ:  Can I finish, Ben?  Let me just finish --

MR. WIDLANSKI:  That's just not true --

Page 105

MR. MOSKOWITZ:  Let me just --

THE COURT:  -- stated that -- one-year attachment --

MR. MOSKOWITZ:  Yeah, one-year attachment.  Right.

THE COURT:  All right.  We're kind of rehashing the same arguments over again.

MR. MOSKOWITZ:  Yeah.

THE COURT:  It's a tough -- this is a close call, and so let me take it under advisement.  I will -- do you want to submit competing --

MR. WIDLANSKI:  If it would help, Your Honor.

MR. MOSKOWITZ:  That would be great, Your Honor.  We would love to do that.

THE COURT:  All right.  How much time do you want?

MR. WIDLANSKI:  However much time Your Honor wants to give us.

MR. MOSKOWITZ:  How about a week?

THE COURT:  Seven days?

MR. MOSKOWITZ:  One week?

THE COURT:  Or you want to do ten -- seven days?

MR. MOSKOWITZ:  Seven days.

Page 106

THE COURT:  Seven days it is.  All right?

MR. MOSKOWITZ:  And we could limit it, if you'd like, to 15 pages?

MR. WIDLANSKI:  Or less than that if Your Honor wants.

THE COURT:  I'd rather it be ten.

MR. MOSKOWITZ:  Or less.  Would you like ten?

THE COURT:  How about a ten-page proposal?

MR. MOSKOWITZ:  Ten pages.

THE COURT:  All right.  And then this way -- and this will give me an opportunity to roll my sleeves and read -- I understand all the issues now.  It's interesting so --

MR. MOSKOWITZ:  Thank you so much, Your Honor.

THE COURT:  You did an excellent job with your presentations -- you all had excellent PowerPoints.

Can I get a copy of your PowerPoint though?

MR. MOSKOWITZ:  Yes, Your Honor.

THE COURT:  Okay.  These are the -- all

Page 107

right.  And you've given a copy to --

MR. MOSKOWITZ:  Yeah --

MR. WIDLANSKI:  I don't have one, no.

THE COURT:  If you could --

MR. MOSKOWITZ:  We're going to give him -- yeah.

THE COURT:  Okay.

MR. MOSKOWITZ:  And we'll give the whole thing.  You know, we only used about a third of it.

THE COURT:  That's fine.

MR. MOSKOWITZ:  But we'll give more.  Okay.

THE COURT:  All right.

MR. MOSKOWITZ:  There you go.

THE COURT:  Thank you.  All right.

MR. MOSKOWITZ:  Thank you, Your Honor.

THE COURT:  So I will look forward to seeing your proposed orders, I will do my additional research, and I'll issue a prompt ruling.

MR. MOSKOWITZ:  Thank you, Judge.

MR. WIDLANSKI:  Thank you, Your Honor, very much.

THE COURT:  You all have a great day.

//

Page 108

(Whereupon, at 3:28 p.m., the

proceeding was concluded.)

Page 109

CERTIFICATE

I, JUDY L. BROWN, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

JUDY L. BROWN
Notary Public in and for the
State of Florida

Page 110

CERTIFICATE OF TRANSCRIBER

I, MOLLY MCCOLM, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

MOLLY MCCOLM

**[& - 9]**

**&**

**&** 3:4,11 4:6,16 5:4 8:25 9:1,6

**1**

**1** 24:11,12 74:22
**100** 3:12 37:3 74:12,14,14,17 74:22 89:13 91:6
**101** 2:16 49:10
**105** 25:24
**1073** 3:19
**115** 27:13,16
**11th** 56:14,16 57:3 79:4 82:23
**121** 27:14,16
**13.04.** 32:17
**13th** 68:13
**14** 36:1,5 91:11
**15** 106:4
**171** 26:8,9
**17150** 1:18
**17th** 1:1
**19** 59:25
**1910** 2:16
**1:32** 1:14

**2**

**2** 26:11,12,13 26:13,15 94:6 95:9 97:8

**20** 65:6
**200** 43:3 61:18
**201** 1:17
**2024** 59:25
**2025** 1:13
**21** 1:13 27:8
**220** 27:25 35:13
**229-2300** 4:21
**23** 59:20
**230** 102:12
**24** 86:25
**25-003574** 1:9
**25-3574** 7:3 41:8
**2525** 4:7
**255-7900** 3:22
**25728** 110:14
**25771** 109:17
**29th** 68:16
**2nd** 3:12 100:15,15,17

**3**

**300** 43:5 93:8
**305** 2:12 4:12 4:22
**305-403-8788** 3:15
**33021** 94:3
**33062** 3:20
**33131** 3:13
**33134** 4:8

**33265** 2:8
**33301** 1:19 2:17 3:6
**33601** 4:18
**3391** 4:17
**36** 3:12
**372-1800** 4:12
**3:28** 108:1
**3rd** 2:16 94:6

**4**

**4** 27:22
**40** 53:2
**400** 92:15
**45** 10:18 42:5
**462-5500** 3:8
**480** 92:8
**482-8437** 4:22
**4th** 44:3,7 100:5

**5**

**5** 101:19
**50** 43:6
**50,000** 95:13
**500** 43:4,4 57:20 91:20 92:10
**55** 36:2
**55.7.19** 30:19
**55.7.19.** 30:2
**550** 45:23 55:5 59:24 61:8,19 79:14

**558** 83:15
**57** 30:1
**58** 57:21
**580** 46:25
**585** 44:24
**5860** 94:2
**5th** 29:5

**6**

**600** 43:1 51:7 59:6 76:16 92:6
**614** 3:5
**650** 45:24
**653409** 2:7
**68** 56:2 57:22
**6n** 3:19
**6th** 1:17

**7**

**7** 63:17 83:25
**740-1423** 2:12
**761-8700** 2:19
**7666334** 1:21
**78** 55:25

**8**

**8** 25:3,8 63:17
**80** 81:16
**813** 4:21
**89** 26:25 35:14

**9**

**9** 4:7 24:20 25:8

**[9.01 - agreements]**                                                    Page 2

| | | | |
|---|---|---|---|
| **9.01**  34:6,6 35:14 | **acronym**  19:23 19:23 | **adjudication** 86:12 | 88:2 94:8 97:11 99:3 |
| **90**  20:24 27:5 35:19 36:6 | **act**  79:19 | **admissible**  9:19 | **agreed**  10:5 19:6 54:6 70:2 |
| **954**  2:19 3:8,22 | **acting**  75:1 | **admit**  92:5 | 70:3,22 72:13 |
| **99**  52:23 | **action**  46:23 47:1 50:22 | **admits**  37:14 37:15 | 80:17 84:3 85:13 87:7,12 |
| **a** | 53:14,16,17,19 53:20 109:12 | **admitted**  9:24 | 87:17 98:21,23 98:23 104:2,9 |
| **ability**  109:10 110:7 | 109:16 110:8 110:12 | **adopt**  33:14 **adopted**  67:22 | **agreeing**  33:2 99:11 |
| **able**  15:1 18:2 | **actions**  56:18 | **advisement** 102:4 105:10 | **agreement** 10:16 19:12,14 |
| **above**  26:4 | **actively**  19:7 | **aerial**  62:9 | 19:22 22:12 |
| **absolutely** 72:17 89:11 | **actual**  47:11 49:24 57:4,7 | **affidavit**  11:12 12:7 55:19 | 23:25 24:4,24 29:19 30:23,24 |
| 90:9,19 100:1 | 64:17 65:13 66:12,14 78:20 | **affidavits**  65:7 65:10 | 32:9,11,23,24 33:9 34:13,14 |
| **abundantly** 83:12 | 82:24 104:16 104:20 | **afforded**  59:10 | 34:15,19,24,25 35:1,6,22 |
| **accept**  34:11 86:2 | **actually**  17:1 35:18 64:17 | **afternoon**  7:6 7:16 8:4,8,9,11 | 36:14 37:2,10 45:10 48:11,15 |
| **acceptance** 93:25 98:7 | 69:24 79:8 82:20 103:25 | 8:17,22 9:2,4 10:13 15:14 | 48:18 50:10 54:18 74:19 |
| **accepted**  19:20 30:21 31:5 | **adam**  2:3,9 7:7 14:1 42:16 | 42:15 **age**  61:21 | 77:5 84:1 98:13 100:9 |
| 38:2 96:10,13 96:14 97:23 | **addition**  19:18 20:9 | **aggressive** 39:23 40:1 | 102:17,21,24 103:7 |
| 98:24 | **additional** 87:20 107:19 | **ago**  62:9 63:20 65:6 | **agreements** 19:17 22:13 |
| **accurate**  109:9 110:5 | **additionally** 23:23 | **agree**  12:4 33:4 49:4 50:19 | 23:23 24:15 28:15 29:21,23 |
| **acknowledged** 31:17 | **address**  43:13 63:11 72:21 | 54:14 57:18,23 58:23 61:13 | 30:4,5,11 31:16 33:11,19 |
| **acknowledge...** 95:10,12 | **addressed** 94:10 97:13 | 67:24 72:22,23 72:24 77:2 | |
| **acknowledge...** 29:23 38:1 | | 80:9,12,13 | |

| | | | |
|---|---|---|---|
| 33:21 36:22 37:7 53:5 55:15 64:10 | **amendments** 80:1 | **applications** 57:8 | **arbitration** 9:14 10:10 11:22 18:23 |
| **agrees** 9:18 15:25 99:4 | **american** 57:16 **analysis** 66:5 | **applies** 37:3,6 38:25 81:11,20 95:6 | 19:1,11,14,17 20:4,7 21:16 |
| **ahead** 15:17 25:2 | **answer** 42:23 **anybody** 16:3,7 52:21 101:12 | **apply** 11:21 20:11 81:20 82:1 90:12 | 21:22 22:12,17 23:24 24:1,25 27:12 28:3,14 |
| **alike** 24:4 25:12 | **anybody's** 77:25 | **approached** 46:14 | 31:15 34:17,19 35:21,25 37:3 |
| **allegations** 20:21 25:18 | **anytime** 69:18 **anyway** 16:14 44:11 103:6 | **appropriate** 86:12 | 38:11,19 40:7 44:18,25 48:25 |
| **alleged** 22:18 48:15 50:10 60:13 | **apartment** 3:19 **apologize** 7:10 15:15 | **approval** 30:7 30:10 31:13 36:23 37:24 | 49:1,23,25 50:4,15,19,22 51:3 54:7 55:1 |
| **allow** 51:3 **allowing** 49:18 **allows** 33:17,17 83:15 | **apparent** 57:4 57:8 65:8,11 **appeal** 43:18 43:21 44:10,14 | **approve** 46:3,7 48:23 **approved** 20:1 20:11,12 22:20 | 56:3,25 57:24 58:9,12,23 61:4 63:14,20 67:9,14 68:5 |
| **alter** 55:10 **alternative** 84:14 | 66:13 82:22 88:20,22 | 30:6,21 31:5 33:23 36:23,25 37:8 38:12 | 69:10 70:9 72:9,21,23,25 73:4 74:20 |
| **altogether** 58:3 76:24 | **appealed** 43:16 **appeals** 49:2 **appearance** 16:8 | 48:24 78:10 98:15 100:10 **approving** 29:17 | 76:16,19,20 77:8,9,14 83:24 84:12 |
| **amazing** 47:23 48:9 | **appearances** 7:4 8:15 15:20 16:2 41:13 | **arbitrable** 102:22 **arbitrate** 33:1 | 85:2,4,24 87:5 89:6,16,18,22 89:25 90:12 |
| **amend** 79:25 **amended** 19:1 19:2 20:16,22 23:4,8 25:17 26:16 28:1,11 28:23 35:12 36:15 37:14 68:16 79:22,23 | **appearing** 13:21 **appellate** 89:17 **applicable** 82:12 85:25 | 33:2 48:13 80:9,11 102:21 **arbitrated** 50:21 92:2 | 92:8,10,12,13 93:14 95:20 96:3,6,22 98:18 99:24 101:9,11 102:20,23 |

103:6,23 104:1 104:2,10

**arbitrations** 32:16 45:7 64:21 77:3 87:24 88:8

**arbitrator** 44:20

**argue** 10:2 12:18 56:8

**arguing** 84:5

**argument** 12:1 16:1 20:8,13 32:20 34:1 36:9 38:18,20 38:24 39:2,3,4 41:15 42:18 64:8 81:11,16 84:14 90:21

**arguments** 21:22 22:23 32:14,14 38:17 56:11 105:7

**arising** 34:24 48:14 50:9 60:12 85:3

**artful** 24:17

**articles** 49:7

**asked** 45:13 50:12 61:9 63:18,22 78:6 85:23 89:20 98:22

**asks** 21:6

**assert** 83:24

**assigning** 32:6

**associated** 21:11 26:17 28:12 31:25 39:24

**assurance** 57:15

**attach** 20:15,17 21:2 36:16

**attached** 24:2 26:15,20 29:20 29:21,22 36:15 37:5 38:4 55:19,23 75:3 103:9 104:11

**attachment** 74:21 98:13 105:3,5

**attachments** 20:1 23:21 57:23

**attorney** 109:14 110:10

**attorneys** 15:21 41:10

**audible** 18:13 18:16 42:3

**audio** 109:8 110:3

**august** 68:16

**auspices** 30:12 100:12

**authority** 56:17 57:4,8,9 58:14 58:16 59:3 64:18 65:8,9 65:12,13 66:12 66:15 78:16,22 78:25 79:2,6 81:4 82:24

**avenue** 2:16

**avoid** 28:2

**aware** 38:11 96:20

**awkward** 39:6

**b**

**b** 4:15 6:1 34:6 36:2 50:9,16 60:12,20 61:5

**back** 16:23 25:2,24 41:3,7 48:20 50:7,7 65:20 85:15

**bad** 60:4 85:10 85:12,12

**barbara** 5:3 7:9

**bargain** 87:14 87:17

**based** 22:18

**basically** 38:16 64:4

**basis** 56:18

**bat** 43:12

**beach** 3:20

**beautiful** 62:15 62:17

**began** 21:10

**begging** 69:6,7

**beginning** 31:4 31:21 38:7 83:14

**begins** 36:3

**behalf** 2:2 3:2 4:2 7:7,17 8:5 8:10,16,19 12:20 54:2 57:15 74:23 75:4 80:8,9,17

**believe** 13:4 64:3

**belt** 26:6

**ben** 8:18 11:4 13:14 45:24 47:14 50:8 51:2 55:18 58:16 60:11 65:1 100:21 104:23

**ben's** 42:18 93:8

**benefit** 1:5 47:9 87:14,17

**benjamin** 4:3

**best** 93:3 109:10 110:6

**betrays** 28:24

**better** 42:2

**[beyond - case]**

**beyond** 26:5 29:13 35:23,24
**bids** 61:8
**bifurcate** 68:10 68:11
**big** 19:10 23:25 31:4 43:10 58:2 68:8 80:4
**bigger** 47:24
**biggest** 59:17
**bill** 82:10
**billion** 42:25
**billions** 47:19
**bills** 30:5
**billy** 56:24,25 56:25 57:3,6 64:20 78:16 79:4,5,5
**bind** 36:19 65:13 78:17 79:9
**binding** 19:11 37:2 54:7 64:2 65:24 67:13,14 67:14 72:8 81:24 84:12 89:21 92:8 93:14 96:22 101:9,10
**bit** 7:23 25:1 31:20 43:13 71:22 104:15
**black** 17:18

**body** 20:19 35:3
**bold** 19:11 23:25 27:12 31:4 95:18
**bolded** 34:22
**bought** 56:10
**boulevard** 4:7
**bound** 30:17 36:18,20 37:18 38:12 101:5
**box** 2:7 4:17 91:15
**boxes** 91:11,13 92:18
**breach** 20:20 27:23 28:8 40:3,3 48:15 50:10
**breaches** 103:18
**break** 13:15 41:3
**brian** 5:6 16:21
**bridge** 16:13
**brief** 60:13 63:17 87:1
**briefing** 63:23 63:23 69:12
**bring** 44:24 53:12 54:5
**brings** 26:22
**broad** 24:1 27:12 28:15

34:20 35:2,23 35:25 72:22
**brought** 22:7 53:13
**broward** 1:2,16 22:8 52:24
**brown** 1:20 109:2,18
**bucks** 92:10
**build** 34:4 59:6 59:23,24 62:3
**builder** 33:1 48:12
**building** 45:23 52:19,23
**built** 23:1,5,5 23:11,13,16 25:5,12 26:1 45:24,25
**bulldoze** 61:19
**bunch** 19:23 28:10
**bushman** 2:5 7:9
**business** 49:14
**buy** 30:16 99:4
**buyer** 51:22 52:7 77:22 94:3 103:3
**buyer's** 93:25 98:6
**buys** 81:13
**bwidlanski** 4:9

**c**

**c** 2:1 3:1 4:1 5:1 7:1 30:25 31:1 31:1 35:6,14 37:6 60:14,20 61:5 75:25 76:2
**c&l** 84:24,25 99:23
**cace** 1:9 7:3 41:8
**cake** 85:8
**calendar** 77:13
**call** 86:7 94:11 97:14 100:20 103:15,19 105:10
**called** 11:7 45:4 47:14 49:4
**calling** 11:13 59:11
**camera** 15:17 16:13
**camera's** 17:2
**care** 47:10,12 47:12 69:15
**carswell** 4:15 9:1,3,4 13:22 16:24 17:23
**cart** 14:16,17
**case** 1:8 7:3 19:3,7 20:16 21:17,20 22:14

**[case - clause]** Page 6

22:24,24 23:4
29:5,7 35:8
41:8 42:20,24
43:1,10,24
44:14,17 46:11
46:13 47:4,15
47:23,25 49:6
49:16,23 50:3
54:3 55:14
56:12,15,23
57:19 58:2,15
59:1,2 63:4,15
63:19 64:1,7
64:22 65:17,20
67:24 68:4,10
68:22,23 70:11
74:1 76:10
77:18 78:1,15
79:4,8 83:14
84:17,24,25
85:1 86:17,19
86:21,22,23,24
86:24 90:3
91:6 92:20
93:7 98:17
99:23
**cases**  22:7 45:4
50:1 58:1,7
63:25 84:18
90:3 92:22,24
96:3
**ccarswell**  4:20
**cda**  19:22,24
20:1,11,12,15

20:18,19 21:23
22:3,3,7,9
23:17 25:6
28:22 29:18,20
29:21 30:10,21
30:23 31:11,12
31:22 32:1,3
32:11,13,15,17
32:24 33:18
34:1,16,25
35:11 36:25
37:8,23 38:18
46:16,20 48:4
48:8,9,23 49:4
50:5,15,18,20
50:25 51:3,23
51:25 52:14
54:18 55:1,11
55:19,21,21
60:2,11 67:9
67:10 72:10,12
73:2 79:12,21
79:23 80:1
81:2 85:16,25
89:22 92:1,9
92:12 98:11
103:9,9,21,23
104:12,19
**cda's**  36:24
52:3
**center**  94:11
97:14
**certain**  57:16
58:10

**certainly**  88:13
**certificate**
57:14 109:1
110:1
**certify**  109:4
110:2
**cetera**  11:6
**champion**  5:6
**chance**  11:14
**change**  55:10
92:14 103:24
**chapter**  83:15
**charge**  17:4
**charles**  4:14
**charper**  4:19
**chart**  36:4
**check**  91:11
92:16,17
**checked**  91:15
91:15
**chief**  46:6
56:24,25,25
57:3,5 78:16
**choose**  21:13
**chronology**
71:22
**circuit**  1:1,1
56:15,16 57:3
79:4 82:23
**cite**  29:8 32:22
36:12 55:12
57:25 63:16,16
64:23 84:17,23
86:25

**cited**  21:17
33:13 50:8
63:17 85:4
99:23
**cites**  56:22
92:21
**citing**  20:23
36:11 58:16
**claim**  28:9,10
28:13 29:3
34:21 47:9
48:14 50:9
53:12 54:16
60:12
**claims**  21:11
22:18 29:12
39:23 40:1
47:24 56:9
58:10 73:2
85:3 101:7
**clarifications**
83:11
**clarified**  11:4
**clarity**  23:7
**class**  46:23
47:1 50:21
53:14,15,17,18
53:20
**clause**  21:16
23:24 24:25
27:12 37:3
40:7 56:3
74:20 84:12
90:12

**[clauses - cont'd]** Page 7

clauses 87:5
clear 19:2
  22:13 26:3
  29:15 46:8,19
  57:11,17 58:13
  78:13,14 83:12
  85:5 96:7
  98:18 102:17
clearer 26:2
cleveland 9:9
click 30:17
clicks 91:13
client 41:11
  46:5 65:4 93:8
close 34:5,10
  91:8 92:21
  104:13 105:10
closes 34:4,11
closing 19:19
  19:24 20:5
  21:12,21,24
  22:3,5,7,8,10
  22:25 23:20
  25:13 29:17
  31:6,14,24
  32:2,8 33:5,8
  38:1,9,10,10
  51:11,19 52:6
  55:20 57:21
  72:19 75:2,5
  78:10 85:17
  94:1,10 97:13
closings 37:10

cmo 63:18,22
  68:4 69:7,12
collect 82:13
collectively
  23:16
columns 26:19
come 41:3 55:8
  58:9 59:17
  61:10 93:1,4,5
comes 50:13
  55:24 56:3
  65:19 92:3
coming 9:21
  10:17 60:25
commercial
  30:15
community
  19:21
compare 36:4
compel 9:14
  10:10 18:23,25
  36:2 43:17
  63:20 68:3
  71:5 75:23,25
  76:19 98:17
  102:20
competing
  102:10 105:11
complaint 19:2
  19:2 20:16,16
  20:23,25 23:4
  23:8 24:9,11
  24:19,23 25:3
  25:17 26:16,21

26:23,24 27:14
  27:15,22 28:1
  28:1,7,11,20,20
  28:23 29:10,10
  29:13 31:7,17
  35:12,12,19
  36:5,12,15,16
  37:14,20 40:4
  48:1,2 68:16
  74:22 103:17
completed 19:4
  19:5 25:21
  28:12 39:24
completely
  21:23 24:18
completion
  32:7 98:7
compliance
  57:15
complying
  83:19
comprehend
  45:20
comptroller
  66:10
computer
  15:12 75:14,17
concedes 23:3
conceived
  85:19
concluded
  108:2
condition 36:24

conditions 58:4
  101:5
conduct 79:19
conducted 58:6
conflict 33:10
congratulations
  81:14
conrad 3:4
conradschere...
  3:7
consent 32:25
  48:12
consented 54:6
consents 58:5
conservative
  61:18
consistent 28:5
constitute
  32:25 48:11
  85:5
construct 72:19
constructed
  23:1
construction
  19:25 22:19
  26:2 32:7 35:1
  43:6 48:19
  66:21 73:11
  83:15 85:1,2
  87:1
construed
  32:25 48:11
cont'd 3:1 4:1
  5:1

**[contained - court]** Page 8

| | | | |
|---|---|---|---|
| **contained** 48:10 | **contract's** 51:17 80:19 85:2 | **correct** 9:8 13:21 18:4 | **couple** 24:20 25:9 32:16 |
| **contains** 20:4 | **contracting** 67:7,15 | 22:5 43:21 44:8 51:19 | 83:11 84:16 95:15 97:8 |
| **contemplate** 85:16 | **contracts** 11:20 11:20 21:4,8 | 54:7 70:14,15 72:18 73:4,5 | 98:1 |
| **contemplated** 19:21 33:7,8 34:8 85:21 | 22:20 30:17 33:15 34:2 | 73:12,23 76:7 76:10,11,12,21 | **course** 22:24 26:3 37:25 41:23 50:25 |
| **contesting** 77:25 | 46:9 51:11,12 58:19,24 72:19 | 76:25 77:20 84:16 | 51:6 78:8 81:8 82:9 |
| **context** 57:10 | 86:6,7,19,21,22 87:6,18 89:23 | **costing** 68:9 | **court** 1:1 7:2 |
| **continues** 36:4 | 91:20 | **costs** 43:6,7 | 7:12,15,19 8:2 |
| **contract** 11:19 11:21 21:15 | **contractual** 55:15 64:10 | **could've** 86:3,3 | 8:7,11,22 9:2,5 9:9,11,13,19 |
| 22:9 24:16 27:18,19 34:22 | **contrary** 57:11 | **council** 46:3,6 51:1 66:11 | 10:5,9,22 11:2 11:15,17,25 |
| 36:7 40:3,8,10 46:3,7 48:4,5 | **controls** 20:5 22:11 | 67:22 78:12,14 | 12:2,9,13,14,20 12:25 13:3,6,9 |
| 48:20 49:24 50:4 51:1,19 | **controversies** 34:23 | **counsel** 5:3 8:21 19:25 | 13:17,20,23 14:9,14,16,25 |
| 58:20,22 67:8 72:15,20 76:3 | **controversy** 34:21 48:13 | 37:24 109:11 109:14 110:7 | 15:5 16:5,10 16:18 17:1,5,8 |
| 76:6 80:12,18 81:24,25 85:4 | 50:9 60:12 | 110:10 | 17:11,19,24 18:7,10,15,18 |
| 87:2,9,11 89:15 90:20 | **copied** 58:21 | **counsel's** 30:7 30:8,12,20 | 18:25 21:20 22:4,8 29:2 |
| 93:14,21 95:6 95:8,12,22,25 | **copy** 13:8,12 38:4 41:16,22 | 100:12 | 39:1,10,13,15 39:18 40:16,19 |
| 96:7,14,15,16 97:2 98:22,23 | 65:3 106:22 107:1 | **count** 27:22 28:7 | 40:24 41:7,20 41:22,24 42:1 |
| 100:9 103:16 103:18,20,22 | **coral** 4:8 | **country** 19:15 45:4 59:11 | 42:5,8,12 43:3 43:11,15,20,25 |
| 104:16,20 | **cornerstone** 29:5 | 66:20 81:12 93:3 | 44:3,6,9,15,21 45:1,6,12 |
| | **corporate** 64:12 | **counts** 27:22 28:10 54:22 | |
| | | **county** 1:2,16 52:24 | |

46:19,21 48:17
48:18 49:2,14
49:20,20,21
51:10,14,21,25
52:3,6,11,16,22
53:1,4,7,9,11
53:17,20,24
54:2,11,19
55:2 56:5
58:11 60:19
62:25 63:3,6
63:10,14 64:22
65:15,21,24
66:1,4,16 67:2
67:6,12,19,25
68:12,15,20
69:4,23 70:1,4
70:7,10,13,17
70:20,25 71:3
71:8,11,14,18
71:21 72:2,7
73:7,12,17,20
73:24 74:6,9
74:13 75:9,13
75:18,21 76:2
76:5,8,14,18,24
77:1,18,21
78:9,19,24
79:17 80:5,11
80:16,21,24
81:3,8,23 82:4
82:5 83:1,5,8
84:4,8,11,20,24
85:1 86:25

87:22 88:6,17
89:5,10,12,19
90:6,10,17,20
90:25 91:2,17
91:20 92:22,24
93:2,5,5,13,21
93:23 94:1,7
94:16,23 95:1
95:5,16,21,24
96:2,6,11,15,18
97:1,4,10,17,21
97:24 98:3,8
98:16,25 99:2
99:6,10,17,20
99:22 100:1,4
100:7,22 101:2
101:15,17,20
101:24 102:3,8
102:11,15
103:5,11,14,25
104:6,9,14
105:2,6,9,16,21
105:23 106:1,7
106:10,13,19
106:25 107:4,7
107:11,14,16
107:18,24
**court's** 43:14
57:11
**courtesy** 13:8
13:12 41:16,22
**courthouse**
1:16

**courtroom** 1:18
15:16,19,21
16:15
**courts** 19:15
87:2
**cover** 28:15
**covered** 19:5
94:9 97:12
**covers** 27:6
**cox** 79:3
**crazy** 48:3 93:7
**cross** 11:14
**crucial** 65:12
**crunch** 10:14
**crystal** 4:15
8:25 58:13
**cummins** 5:6
16:22 17:4
**currie** 2:15
7:17
**cursory** 28:23
**customer** 28:6

**d**

**d** 7:1 60:15,20
61:5 75:22
76:1
**damage** 54:1
**damages** 19:3
24:21 25:7,21
25:23 26:17,21
28:12 39:23
42:25 47:7

**date** 1:13 48:7
**david** 1:15 4:14
8:24
**day** 11:18
27:12 52:18
60:9 65:22
67:7 73:1 84:5
88:24 107:24
**days** 63:19
105:21,24,25
106:1
**dca** 29:5 100:5
**de** 4:7
**deal** 30:15
31:25 68:9
80:4
**dealt** 38:20
**december**
59:25 69:2
82:11
**decide** 58:12
**decided** 51:8
**deciding** 92:11
**decision** 64:3
89:6
**decisions** 66:3
**deemed** 32:24
48:11
**default** 60:2,2,3
**defaults** 32:4,5
**defective** 45:25
61:12,12 93:9
**defects** 19:3,4
22:19,19 25:21

| | | | |
|---|---|---|---|
| 25:22 26:2 28:11 39:23,24 73:2 83:16 | **description** 6:2 | **discovery** 68:11 69:19 | 31:5,23 33:5,5 33:7 34:9 94:25 95:18 |
| **defend** 87:15 | **deserves** 87:16 | **discretion** 43:23 | 97:4 98:10,21 |
| **defendant** 1:10 4:2 56:19 | **designed** 31:24 | **discuss** 22:21 55:22 88:1 | 99:15,15 100:15,16,21 |
| **defendant's** 10:1 | **details** 89:2 | **discussed** 85:21 88:4 | 103:17 104:10 |
| **defendants** 47:25 | **developer** 66:20 93:3 | **discussion** 86:17,18 | **documents** 9:19,20,21,24 |
| **defending** 86:11,11 | **developers** 61:10 | **disposes** 20:6 | 10:17,21 12:7 12:7,16 15:22 |
| **defense** 8:16 12:21 16:6 41:25 70:23 75:22 82:9,14 | **development** 19:21 | **dispute** 12:2,14 19:13 21:21,24 24:7,10 25:14 28:17,21 32:3 34:21 38:5,6,6 48:4,8,13 50:14 56:15,16 61:13 103:22 | 29:14,18 30:9 30:18 31:14 33:7,8 38:8,10 57:21 85:17,18 86:1 |
| **deference** 19:16 | **difference** 9:22 9:23 | **disputed** 50:19 | **docusign** 91:8 92:8,15 |
| **define** 26:11 | **different** 11:10 11:21 27:8 44:20 59:5 72:20 88:9 | **disputes** 15:25 20:5 22:3 28:16,16 32:2 85:3 86:13 94:17 95:19 96:21 97:18 101:8 | **doing** 30:15 39:21 40:1 47:4 54:23 60:22 83:20 |
| **definitely** 17:19 17:24 78:7,9 | **differently** 58:14 | | **dollars** 42:25 47:9,19 59:9 60:24 68:9 |
| **delay** 44:11,16 83:20 | **difficulty** 104:15 | | **doubt** 51:9 |
| **demands** 50:22 | **digital** 109:8 110:3 | **distinguish** 78:21 | **drafted** 30:11 100:11 |
| **denies** 68:5 | **direct** 46:17 60:15 | **district** 49:22 | **drag** 88:20,22 |
| **deny** 38:24 43:20 44:6 68:2 88:19 | **directed** 72:5 | **docket** 99:1 | **dragging** 88:14 |
| **depending** 43:14 | **directly** 23:13 29:6 57:11 | **docu** 79:14 | **dreamed** 59:21 |
| **deposition** 69:21 | **disability** 57:1 | | **drive** 62:19 |
| **described** 25:19 | **disagreement** 11:11 28:19 | **document** 19:12 20:22 | **due** 49:3 |
| | **disaster** 61:9 | | |
| | **disclosures** 42:24 | | |

**duly** 109:5

**e**

**e** 2:1,1 3:1,1 4:1 4:1 5:1,1 6:1 7:1,1 91:9
**earlier** 15:7 35:17 51:11
**easier** 39:10
**eastcustomer...** 94:12 97:15
**eat** 85:9
**effect** 29:2 87:3
**effective** 24:18
**effects** 43:7
**efficient** 77:15 88:15
**efficiently** 47:18 77:11
**effort** 20:7
**eight** 60:24
**either** 23:1 24:8 38:24 43:15,15 44:10 54:15
**electronic** 14:17
**eliminating** 21:7
**elizabeth** 3:3
**employed** 109:11,14 110:8,11
**employee** 109:13 110:10

**enabled** 40:24
**ended** 44:17
**enforce** 21:14
**enormity** 62:11 62:23
**enter** 77:9
**entered** 80:17
**enters** 48:19 58:20 89:15
**entire** 19:3,13
**entirety** 21:15 25:16 26:13
**entities** 58:9
**entity** 72:20
**equally** 85:25
**es** 109:4
**escherer** 3:7
**esquire** 2:3,4,5 2:14 3:3,10,17 4:3,4,5,14,15
**essence** 89:1
**essentially** 16:1 31:23
**establish** 22:15
**established** 22:16
**et** 11:6
**evade** 20:7 86:16
**evd** 6:2
**event** 71:23 100:23
**events** 71:23

**everybody** 8:13 9:18 15:14,18 15:19 56:13 66:11 80:8 81:12 99:3
**evict** 60:5
**evicted** 61:20 62:1,12 68:8
**evidence** 12:17 15:23 56:20 67:18,21
**evidentiary** 11:8 100:19
**exactly** 41:18 46:12 61:21 94:20
**examine** 11:14
**excellent** 106:19,20
**except** 54:4 58:15 82:18
**exception** 29:7
**executed** 75:4
**exercise** 100:3
**exhibit** 20:18 26:11,11,11,13 26:13,15,20 30:22,25 31:1 31:1 34:16 35:5,6,6 36:2 37:1,6 74:19 75:3,22,25 76:1,2 98:14

**exhibits** 20:12 30:21,22 36:25 37:1
**exist** 21:3 88:10 88:11
**exists** 83:17 98:22,23 102:22
**expedient** 88:16
**experience** 46:24
**experts** 61:1 65:11
**explain** 44:23 46:10
**explore** 88:16
**express** 20:21 27:23,23 38:19 40:3,4 73:3 78:22,25 84:1 98:19 99:8,12 103:18
**expressed** 56:19 57:13
**expressly** 20:18 21:11 32:16 56:20
**extending** 57:8

**f**

**f** 60:18
**face** 26:24 49:25 65:20

facile  77:6
fact  20:9,24
    29:17 34:10,11
    46:4 57:20
    60:4 68:4
    72:13 74:4
    78:14 84:23
    89:16 91:24
facts  54:25
    66:7 74:2 91:4
    91:5,5,7,7
factual  12:2,5
    12:14,15 15:25
    28:18
fairness  73:25
families  51:16
    61:21 62:5
family  56:2
    81:15
far  24:7 28:24
    36:21
farola  5:4 8:20
farther  35:24
favor  77:17
federal  3:5
    46:19 48:17
    49:2,21 57:1
    58:7,11 60:19
    65:22 93:2,5
feel  66:24
figments  85:18
figure  46:12
figured  13:1

file  88:22
filed  39:5 47:8
    47:15 48:2
    68:12,22,23,25
    91:21
filing  70:16
final  39:17
finally  22:21
    37:8 55:9
    71:16
financially
    109:15 110:11
find  65:2
finding  95:20
findings  12:15
fine  107:11
finish  104:23
    104:24
finished  41:22
finishing  32:7
firm  2:6 7:14
    42:16 64:13
    65:5
firms  93:3
first  12:21
    13:25 15:6
    19:10 38:17
    39:11 43:14
    46:16 49:10
    64:19 66:22,23
    68:24 82:11
    86:14 93:19
    95:17 98:4

five  13:15
    40:17 41:2
    46:14,17 60:14
    63:16 79:25
    93:12
fix  15:8 71:10
    71:10
fl  1:19 2:8,17
    3:6,13,20 4:8
    4:18
flip  72:24 88:18
    89:20 90:10
floor  3:12 4:7
florida  1:2,4
    2:2 3:2 5:9 7:4
    19:16 28:4
    41:8 42:17
    49:22 51:18
    52:4,12 53:14
    59:6 76:9
    77:23,23 86:24
    89:24 92:21
    94:3,4 96:19
    109:20
focuses  38:16
foley  4:16 8:25
    9:1,6
foley.com  4:19
    4:20
follow  58:21
followed  61:5
force  76:16
    81:21

foregoing
    109:3,4 110:4
forgot  15:15
    42:7
form  33:10
    37:6 48:18,21
    58:19,21,22
    82:17 89:15
forms  56:25
fort  1:19 2:17
    3:6
forth  31:12
    34:1 36:22,25
    37:9 48:16
    60:14
forum  44:20
    86:12 88:25
forward  73:17
    107:18
four  46:14,17
    60:8,10 61:25
    79:10
frankly  87:10
front  19:9 29:8
    104:15
full  15:16 29:2
    84:18
furious  61:25
further  19:12
    32:10 39:15
    71:24 109:13
    110:9

**[g - hand]**                                                          Page 13

| g | | | |
|---|---|---|---|
| **g** 7:1 | **go** 15:17 17:22 | 49:8,14,22,23 | **grandfather** |
| **gables** 4:8 | 18:3 25:2,24 | 50:3,7,17 51:5 | 46:6 |
| **gallery** 17:9 | 26:4,8 27:4,21 | 51:6,7,8 54:17 | **grant** 43:17 |
| **gelfand** 3:17,18 | 29:12 42:20 | 55:8,16,21,22 | 44:7 76:19 |
| 8:9,10,12 | 49:18,19,23 | 58:17 59:1,19 | 87:23 88:21 |
| **gelfandpa.com** | 50:7,15 52:6 | 60:5,5 61:11 | **granted** 19:1 |
| 3:21 | 60:19 61:4,19 | 61:14 62:2,2 | **graphics** 5:6 |
| **general** 18:21 | 61:23 62:2,3 | 63:10 64:19 | **gravamen** 29:3 |
| 19:25 30:6,8 | 66:8 68:17 | 69:11,11,12 | **great** 12:11 |
| 30:12,20 37:24 | 72:8 77:13 | 70:11,21 72:4 | 13:10 14:22 |
| 98:17,18 | 79:21 80:2 | 73:17 78:7 | 19:16 31:3 |
| 100:12 | 81:24 89:16 | 79:15 88:20,22 | 54:4 56:2 |
| **getting** 25:1 | 100:14 101:18 | 90:13 92:4,6,7 | 105:14 107:24 |
| 43:16 91:10 | 107:15 | 97:16 98:12 | **grossman** 3:11 |
| **ghost** 62:19 | **goal** 77:7 | 100:19 102:3,4 | **group** 61:23 |
| **give** 10:11 | **god** 59:19 | 103:23 107:5 | **groups** 23:11 |
| 19:16 29:2 | **goes** 17:25 | **good** 7:6,16 8:2 | **guess** 44:15 |
| 41:22,23 51:5 | 35:23,24 67:3 | 8:4,8,9,11,17 | 51:22 77:2 |
| 55:4 61:11,15 | 81:25 | 8:22 9:2,4 | 84:13 87:25 |
| 85:11 87:3 | **going** 7:9,11 | 15:14 18:9 | 88:1,18,21 |
| 95:5 105:19 | 11:9,24 12:3 | 40:20 41:1 | 94:6 100:23 |
| 106:14 107:5,8 | 13:5 14:11,13 | 42:15 85:9,11 | 103:7 |
| 107:12 | 15:1,17 16:1 | 90:1 91:10 | **guys** 15:3 60:1 |
| **given** 10:15 | 16:12,13 17:12 | **gosh** 13:20 17:9 | 80:3 |
| 37:20 39:7 | 17:13 18:11 | **govern** 21:23 | |
| 57:15 98:12 | 19:22 22:15 | 31:24 | h |
| 107:1 | 23:22 24:6,10 | **governed** 19:24 | **h** 6:1 30:22 |
| **giving** 64:20 | 25:19 27:8 | 21:25 22:19 | 34:16 35:6 |
| **glad** 45:12 | 33:4 37:14 | **government** | 37:1 74:20 |
| **glance** 28:23 | 41:18 42:10,19 | 57:1 81:18 | **haimes** 1:15 |
| **globally** 73:13 | 42:21 43:9,10 | **government's** | **half** 42:25 |
| | 43:10 44:11,18 | 92:23 | 47:19 62:20 |
| | 44:20,21 45:18 | **governs** 22:3 | **hand** 40:2,12 |
| | 45:23 46:7,15 | 24:3,5 51:24 | 78:21 |

| | | | |
|---|---|---|---|
| **handled** 47:18 | **hear** 19:23 24:6 | 34:13,14,15,19 | 61:14,19,20 |
| **hands** 71:21 | 39:10 60:11 | 34:25 35:1,5,7 | 62:3,12 74:3 |
| **hang** 40:21 | **heard** 9:6 60:21 | 35:14,22 36:14 | 74:12,14,15,17 |
| 101:17 | 60:22,23 63:19 | 37:2,7 38:25 | 74:24 75:6 |
| **happen** 73:11 | **hearing** 1:12 | 52:7 56:2,10 | 76:21,23 92:6 |
| 73:14 | 11:8 64:1 69:8 | 59:19 62:12 | 93:9,9 |
| **happened** | 69:14,17 | 74:19,25 88:11 | **honor** 7:7,16 |
| 16:25 45:20 | **held** 85:1 92:24 | 88:12 91:10 | 8:18 9:25 10:7 |
| 61:2 64:13 | **hello** 8:24 | 92:16 98:13 | 10:15 11:1,3 |
| 69:5 71:7 | **help** 16:20 | 100:9 101:4 | 12:5,19,24 |
| **happens** 34:6 | 54:17 105:12 | **homeowner** | 13:18 16:4,9 |
| 38:9 59:24 | **helped** 71:16 | 76:9 81:12 | 18:6,25 19:9 |
| 61:18 | **helpfully** 26:10 | 94:3 | 19:15 39:8,22 |
| **happy** 39:14 | **hereto** 109:15 | **homeowners** | 40:18 41:5 |
| 65:4,5 102:7 | 110:11 | 51:15 | 42:11,16 43:22 |
| **hard** 77:12,13 | **hey** 60:21 61:3 | **homes** 1:9 4:2 | 43:23 44:8,22 |
| **hardcopy** | 80:2,3 91:9 | 7:4 19:4,5 20:5 | 45:15 48:3,24 |
| 75:17 100:14 | **hi** 7:25 | 21:12 22:25,25 | 50:18,21 52:15 |
| **harley** 4:4 8:18 | **highlighted** | 23:5,6,12,12,12 | 57:25 58:19 |
| **harmonious** | 26:18 32:9 | 23:14 24:3,5 | 60:9 63:24 |
| 87:9 | **highway** 3:5 | 25:4,11,12,13 | 66:3 67:5,17 |
| **harmoniously** | **hillsboro** 3:19 | 25:21,23,23 | 68:2,18 69:14 |
| 33:12,15 86:23 | 3:20 | 26:1,14,17,19 | 69:19 71:25 |
| 87:3,4,7 | **hired** 46:2 | 26:19 27:2 | 78:4 81:7 83:4 |
| **harmonize** | **history** 81:17 | 28:12 30:24,25 | 83:7,13 84:19 |
| 21:5 | **hit** 85:7 | 31:9 32:8 34:7 | 85:7,23 86:15 |
| **harper** 4:14 | **hollywood** | 34:7 35:15,16 | 87:20 89:8,14 |
| 8:24,25 9:3,8 | 45:17 94:2 | 35:16 37:3,7 | 90:2,15,24 |
| 9:10,12 | **home** 19:19 | 39:24 41:9 | 91:24 92:5,25 |
| **haul** 49:13 | 24:14,24 26:21 | 43:1 45:23,24 | 93:12 100:13 |
| **head** 85:8 | 28:4,15 29:19 | 46:25 47:12 | 100:18 102:7 |
| **health** 43:7 | 29:20,22 30:4 | 51:7 54:3,4,21 | 103:1,21 |
| 47:13 | 31:16 33:8,11 | 59:7,15,23,25 | 105:13,15,19 |
| | 33:18,21 34:4 | 60:6,25 61:8 | 106:6,18,24 |

**[honor - interrogatories]**

107:17,22
**honorable** 1:15
**honored** 42:16
**hooked** 14:17
  15:12 16:16
**hope** 44:13
**horrible** 60:4
  61:14
**house** 45:8,16
  53:13 54:16
  62:21 66:23
  82:13
**howard** 2:5,11
**howie** 2:5 7:8
**hst** 4:10
**hundreds**
  26:14,14 59:9
  60:17 61:24
  62:5 68:7 91:2
**hurricane**
  62:14

**i**

**idea** 11:23
  18:21
**identical** 35:21
  36:6
**identified**
  20:19
**ignore** 21:2
  24:14,15 33:20
  40:6,7,9 87:13
**ignoring** 21:7

**imagination**
  85:19
**imagine** 19:22
**immediate** 85:6
**immediately**
  59:25
**immunity** 20:8
  20:10,14 22:22
  38:17,23 40:14
  49:5,6,9 54:9
  56:21 57:5,7,9
  57:12,25 58:3
  58:13 65:13
  66:14 67:20
  79:6,7,13,16
  80:14,15 81:11
  81:18 82:2,16
  82:23 86:7,8
  90:4 92:22,23
  102:18 103:2,4
**implicated**
  22:22 24:25
  25:1 86:8
**implicitly**
  79:18
**implied** 56:18
  57:13
**importance**
  10:3
**important**
  23:19,20 25:10
  32:21 36:11
  40:6 50:5 64:3
  74:4 79:17

**importantly**
  20:20 30:19
**impression**
  68:24
**incidents** 47:8
  66:25
**include** 20:12
  29:18 31:14
  32:6 83:22
  85:24
**includes** 20:3
  29:19 95:19
  96:21
**including** 21:15
  21:18,20 58:1
  101:6
**incorporate**
  67:13
**incorporated**
  72:14 96:11
**incredibly** 24:1
**incurred** 25:7
**indemnificati...**
  54:18,22
**indemnify**
  54:17
**indian** 48:19
  59:8
**individual** 23:2
  35:8 44:24
  47:2 51:14,16
  52:7,10 53:12
  53:13 54:5,12
  54:14,21 57:10

74:5 77:3,24
  79:8,9 80:6
  88:8 94:13
**individuals**
  62:24 63:2
  74:18,22 75:1
  76:16
**infested** 62:7
**initial** 42:23
**initialed** 97:25
**initials** 96:23
**initiated** 20:9
  86:9
**injured** 43:8
**input** 17:25
**inside** 62:20
**inspected** 60:17
**inspecting**
  60:25
**inspections**
  61:6
**instance** 53:11
**instances** 51:15
**intentionally**
  23:9
**interest** 88:14
**interested**
  45:11 109:15
  110:12
**interesting**
  106:16
**interrogatories**
  69:21

**[involve - know]**

**involve** 84:21
**involved** 46:22
  60:9
**issue** 9:16,17
  12:5 22:10
  29:14 35:8
  37:4 38:25
  47:16 50:14
  56:7 65:12
  66:13,14 78:1
  80:14 82:7,24
  86:21,22 87:11
  88:10,11
  102:22 107:20
**issues** 25:13
  88:9 102:19
  106:15
**it'll** 13:13 43:23
**items** 94:9
  97:12

**j**

**j** 4:3
**james** 21:20
  50:3 55:14,14
  55:17 58:15
  59:1,2 63:9,13
  63:19 64:1,17
  65:7 78:22
  79:2 82:19,19
  82:21 90:3
**jason** 3:10 8:5
**jk** 3:14

**job** 1:21 106:19
**joey** 7:8
**johnson** 86:24
**joined** 46:13
  64:13
**joint** 45:6 61:5
  70:22,25 83:12
**jones** 91:9,12
**joseph** 2:4,10
  2:14 7:17
**jryoung** 2:18
**judge** 1:15 7:25
  8:4,24 12:6
  13:2 14:23
  16:17 17:7,22
  18:9 20:15
  21:1,10,18,22
  22:15,25 23:20
  25:9,15 26:18
  26:22 27:4,8
  27:11,19 28:18
  28:23 29:5
  30:13 31:3,7
  31:21 32:13,21
  33:17 34:8,10
  34:14 35:7
  36:2,13,17
  37:13,22 38:4
  38:13 39:20,21
  40:9,11,15
  53:23 55:13,14
  56:7,22 64:11
  64:15 65:2,22
  65:22 66:13

68:5 72:6 73:5
  73:22 75:3,16
  76:11 77:8,12
  82:21 83:10
  84:15 85:7
  86:5,23 87:4
  87:11 88:4
  93:19 94:5,15
  95:3 96:25
  98:2,10,14,20
  99:9,15,22
  101:13 102:6
  102:14 103:15
  104:22 107:21
**judicial** 1:1
  9:15,20,23
  10:4 11:5,12
  15:23,24
  100:24
**judicially** 12:17
**judy** 1:20 109:2
  109:18
**jump** 10:10
**jurisdiction**
  82:3,4
**jury** 44:21 89:7

**k**

**k** 3:10
**katherine** 4:5
  8:18
**kaye** 2:4 7:8
**kazoo** 49:7

**keep** 18:18
  37:14
**kellogg** 3:10,11
  8:4,5,5,8
**kid** 59:21
**kids** 62:5,6
**kind** 9:16 12:14
  14:18 23:8
  37:17 43:12
  46:10 52:23
  105:6
**kmitchell** 4:11
**knew** 79:20
**knock** 32:13
**know** 7:10 9:15
  9:18,22 10:2
  12:2 14:5,12
  15:13 16:18
  17:9 19:15
  24:20 35:10
  37:19 38:3,22
  39:4 40:5
  41:10 43:9
  44:16,16 45:10
  46:25 47:3,6
  47:21 48:24
  49:7,8,11 51:5
  54:17,23 55:3
  56:10,14 59:13
  60:4 61:8
  64:10,12 65:18
  65:22 68:1
  72:10,11,12
  73:21 77:11,12

77:13 78:3,20 84:12 88:3,5 88:12 89:1,17 89:20 90:2,3 90:11,13 92:16 93:11 94:14,22 104:16 107:9

**knowing** 92:19

**knowledge** 109:10 110:6

**knows** 49:15

**kozyak** 4:6 5:4 8:19

**kttlaw.com** 4:9 4:10,11

**l**

**l** 1:20 109:2,18

**land** 52:15,19 52:20,21,22 59:13,14,22

**lands** 28:6

**language** 21:3 27:7,18 29:11 30:18 35:18 37:20 50:12 83:22 87:13 95:18 100:16 100:17 103:19

**lardner** 4:16 8:25 9:1,6

**large** 30:15 31:23,25

**largest** 66:20 93:2

**lauderdale** 1:19 2:17 3:6

**law** 2:6 21:17 21:21 22:14 33:13,13,14 40:10,11,11 42:16 46:8 47:11 49:6,10 56:14 57:24 77:18 78:13 82:17,18 83:15 90:2 93:3 98:17 102:16

**law.com** 2:9,10 2:11

**laws** 57:16

**lawsuit** 24:13 54:5

**lawyer** 64:7

**lawyers** 26:4 27:20 48:21 50:12 61:23 77:12

**lays** 27:5

**leaking** 60:7

**leaks** 61:11

**lease** 23:14,17 24:3 25:23 34:6 35:16 74:3,10,11 75:6 76:3,4,5 76:20,22 87:24

89:23

**leased** 23:15 75:8

**leases** 52:23

**leave** 62:1,6

**left** 19:10 42:6

**legal** 5:6 10:2,3 12:1,3 16:1

**lehman** 3:11

**length** 23:3

**lengths** 42:20

**lennar** 1:9 4:2 7:4 8:19 23:11 24:14 25:5,11 27:1,17 28:3,5 28:22 31:1,8 32:1 35:13,15 36:19 40:2 41:9 42:20 45:2,23 46:15 48:5 49:19 51:18 52:4 55:9 60:10,24 66:19 71:9,13 73:1,18 75:5 76:15 81:13,15 81:24 85:24,25 86:9,10,11,15 87:14,15,15,16 87:16 88:13,16 89:20,21 91:10 92:16 93:1,2 101:6,8 103:3

**lennar's** 9:14 18:25 49:14 56:1 62:16

**lennar.com.** 94:12 97:15

**leon** 4:7

**letter** 60:1 82:11

**letters** 19:11 23:25 31:4

**levine** 3:11 8:5

**liability** 32:10

**lie** 28:25

**life** 27:12

**lifetime** 59:12 59:14

**limit** 10:12 106:3

**limited** 19:5,8 31:1 38:3 49:4 49:5,9,16,16 93:20 94:8,9 95:18 96:20 97:7,11,12 101:6,6,8

**line** 24:12 32:8 74:22 83:25

**list** 27:5 59:20

**listed** 52:7

**listen** 17:14 77:12

**listening** 17:12 18:11 42:18

**[litany - members]**

**litany** 25:17
**litigation** 20:10
  47:5 68:11
  86:10
**little** 7:23 9:16
  23:10 25:1
  29:13 31:20
  43:13 62:5,6
  71:21,22 74:2
  104:15
**live** 21:14,14
  46:1 59:12
  60:6 66:22
**lived** 55:6
  82:13
**living** 59:21
  66:24
**liz** 7:25
**lklsg.com** 3:14
**llc** 1:9 4:2 5:7
  7:4 41:9
**llp** 2:15 3:11
  4:6,16 5:5
**located** 94:2
**location** 1:16
**logistics** 13:14
**long** 12:13
  102:11
**longer** 22:9
  65:23
**look** 16:14
  24:11,19 27:13
  27:25 29:3
  31:11 32:18

  50:5 62:13,15
  62:16 67:7
  72:14 73:14
  77:22 93:17
  102:5 107:18
**looked** 31:3,11
  91:16,21
**looking** 14:9
  16:12 70:21
  82:22
**looks** 44:10
  45:19
**lost** 45:5
**lot** 13:23 31:10
  46:23 84:21
  86:16,17
**love** 105:15

**m**

**m** 2:3,4,5
**m.o.** 45:3
**made** 84:1
  94:11 97:14
**mail** 91:9
**main** 84:14
**make** 10:17
  12:14 15:6
  22:15 23:10
  39:2,3 40:20
  44:13 59:8
  72:23 78:13
  84:10
**makes** 9:22
  14:8 19:2

**making** 20:21
  29:12
**man** 101:25
**mandated**
  37:22
**mandatory**
  19:14 31:14
  34:16 72:8
  89:25 96:3
**manner** 48:16
  50:11 58:5
**march** 68:12,25
  69:2,5
**marked** 6:3
  75:22,25
**massive** 42:25
  45:15 59:7
  66:21
**matter** 43:15
  48:13
**matters** 77:10
**mccolm** 110:2
  110:15
**mean** 11:18
  13:23 36:17,18
  38:14 45:3
  65:10 69:8
  73:14 75:11
  77:4,17 78:10
  84:18 85:7
  88:19,24 92:7
  95:3 100:4
  102:15

**means** 50:16
**mediation**
  46:14,15,18
  60:16 68:19
**meet** 7:13
  61:22 63:18
  69:11,13
**member** 23:12
  23:17,20,22
  24:3,4,5,14,22
  24:24 25:12,23
  26:19,21 28:15
  29:19,20,22
  30:4,23,25
  31:15 33:8,11
  33:18,21 34:7
  34:13,14,15,18
  34:24 35:5,16
  35:22 36:13
  37:1,7,12
  52:10 74:9,12
  74:19 76:3
  77:1,3 82:16
  87:25 98:13
  100:9
**member's**
  94:14
**members** 1:6
  23:2,14,16
  27:2 35:8 43:8
  44:24 47:10,11
  47:17 51:17
  74:18 75:1

**mentioned**
36:15 43:13
63:21
**mentions**
104:20
**merits** 63:3,11
67:3 86:17
**met** 60:9 66:9
66:10,10,11
**miami** 2:8 3:13
**miccosukee**
47:5
**midwest** 9:7
**mile** 3:19
**million** 43:3,6,6
61:18 92:10
93:8
**millions** 47:9
59:8,9,9 60:24
68:9
**milwaukee**
9:10,11
**ministerial**
100:3
**minute** 13:15
41:2,3 59:2
**minutes** 10:18
40:17
**misspeak** 55:18
**misused** 82:14
**mitchell** 4:5
8:19,23
**mixed** 74:2

**mobile** 62:3
**mold** 61:2,13
62:7,22
**molly** 110:2,15
**moment** 23:6
**money** 49:21
50:2 57:1 93:6
**monitor** 14:17
42:2
**monitors** 14:10
14:18 15:7
**month** 60:15
68:21
**months** 46:14
46:17 60:8,10
60:21,24 61:3
61:25 68:6,18
71:13
**moreno** 55:14
56:22 64:11,15
66:13 82:21
**moreno's** 21:18
65:22
**morning** 7:19
8:2 15:9 65:1
**moskowitz** 2:3
2:6,9,10,11 7:6
7:7,13 10:6,7
10:19 11:3,16
11:23 12:4,11
12:19 13:5,13
13:18 14:4,7
14:10,15,21
15:1 16:4 18:5

40:18,22 41:5
41:17,21,25
42:6,10,15,16
43:5,19,22
44:1,5,8,12,22
45:2,9,14
46:22 51:13,20
51:23 52:2,5,9
52:13,17,25
53:2,5,8,10,15
53:18,22,25
54:8,13,20
55:3 56:6 63:1
63:5,8,12,15
64:24 65:16,25
66:2,6,17 67:4
67:10,17,21
68:1,14,17
69:1,6,25 70:3
70:6,8,12,16,18
70:24 71:2,6,9
71:12,15,20,25
74:1,16 76:13
77:2 78:3,6,12
78:23 79:1
80:7,13,20,23
81:1,6,9 82:3,7
83:3 85:17
86:14 88:18
89:4,8,11,13
90:1,8,15,19,23
91:1,4,18,23
93:16,22 94:13
94:20 95:7,11

95:25 96:5,17
96:24 97:3,16
98:5,22 99:5
99:13,19
100:18,25
103:1,8,13,21
104:3,8,11,18
104:23 105:1,4
105:8,14,20,22
105:25 106:3,8
106:12,17,24
107:2,5,8,12,15
107:17,21
**motion** 9:14,15
10:10 18:23,25
36:2 43:17
63:20 68:3
70:22,23,25
71:4,4 75:4,23
75:25 76:19
83:12 84:1
**motions** 98:17
**motivation**
77:16
**move** 32:18
33:24 60:5
**moves** 77:14
**muddies** 23:8
**murky** 23:10

|  n  |
| --- |

**n** 2:1 3:1,18 4:1
5:1 7:1

**[nail - opioids]**

| | | | |
|---|---|---|---|
| **nail** 71:12 | **neither** 32:10 | **o** | 50:7 52:11,16 |
| **name** 47:1 52:9 | 36:13 109:11 | | 53:4,8,21,24 |
| 52:25 53:3,6 | 110:7 | **o** 7:1 | 54:19 55:2,16 |
| 76:9 94:3 | **never** 32:2 33:3 | **oath** 100:21 | 56:4,5,13,19 |
| **named** 24:13 | 33:4 47:16 | **object** 100:19 | 58:24 59:1,2 |
| 51:21 | 49:23,25 50:18 | **objective** 99:24 | 62:8,10 63:8 |
| **names** 7:21 | 52:11,20 57:19 | **obligation** 29:3 | 63:18 66:16 |
| **nation** 92:20 | 60:21,22,23 | **observers** | 67:23 69:4 |
| **native** 57:16 | 63:21 68:1 | 16:11 | 70:1,17 71:11 |
| **nearly** 35:21 | 79:24 95:7 | **observing** 5:3 | 73:24 74:4 |
| **need** 10:20,20 | 104:11 | **obvious** 26:23 | 75:18 76:2 |
| 11:5,18 12:7 | **news** 59:17 | **obviously** 10:2 | 82:11 89:12 |
| 12:15 14:23 | **nicely** 25:25 | 11:6 43:17 | 93:24 103:11 |
| 16:2,7 18:4,19 | **nine** 61:3 68:21 | 65:23 66:19 | 106:25 107:7 |
| 38:21,22 41:12 | **non** 67:13 | 88:8 | 107:13 |
| 65:13 77:19 | **normal** 91:12 | **occurs** 22:10 | **oles** 2:15 |
| 79:10,11 | **northeast** 2:16 | **october** 1:13 | **once** 21:10 22:8 |
| 100:20 102:5 | **notably** 36:13 | **office** 30:7,8,12 | 70:8 |
| 102:12 | **notary** 109:19 | 30:20 100:12 | **one's** 14:13 |
| **needs** 10:4 92:2 | **note** 95:14 97:8 | **officer** 109:2 | **ones** 25:18 |
| **negotiate** 49:8 | **noted** 83:13 | **officials** 66:10 | 74:25 87:25 |
| 68:19 | **notice** 9:15,20 | **oh** 13:20 16:24 | 103:19 |
| **negotiated** | 9:23 10:4 11:5 | 17:9 50:6 | **ongoing** 32:6 |
| 22:20 30:6,18 | 11:12 15:23 | 59:18 101:25 | **online** 30:16 |
| 30:20 31:24 | 69:22 100:24 | **okay** 7:15,23 | **opening** 24:12 |
| 33:22 36:23 | **noticed** 12:17 | 8:7 9:11 10:22 | **operating** |
| 85:14,22 86:4 | 15:24 | 11:2 12:25 | 27:15 |
| 92:9 | **number** 29:16 | 13:17 14:4,15 | **opinion** 21:19 |
| **negotiation** | 50:19,20 94:6 | 17:5,24,25 | **opinions** 100:5 |
| 46:17 69:3 | 97:8 | 18:7,12,22 | **opioid** 7:11 |
| 73:9 | **number's** 43:9 | 39:12,18 40:25 | 47:5,8,16 |
| **negotiations** | **numbers** 61:17 | 41:20,24 42:7 | 53:22 |
| 60:15 73:15 | **numerous** | 43:25 44:15 | **opioids** 56:12 |
| | 20:21 | 46:21 48:18 | |

**[opportunity - phone]**

**opportunity**
  106:14
**opposed** 21:7
  68:23 72:13
**opposite** 65:14
**order** 13:16
  65:16 70:22
  83:23 87:3
  89:18,18
  102:18,19,25
**orders** 102:10
  107:19
**original** 101:4
  101:13,13
**osceola** 5:8
  46:4,6
**outcome**
  109:16 110:12
**outside** 28:6
  62:16
**overwhelming**
  22:14
**owe** 49:21
**owes** 50:2
**own** 44:25
  45:10 53:1,13
  54:16 56:10
  59:19 60:25
**owned** 24:22
  24:22 25:12
  74:17 75:7,7
  76:23
**owner** 52:18
  54:5 101:4,13

101:13
**owners** 47:2
**owns** 25:4
  52:15

| **p** |

**p** 2:1,1 3:1,1
  4:1,1 5:1,1 7:1
**p.a.** 3:18
**p.m.** 1:14 108:1
**p.o.** 2:7 4:17
**page** 19:10
  24:11 55:25
  56:2 57:21,22
  63:17,17 77:22
  86:25 92:8
  93:19 94:5,6
  95:17 98:4
  100:15,15,17
  101:18 102:12
  104:15 106:10
**pages** 36:1,5
  106:4,12
**paid** 47:19 93:9
**paper** 85:21
**papers** 21:18
  22:17 23:18
  55:13 84:17,25
  95:13
**paragraph**
  20:24 24:12,20
  25:3,24 26:8
  26:25 27:4,5
  27:25 35:13,14

35:19 36:5
**paragraphs**
  24:20 25:8
  27:13,16 32:17
**paralegal** 5:4
  8:20
**parent** 65:9
**park** 45:18
**part** 32:25 48:3
  48:8,12 58:3
  67:9 74:1
  81:14 88:7
  96:7
**participate**
  60:14,16 73:15
**particularly**
  19:16 32:19
**parties** 19:17
  22:13 24:13
  30:3,14,19
  49:3 64:5,6
  70:22 73:3,10
  77:5 83:16
  109:12,14
  110:8,11
**partner** 83:21
**partners** 7:8
**parts** 33:20
**party** 32:10
  67:7,15 70:8
  72:15
**party's** 84:2
**pass** 79:12
  81:19

**passed** 29:15
  29:16 48:22
  64:20 67:22
  104:4
**past** 23:5
**pause** 22:1 23:7
**pay** 54:21
  87:16 93:4
**pending** 44:14
**people** 7:14
  13:20,24 15:16
  18:1 43:1
  45:25 46:2
  49:13 51:7
  53:3,6 56:10
  59:12,13,18
  60:6 61:1,20
  61:24 62:4
  66:22,23 68:8
  77:8 79:11
  82:13
**percent** 89:13
  91:6
**perez** 5:3 7:9
**perfect** 12:11
  41:5
**period** 68:21
**person** 45:9
  66:8
**perspective**
  10:1
**ph** 79:3
**phone** 69:14

**[photo - proposal]**

photo 62:9
physically
 66:23
pick 21:12
picture 62:17
pictures 66:25
piece 40:6,7
pieces 21:8
 31:17
place 22:9
 44:19 98:10
places 60:3
plaintiff 1:7 2:2
 3:2 7:5,7 16:5
 56:11 76:10
plaintiff's 5:3
 41:15
plaintiffs 86:10
planning 31:23
pleading 24:17
 27:24 29:11
please 18:24
 68:5 71:10
plug 16:23
plugged 13:1
pods 62:20
point 21:21
 25:25 29:6
 39:17 74:1
 86:5 93:12
policy 22:14
 77:16
ponce 4:7

pool 23:14,17
 23:17,20 24:3
 24:4 25:23,23
 26:19 34:7
 35:16 74:3,6,9
 74:10,11,12
 75:6 76:3,3,4,5
 76:20,22 77:2
 87:24
portions 87:3
position 28:24
possibly 54:8
 55:7
post 20:5 21:12
 21:24 22:25
 25:13 29:17
 31:14 32:2
 33:8 72:19
 85:17
power 57:6
powerpoint
 12:23 106:22
powerpoints
 106:21
pre 19:24 21:21
 22:3,5,7 31:24
 33:5
prefers 39:9
prejudice 84:2
premised 21:11
 28:11 31:13
prepared 110:3
preposterous
 60:23

prescribe 58:4
present 5:2
 11:9 41:10
presentation
 10:18,19 13:5
 22:16 31:21
 39:7 44:13
 76:13 99:16
presentations
 106:20
presume 11:7
 11:13
pretend 21:2
pretty 26:3
 50:24 87:10
 89:3
prevent 42:20
previous 86:19
print 65:3
prior 109:5
probably 7:22
 23:18 39:10
 41:12 43:16
 44:10 84:20
 88:19 89:6
problem 15:7
problems 89:2
procedure
 46:19 63:24
procedures
 101:7
proceed 18:23
 42:14 69:18

proceeding
 42:21 108:2
 110:4
proceedings
 37:9 71:1
 83:13 109:3,5
 109:6,9 110:6
process 19:25
 23:21 44:17
 49:3 55:24
 61:9 73:10
 75:3 77:7,14
 77:15 88:14
processes 31:25
 34:2
production
 69:20
prohibition
 38:19
prohibits 32:16
 55:1
project 25:5
 45:15 59:4
 62:11 66:21
projects 45:22
 59:5 62:4
prompt 107:20
properties
 60:17 62:23
 87:24
property 22:10
 53:1 94:2
proposal
 106:11

**[proposed - recording]**                    Page 23

**proposed** 102:10 107:19
**proved** 34:9
**provide** 13:11 23:7 27:1 31:9 35:15 100:13
**provided** 19:19 28:3,5 35:7,13 55:5
**provision** 11:22 19:13 20:4,7 24:1 32:4,22 33:1,3 34:17 34:20,22 35:22 35:23,25 38:19 50:6 67:9 77:9 85:2,24 89:22 89:25 93:14 96:6 103:6
**provisions** 21:4 21:5,13 24:15 28:13,14 29:25 31:15 33:15 38:13 87:2 99:24
**public** 22:14 77:16 109:19
**pull** 13:24 15:6 15:15 75:10
**pulls** 40:25
**purchase** 23:23 23:25 24:4,24 29:19,21,22 30:3,5,23,24

33:9,11,18,21 34:13,14,15,19 34:25 35:5,22 36:14,22 37:2 37:7,10 74:19 98:13 100:9
**purchased** 24:5 27:2 74:25
**purchaser** 34:5 35:7 74:3 101:4
**purchasers** 37:11
**purpose** 83:18
**purposes** 76:1
**pursuant** 52:13 83:14
**put** 10:20 15:5 16:12 50:12 72:9,11 73:2 89:21 92:1
**puts** 28:24

**q**

**qualified** 109:7
**question** 36:8 42:19,22 45:13 49:24 56:6 72:5 81:10 85:23 89:19 90:1 99:6
**questioning** 103:12

**questions** 43:12 47:20 87:21
**quick** 15:13 89:3
**quickly** 32:18 59:4 77:10
**quote** 38:14,15
**quoted** 35:18 37:23
**quoting** 40:4 99:15

**r**

**r** 2:1,14 3:1 4:1 5:1 7:1
**raise** 56:11 82:9,9
**raised** 32:14 91:25 93:12
**range** 50:24
**rather** 106:7
**raymond** 21:19 50:2 55:13,14 55:17 58:15,25 59:1 63:9,12 63:19 64:1,17 65:6 78:21 79:1 82:19,19 82:21 90:3
**read** 21:4 29:24 32:21,22 33:12 33:15,19 38:2 55:13 57:22 78:16 84:19

86:23 87:2,7 92:24 94:7 97:7,10 106:15
**reading** 10:21 33:16,17 87:9
**ready** 10:8
**real** 15:13 99:24
**really** 9:17,22 20:10 38:22 102:15
**reason** 10:3 11:17 50:5 66:18 73:6,8 88:7
**reasoned** 21:19
**rebuild** 61:8,14
**rebuttal** 10:24 42:13 83:5
**receipt** 30:11 31:13 95:10,12
**receive** 37:11
**received** 31:18 37:15,16 38:12 94:22 97:7
**recent** 100:5
**record** 7:3 41:6 41:7,9 55:7 65:7 83:12 100:20 109:9 110:5
**recorded** 109:6
**recording** 109:8 110:4

**recovery** 25:7
**redesign** 43:6
**redline** 100:25
**redlining** 87:8
**reduced** 109:7
**refer** 85:15
**reference** 30:25
  72:14 96:12
  97:1
**referred** 19:20
**reflect** 41:9
**regardless**
  55:15 64:9
**regional** 94:11
  97:14
**rehashing**
  105:7
**reject** 40:12
  64:8,9
**related** 25:22
  34:24 50:20
  109:11 110:7
**relates** 50:14
  50:23,25 67:11
  92:2
**relating** 48:14
  50:10,24 85:4
**relative** 109:13
  110:10
**relief** 29:4
**relocated** 46:1
**rely** 87:1
**relying** 11:19

**remedies** 32:5
  32:6
**remedy** 44:19
**remember** 9:5
  34:15 69:17
**remy** 5:4 8:20
**rented** 75:8
**repeats** 26:9
**reply** 39:3 72:3
  84:18
**report** 65:1
**reported** 1:20
  65:19 66:25
**represent**
  42:17
**representative**
  5:8 26:12 46:5
**represented**
  65:6
**reps** 41:11
**request** 69:20
  94:10 97:13
**requested**
  89:21
**require** 37:11
  44:24 89:23
  98:18
**required** 22:17
  27:1 31:9
  35:14 37:16,24
  67:23
**requirement**
  95:19 96:21
  101:7

**requires** 85:3
**requiring** 87:2
**research**
  107:20
**reservation**
  45:18 52:20,21
  59:21
**reserve** 10:12
  40:13
**residences**
  27:17
**residential** 28:6
**resolution**
  19:13 20:2
  29:16,16 30:1
  30:2,2,13,19
  31:12 32:3
  35:10 36:22,24
  37:8 44:16
  46:9 48:22
  51:1,2 55:10
  57:18,19 64:12
  64:16,18,20
  67:23 78:18
  79:7,10,13,20
  79:22,24,24
  80:2,7 81:19
  82:20,21,22
  83:18 90:5,22
  100:11 104:4
**resolutions**
  11:6,11 29:17
  37:22 82:25
  85:16

**resolve** 12:3
  60:18 77:10
  83:17
**resolved** 15:25
  47:24 48:15
  50:11 60:13
**respect** 57:16
**respond** 39:4
  39:20,20 58:1
**response** 18:14
  18:17 24:9
  32:15 38:5,16
  38:16 39:5
  40:13 41:15
  42:4 72:3
**responsibilities**
  86:16
**responsible**
  54:21
**rest** 10:13
**result** 47:7
  104:4
**resulting** 19:3
**review** 30:7
**reviewed** 20:1
  30:5
**revised** 48:1
**right** 7:2,12,19
  7:23,24 8:2,11
  8:13,14,15,22
  8:25 9:2,7,13
  9:18 10:9,10
  11:2,15,19,23
  12:18 13:2,3,9

**[right - says]** Page 25

| | | | |
|---|---|---|---|
| 13:19 14:7,24 | 70:11,20,24 | 89:17 | 65:14 67:7,23 |
| 15:11,14 16:11 | 71:2,8,10,14,18 | **righty** 99:20 | 72:14 74:23 |
| 16:15 17:8,11 | 71:23,24 72:2 | **ripich** 66:7 | 78:22 79:13 |
| 17:13,15,16 | 72:4,7,10 73:7 | **road** 63:4 | 80:18,20,25 |
| 18:1,10,22 | 73:9,17,20,21 | **roll** 106:14 | 81:3,20,21 |
| 22:2 24:2,17 | 74:4,13,19 | **roofs** 61:12 | 82:8 83:23 |
| 24:22 25:9,25 | 75:9,13,14,18 | 62:10 | 84:11 87:23 |
| 26:3,25 27:15 | 75:21 76:8,13 | **root** 22:2 25:14 | 90:11,18,23 |
| 27:21 28:9 | 76:14 77:1,6,7 | **rotate** 16:14 | 91:17 92:15 |
| 29:2,8,10,16 | 77:21 78:1,19 | **rotating** 17:3 | 97:23 101:3 |
| 31:4,8 32:4 | 82:14 83:1,2,3 | **rows** 26:18 | 103:24 104:7 |
| 34:4,18,25 | 83:5,8,14,17 | **ruined** 62:21 | **says** 19:13 25:4 |
| 35:4,24 36:3 | 84:4 85:8,22 | 62:21 | 26:25 27:6 |
| 36:10,17 38:1 | 85:25 86:8 | **rule** 87:1 | 28:3 30:20 |
| 38:8 39:1,13 | 88:5,6,9,15,17 | **ruled** 64:11 | 33:2,3 34:5 |
| 39:22,25 40:16 | 89:8 90:3,11 | **ruling** 43:14 | 35:12 46:19 |
| 40:19 41:2,12 | 90:18 91:6,7 | 107:20 | 48:9,25 49:24 |
| 41:14,24 42:1 | 91:11 92:3,23 | **run** 91:5 | 50:4 51:5 |
| 42:14 43:11,12 | 93:13 94:3,7 | **s** | 52:13 55:15,21 |
| 43:16,18,19,21 | 95:5,11 96:17 | | 56:1,14,16 |
| 44:5,9,21 | 97:8,17,19 | **s** 2:1 3:1 4:1,4 | 57:23 58:2,14 |
| 45:12,24 48:10 | 98:3,16 99:5 | 5:1 6:1 7:1 | 58:22 60:1,18 |
| 49:14 50:6 | 99:10,13,25 | **saint** 5:4 8:20 | 65:8,11 66:8 |
| 51:4,6,10,17,20 | 100:7,22 101:2 | **sale** 30:5 | 67:10 75:4 |
| 52:2,5,15 53:9 | 101:16,17,24 | **sanderlin** 56:15 | 76:8 77:22 |
| 53:14 54:13 | 101:25 102:16 | 56:17,22 67:24 | 79:4,9,9 80:8 |
| 55:3,22 56:21 | 102:22,25 | 78:15 79:3 | 81:2 89:17 |
| 62:16,25 63:4 | 103:14,16 | **save** 39:2 | 92:10,13 93:16 |
| 63:11 64:4,13 | 104:14,18 | **saw** 43:3 82:19 | 93:17 95:2 |
| 64:18,20,22,25 | 105:5,6,16 | **saying** 11:20 | 96:8 97:7 |
| 65:15,21,25 | 106:2,13 107:1 | 38:1 39:22 | 99:23 100:13 |
| 66:20 67:2,4,6 | 107:14,16 | 40:2,5 45:7 | 100:21 101:2 |
| 67:17,25 68:13 | **rights** 83:23 | 55:6,10 56:23 | 103:23 104:1 |
| 68:17,20 69:10 | 84:3 85:13 | 60:23 64:7,18 | 104:16 |

**[schedule - single]** Page 26

| | | | |
|---|---|---|---|
| **schedule** 63:23 63:24 69:12 | 61:24 62:8,10 62:18 63:1 66:4 68:23 | **separate** 23:11 23:24 34:17,18 72:20 | **shown** 55:9 |
| **scherer** 3:3,4 7:10,25,25 8:3 60:1 82:10 83:22,24 | **seeing** 107:19 | **separately** 37:5 | **sic** 7:19 |
| **schneider** 3:11 | **seeking** 29:4 86:12 | **serious** 32:19 36:9 | **sick** 61:2 |
| **scott** 3:17,18,21 8:9 | **seeks** 25:7 70:8 | **seriously** 36:10 | **side** 9:16 36:3 62:4 72:24 88:18 89:20 90:10 |
| **screen** 17:17 18:2,3 19:9 25:9 29:8 36:3 40:23 | **seem** 72:23 | **served** 42:24 69:18,19,20,21 | **sign** 57:8 69:11 72:12 78:2 80:12 81:4 86:1,2 |
| **sealed** 64:4,5 | **seems** 11:25 | **set** 31:12 34:1 36:22 48:16 60:13 | **signature** 109:17 110:14 |
| **second** 15:18 22:2 25:12 38:18,20 40:21 53:10 64:18 | **seen** 23:18,21 29:9 34:10 | **sets** 36:24 37:9 | **signed** 29:23,24 37:25 45:10 55:6 56:25 74:18 77:23 78:2,4 79:5 80:16 82:1 86:4 89:23 94:23 95:2,7 96:19,23 104:20 |
| **secret** 37:18 | **sell** 51:6 | **settled** 65:17,18 | |
| **section** 32:12 34:6 35:14 50:9 60:12 91:14 | **seller** 52:8 | **seven** 71:13 105:21,24,25 106:1 | |
| **sections** 29:9 51:4 | **selling** 54:16 | **shape** 33:10 | **significant** 47:7 |
| **see** 9:13 10:3 12:15 14:2,15 15:2,10,18,19 18:2 19:9 20:2 25:17 26:8 36:6 40:25 43:4 45:11,17 46:15 49:23,25 50:1,7,17 | **seminole** 1:4 2:2 3:2 5:8 7:3 8:6 21:19 23:13 28:4 41:8 42:17 45:18 46:3 47:6,8 48:19 51:16,18 52:3 52:11 53:14 59:8,16 64:16 65:5 67:8,15 76:9 77:22,23 78:1,5,21 80:17 81:17 89:24 90:11 94:4 96:19 | **share** 18:3 40:22 | **signing** 79:3,14 82:16 |
| | **send** 81:13 91:9 | **sheets** 61:21 | **signs** 79:4 |
| | **sense** 14:9 | **short** 102:11,13 | **similar** 25:18 |
| | **sent** 48:7 57:20 104:12 | **shoved** 65:20 | **simple** 56:7 |
| | | **show** 27:9 56:20 61:21 62:2 67:1 | **simply** 57:7 |
| | | **showed** 31:16 31:19 37:21 51:2 79:11 82:20 99:16 104:3 | **simultaneously** 40:5 |
| | | **showing** 17:6 17:21 58:18 75:22 | **single** 19:19 28:10 35:7 |

38:11,25 48:20 57:9 58:20,23 62:11,12 71:12

**sit**  49:12 91:13

**six**  45:22 59:5 60:20 61:24 62:4,23 63:19 68:6,18

**sixth**  80:3

**skills**  109:10 110:6

**sleeves**  106:15

**slide**  13:5 42:1

**slides**  41:18

**smith**  2:15 7:17

**smithcurrie.c...** 2:18

**sold**  23:1,13,15 52:20 62:23

**sole**  58:15 59:2 82:7

**solely**  28:22

**solicited**  61:8

**somebody** 18:12 50:2 55:6 72:16 78:8,15 80:16 86:20

**somebody's** 85:18

**sophisticated** 30:14 73:10

**sorry**  70:4

**sort**  21:1,7 26:5 33:24 37:17 83:11

**sounds**  10:16 14:22 44:9 88:25

**south**  3:5

**southeast**  1:17 3:12

**southern**  49:22

**sovereign**  20:8 20:10,14 22:22 38:17,23 40:14 49:4,5,9 54:9 56:21 57:5,9 57:12,25 65:12 66:13 67:20 79:6,7 80:14 80:15 81:11,18 82:2,16,23 85:5 86:7,8 90:4 92:20,22 92:23 102:18 103:2,4

**spare**  14:18

**speak**  32:2 40:14 73:16

**speaker**  18:13 18:16 42:3 83:7 95:9

**speaks**  33:4

**specific**  34:16 49:17 80:14

**specifically** 19:20 24:21 37:10 48:1

**speed**  77:8

**spells**  32:1

**spend**  38:23

**spending**  31:22

**spent**  60:24

**spoke**  83:21

**spot**  98:4

**stamp**  79:14

**start**  7:5 30:1 39:6 45:14 66:24 83:6 103:2,3,4

**started**  66:22 66:24

**starting**  36:5

**state**  11:4 22:8 46:19 48:17 49:2,20 58:11 59:6 60:19 64:10 93:2,5 109:20

**stated**  35:11 105:2

**statement** 57:12

**states**  21:20 77:19 84:24 99:23

**statute**  83:18 83:19

**statutory**  34:23

**stay**  43:23 44:3 44:7,7,14 68:3 68:5 69:23,25 70:12 71:1 83:13 84:2

**stayed**  71:1

**step**  38:11 104:5

**stick**  92:8

**stipulate**  9:24

**stipulated** 100:24

**stipulation** 15:22

**stof**  28:3 48:12 78:17 79:15,15 79:15 82:17 104:20

**stop**  37:13 68:10

**straightforward** 87:11

**street**  1:17 3:12 94:2

**strike**  89:24 90:13

**strikethrough** 100:16,17

**struck**  87:15,17 101:3,10

**structure**  52:19

**stuck**  81:15

**[student - thank]** Page 28

**student** 49:11
**studs** 61:16
**stuff** 62:20
  68:24 75:4,5
  85:9,10,11,12
  85:12
**subject** 15:22
  28:2 30:9,10
**submit** 73:3
  101:7 102:10
  105:11
**submitted**
  95:20 96:22
**subsequent**
  30:3,10 34:2
  37:9 50:14
**subtle** 27:21
**subtly** 37:17
**sue** 46:18 49:9
  49:19,20,21
  56:9 58:8,10
  58:11 61:3
  71:17 86:9
  93:5 103:16
**sued** 25:11 56:8
  58:5 74:23
  99:12
**sues** 47:17 50:2
**suffer** 47:7
**suffered** 53:25
**suggest** 28:21
**suggested**
  33:16

**suggesting**
  85:17
**suing** 19:7
  20:20 24:21
  25:21,22 26:16
  26:21,24 27:10
  27:19 28:9
  36:7,17 37:23
  38:14 39:25
  40:2 56:13
  81:9 86:6,6
  87:6,12,19
  98:21,24 99:14
  103:17
**suit** 21:10 58:6
**suite** 2:16
**sums** 25:25
**superstar** 8:20
**support** 22:23
**supports** 30:2
**supposed** 33:14
  94:14
**supreme** 21:20
  57:11 77:18
  79:17 84:24
  85:1 86:25
  92:21 99:22
**sure** 9:17,19
  15:6,8 25:16
  40:20 41:18
  45:14 49:19
  63:5 66:3
  77:24 78:10
  84:10,18 88:16

  102:9
**surfside** 47:22
**suspenders**
  26:6
**switch** 13:6,15
  15:17 40:19
**sworn** 109:5
**systematically**
  27:17

**t**

**t** 6:1
**tailor** 28:2
**take** 10:19,23
  11:5,12 13:14
  16:3,7 23:6
  25:10,15 27:13
  29:1 31:7
  33:18 40:16
  41:2,3 42:10
  47:10,12,12
  61:15 102:4
  105:10
**taken** 109:3,12
  110:9
**takes** 22:9
**talk** 23:22 25:3
  29:13 34:12,13
  38:8,9,10,21
  47:15 58:17
  68:4 92:22
**talked** 31:20
  34:3,9 35:17
  48:21 98:11

**talking** 12:8
  24:9 31:10
  84:23 86:21
**talks** 32:4 34:7
**tampa** 4:18
**tantamount**
  57:17
**tell** 46:13 54:24
  59:3 63:25
  88:13
**telling** 92:14
**ten** 41:3 56:9
  59:18 105:23
  106:7,9,10,12
**tense** 23:5
**terminate** 32:9
**terminated**
  25:5,6
**terms** 21:25
  23:17 58:4
  101:5
**tested** 60:17
  61:1
**testifies** 66:8
**testify** 11:24
  100:21
**testifying** 109:5
**thank** 12:19
  13:18 40:14
  71:25 83:3,10
  91:10 92:15
  106:17 107:16
  107:17,21,22

**[themself - tribe]**

| | | | |
|---|---|---|---|
| **themself** 47:6 | 77:25 84:4 | **together** 33:12 | 46:3,8 49:13 |
| **thereof** 50:11 | 85:7 89:5 | 33:19 79:11 | 49:20 51:1,16 |
| 87:4 | 102:6,16,17,23 | 87:25 88:2 | 55:10 56:17 |
| **thereto** 28:12 | 104:14 | **told** 45:16 | 57:18,19 59:13 |
| **thing** 26:23 | **third** 26:22 | 61:17 65:1 | 59:14,18 64:16 |
| 33:3 44:16 | 107:9 | 68:7 | 64:19 67:22 |
| 49:10 52:14 | **thought** 47:3 | **tomorrow** | 74:18 75:1,2 |
| 54:24 55:12 | 70:5,10 | 69:15 | 78:12,14,18 |
| 77:19 91:16 | **thousands** 45:3 | **took** 57:1 | 79:2,7,10,12,16 |
| 100:14 107:9 | **three** 26:19 | **top** 48:10 | 79:20,22,24,24 |
| **things** 13:15,16 | 60:8 62:9 | **tort** 34:22 | 80:2 81:19 |
| 25:10 27:5,8 | 102:24 104:8 | **tough** 105:9 | 82:20,21 90:5 |
| 48:7 56:24 | **throckmorton** | **town** 62:19 | **tribe** 1:4 2:2 |
| 57:2 62:15 | 4:6 5:5 | **track** 18:18 | 3:2 5:8 7:3,18 |
| 73:11,13,23 | **time** 1:14 9:6 | **transaction** | 8:1,6,10 19:6 |
| 81:23 84:16 | 10:12,12,13,23 | 30:16 50:23 | 19:20 20:11 |
| 86:15,18 92:15 | 16:12 18:19 | **transactions** | 21:6,10,14,19 |
| 95:15 97:9 | 25:20,20 31:22 | 34:3 | 22:20 23:2,3 |
| 98:1 102:5 | 33:20 38:23 | **transcriber** | 23:13,15,15 |
| **think** 7:22 8:13 | 39:2 42:6,8,11 | 110:1 | 24:8,13 25:4 |
| 10:17,20 11:4 | 42:12 59:17 | **transcript** | 25:11,20 26:1 |
| 11:10 12:3 | 66:22,23 71:15 | 110:3,5 | 26:6,9 27:3,6 |
| 14:8 15:3 | 71:22 79:23 | **transcriptionist** | 28:4,17,22 |
| 16:13 18:4,5,8 | 89:1 90:4 | 109:8 | 29:4,15,24 |
| 18:11 23:8 | 92:17 105:16 | **transferability** | 30:8 31:5,6 |
| 24:6,10,11 | 105:18 | 101:15 | 32:1,15 33:1 |
| 28:17,18 32:19 | **times** 63:16 | **transferred** | 33:14 34:10 |
| 33:24,25 36:11 | **timing** 69:1 | 22:10 25:14 | 35:9,13,18 |
| 38:6 41:1 | **tina** 5:8 46:4 | 101:21,23 | 36:23 37:12,15 |
| 42:18,19 43:15 | **today** 19:23 | **trial** 7:11 77:14 | 38:11 39:21 |
| 43:20 44:12 | 42:17 45:18,19 | 90:21 | 41:8 42:17 |
| 45:15,20 49:20 | 46:5 62:8,18 | **tribal** 1:6 24:22 | 43:8 44:24 |
| 54:9,10 55:18 | 63:6 71:5 76:1 | 25:12 28:6 | 46:16,24 47:6 |
| 64:17 65:4,4 | | 30:6 37:12 | 47:8,17 48:5 |

**[tribe - used]**

48:19,22 49:1
49:8,13,15
50:1 51:7,18
51:23 52:4,10
52:12,14,15,17
53:14,23 54:10
54:15,20,23
56:8,8,9,12,20
57:14,16 58:4
58:4,8,19,20,24
59:8 60:10
62:21 64:16,16
64:19 65:5,6
65:14,17 66:9
66:9,19 67:8
67:15 74:3
75:1,2,6,7 76:9
76:23 77:22,23
78:1,5,8,17,21
79:10 80:9,17
81:17,17,25
82:1,16,25
86:1,20 87:18
87:18 89:14,15
89:24 93:6,11
94:4,13 96:19
101:14 104:4
**tribe's** 11:10
19:25 20:7
52:19 56:13,18
57:5 71:16
79:6
**tribes** 47:6
59:11 61:24

84:21,23
**tribune** 59:16
**tried** 28:2
37:17
**tropin** 4:4,6 5:4
8:18,19,23
47:14,22 64:6
64:7 65:5
83:21
**troubling** 66:18
**true** 85:20
104:22,25
109:9 110:5
**try** 28:21 70:14
71:10,10 83:16
**trying** 46:12
59:20 69:9
71:19 76:15,17
78:20 83:20
86:15 87:13
**tuesday** 1:13
**turn** 14:3,11,13
14:19 17:10
34:4 83:9
**turned** 17:15
**turns** 14:1,6
**two** 23:11
24:13 25:8
32:13,14 38:17
43:12 47:4,18
50:20 82:25
104:8
**type** 55:22

**typewriting**
109:7
**typical** 103:3

**u**

**ultimately** 27:2
**uncontested**
54:25
**undeniable**
22:15
**under** 19:7
22:3 23:16
27:10,19 28:9
28:22 30:12
34:24 36:7,17
37:23 38:15
39:25 46:16
57:24 67:23
68:23 73:3
81:9 82:14
86:6,6 87:6,12
87:19 94:9
97:12 98:21,24
99:12,14
100:10,11,21
101:8 102:4
105:10
**understand**
51:25 62:25
71:23 72:17
80:24 83:1
89:10 90:2,17
90:21 94:8
97:11 99:2,17

102:18 103:11
104:6 106:15
**understanding**
12:10 30:3
**understood**
29:24 38:2
**unequivocally**
56:19 57:13
**unfair** 93:1,4
**unfortunately**
14:16 24:18
**unidentified**
18:13,16 42:3
83:7 95:9
**unintentionally**
23:9
**unique** 45:8
**united** 21:20
77:19 84:24
99:23
**units** 24:22
25:7 26:10,10
**unmistakable**
57:17
**unmistakably**
56:21
**unplug** 16:22
**unprecedented**
59:7
**upstairs** 7:12
**use** 14:20 41:19
65:9
**used** 107:9

**[usually - we've]**

| | | | |
|---|---|---|---|
| **usually** 96:3 | 81:10,18 82:15 | **wanted** 18:1 | 36:14,19 37:6 |
| **v** | 90:4 | 53:12 54:5 | 37:11,15 38:2 |
| **v** 1:8 | **waived** 20:13 | 63:23 64:5 | 38:3,24 40:3,4 |
| **vacate** 71:4 | 22:23 56:21,24 | 69:25 72:8 | 51:8,9 55:4,20 |
| **vacated** 64:3,4 | 84:13 102:23 | 83:22 88:21 | 55:22 61:11,15 |
| 65:3,17,19 | 102:24 | 89:1,14 | 67:13 74:21 |
| 89:18 | **waiver** 49:5,16 | **wants** 87:14 | 79:25 80:22 |
| **valid** 102:19,20 | 49:16 56:17 | 105:19 106:6 | 81:4,6,10,14,19 |
| 103:5,7 | 57:12,17,24 | **warranties** | 81:20 82:8,12 |
| **valley** 58:2 | 58:2 67:12,19 | 26:25 27:18 | 82:15 85:10 |
| **verbatim** 20:23 | 82:2 85:5 | 29:22 30:4 | 92:4,7 93:20 |
| **verdict** 89:7 | 92:19 98:19 | 31:9,18 33:9 | 94:8,9,19,21 |
| **versus** 72:13 | **waiving** 79:15 | 33:11,19,22 | 95:3,6,8,19,23 |
| **vested** 57:6 | 83:23 | 34:8 39:25 | 96:10,14,20 |
| **video** 5:6 16:19 | **want** 10:11,11 | 47:2 48:6 51:6 | 97:7,11,12,20 |
| 45:17,19 | 10:23 12:16,17 | 55:4,5 60:3 | 98:12 99:12 |
| **videoconfere...** | 12:21 16:20,22 | 72:18 73:3 | 100:10 101:6,8 |
| 5:5 | 17:2 21:13 | 80:10 86:2,2 | 102:2 103:18 |
| **view** 42:2 | 24:14,15 29:13 | 99:4,8 104:17 | 104:21 |
| **vine** 94:2 | 32:13 33:20 | **warranty** 19:5 | **waste** 25:19,20 |
| **violated** 27:17 | 36:18 39:1,3 | 19:6,8,18 20:3 | **waters** 23:9 |
| **void** 80:19 | 40:25,25 42:9 | 20:3,13,17,21 | **way** 20:6 24:8 |
| **voluntarily** | 44:17 49:1,13 | 20:23,24 21:11 | 26:12 33:10 |
| 57:5 | 56:8 59:3 | 21:13,25 22:4 | 43:15 44:10 |
| **voluntary** 58:3 | 65:18,19 66:4 | 22:6,11,11 | 48:2 56:3 |
| **vs** 7:4 21:19 | 68:10 69:18 | 23:24 24:2,3 | 64:11 72:11 |
| 41:8 78:21 | 73:18,23 77:10 | 27:1,6,9,10,11 | 73:21 88:15 |
| **w** | 78:13 80:5 | 27:11,23,23 | 92:25 99:21 |
| **wait** 59:12,14 | 82:9 83:24 | 28:4,5,9,13,13 | 106:14 |
| **waive** 55:11 | 84:7,9,16 85:8 | 28:14 29:11,18 | **we've** 26:17 |
| 57:4,7,9 58:13 | 85:9,9,10 | 29:25 31:2,15 | 28:24 31:10 |
| 69:10 79:6,7 | 88:25 89:13,16 | 34:17,18,22 | 34:3,9 37:21 |
| 79:13 80:15 | 91:25 92:25 | 35:4,5,6,14,15 | 38:7,20 43:5 |
| | 105:11,17,23 | 35:18,21,24 | 46:25 69:6,7,8 |

**[we've - zoom]**

75:3,15 88:4
98:11 100:4
**wealth**   21:17
**week**   61:22,23
   63:24,25 66:8
   66:9 105:20,22
**weeks**   62:9
**weight**   22:14
**welcome**   56:1
   92:16
**went**   17:17
   47:25 48:20
   62:9,14 66:13
   66:19 75:2
   93:11
**westlaw**   65:2
**whatnot**   9:21
   39:5 96:23
**who've**   45:4
   46:2
**wide**   50:24
**widlanski**   4:3
   8:17,18,23
   9:25 10:15,25
   12:6,23 13:2,4
   13:8,11,19
   14:1,5,8,12,19
   14:23 15:3
   16:9,17,20
   17:6,10,17,21
   18:8,24 22:6
   39:8,12,14,16
   39:19 70:15
   72:6 73:5,8,13

73:19,22,25
74:8,11,14,17
75:11,15,20,24
76:4,7,11,15,22
76:25 77:4
78:5 83:2,10
84:6,9,15,22
88:3,7 93:15
93:19,24 94:5
94:15,18,21,24
95:2,14,17,23
96:1,9,13,25
97:6,19,22
98:1,6,9,20
99:1,8,11,14,21
100:2,6,8
101:12,16,18
101:22 102:1,6
102:9,13
103:15 104:22
104:25 105:12
105:18 106:5
107:3,22
**win**   37:13
**withdraw**
   64:19
**witness**   10:21
   11:7,10,13,24
   55:8 78:7
   100:20 109:4
**witnesses**   12:16
**won**   93:10
**wonderful**   11:1

**word**   26:9 31:7
   79:9 104:21
**words**   29:1
   96:2
**work**   70:14
   77:5,6 81:16
   83:16
**working**   14:2
   15:8,9,9,10,11
**works**   40:10,11
   40:11 47:20
**world**   99:24
**worried**   18:20
**worry**   18:4
**worse**   62:15
**worth**   31:22
**writes**   60:1
**writing**   78:17
**written**   102:21
   103:7
**wrong**   87:16
**wrote**   70:19
   78:15 82:10

**x**

**x**   6:1

**y**

**y'all**   9:6
**yeah**   8:7 12:6
   13:6 14:14,21
   15:5,11 16:13
   16:18 17:1,19
   18:8,18,20
   39:16 40:24

41:1 42:5,8
52:25 60:3
63:12 66:4
70:3,5,12 71:6
71:20 73:19
74:8,16 75:12
75:15 78:9
84:9,11 89:4
89:11 93:22
94:24 95:21,24
96:5,13 98:8
101:22 102:12
103:13 105:4,8
107:2,6
**year**   47:23
   52:23 68:10
   79:14 80:23
   81:14,21 91:8
   103:24 105:2,4
**years**   47:4,19
   59:18,20 65:6
   81:16 85:20
**young**   2:14
   7:16,17,20,23
**yous**   92:1

**z**

**zoom**   13:21,24
   15:13,15,15,19
   16:3,7 17:13
   18:2,11 40:23