**The Clerk's Office will be closed on Friday, July 3rd for Independence Day**

**Is your court hearing being held via Zoom? Learn more about Remote Court Hearings by Zoom (/GeneralInformation/Miscellaneous#RemoteHearingsbyZoom)**

**HIDE NOTICES**

**BRENDA D. FORMAN**
CLERK OF THE COURTS
browardclerk.org ■ BROWARD COUNTY, FLORIDA



Menu

# Case Detail - Public

Print

**Mia D. Jones Plaintiff vs. LENNAR HOMES, LLC, et al Defendant**

**Broward County Case Number:** CACE26008429
**State Reporting Number:** 062026CA008429AXXXCE
**Court Type:** Civil
**Case Type:** Neg - Construction Defect
**Incident Date:** N/A
**Filing Date:** 05/20/2026
**Court Location:** Central Courthouse
**Case Status:** Active
**Magistrate Id / Name:** N/A
**Judge ID / Name:** Haimes, David A

+ Party(ies) Total: 6

− Disposition(s) Total: 0

| Date | Statistical Closure(s) |
|---|---|

| Date | Disposition(s) | View / Pages |
|---|---|---|

## Event(s) & Document(s)

Total: 21

| Date | Description | Additional Text | View / Pages |
|---|---|---|---|
| 06/15/2026 | **Notice of Appearance** | NOTICE OF APPEARANCE AND DESIGNATION OF EMAIL ADDRESSES FOR DEFENDANT, BUILDER SERVICES GROUP, INC. /Wa GALE INSULATION Party: *Defendant* LENNAR HOMES, LLC *Defendant* ALL PHASE ROOFING, INC. *Defendant* OSCAR AIR CONDITIONING INC. *Defendant* ABC DRYWALL, CORPORATION *Defendant* BUILDER SERVICES GROUP, INC. | /2 |
| 06/15/2026 | **Proof of Service** | the 10th day of June, 2026 at 11:25 am Party: *Defendant* ABC DRYWALL, CORPORATION | /1 |
| 06/15/2026 | **Proof of Service** | the 12th day of June, 2026 at 12:20 pm Party: *Defendant* BUILDER SERVICES GROUP, INC. | /1 |
| 06/11/2026 | **Proof of Service** | 10th day of June, 2026 Party: *Defendant* ALL PHASE ROOFING, INC. | /1 |
| 06/10/2026 | **Waiver of Service of Process** | | /2 |
| 06/10/2026 | **Proof of Service** | 9th day of June, 2026 Party: *Defendant* OSCAR AIR CONDITIONING INC. | /1 |

| Date | Description | Additional Text | View / Pages |
|---|---|---|---|
| 06/03/2026 | **eSummons Issuance** | Party: *Defendant* ALL PHASE ROOFING, INC. | /3 |
| 06/03/2026 | **eSummons Issuance** | Party: *Defendant* LENNAR HOMES, LLC | /3 |
| 06/03/2026 | **eSummons Issuance** | Party: *Defendant* BUILDER SERVICES GROUP, INC. | /3 |
| 06/03/2026 | **eSummons Issuance** | Party: *Defendant* OSCAR AIR CONDITIONING INC. | /3 |
| 06/03/2026 | **eSummons Issuance** | Party: *Defendant* ABC DRYWALL, CORPORATION | /3 |
| 06/02/2026 | **Order Designating a Case Complex** | This action is assigned to Division 07 | /1 |
| 05/29/2026 | **eSummons Issuance** | Party: *Defendant* LENNAR HOMES, LLC | /3 |
| 05/29/2026 | **eSummons Not Issued - Filer Advised** | name of defendant does not match<br>Party: *Defendant* LENNAR HOMES, LLC | /3 |
| 05/29/2026 | **eSummons Not Issued - Filer Advised** | name of defendant does not match | /3 |
| 05/29/2026 | **eSummons Not Issued - Filer Advised** | name of defendant does not match<br>Party: *Defendant* ABC DRYWALL, CORPORATION | /3 |
| 05/29/2026 | **eSummons Not Issued - Filer Advised** | name of defendant does not match<br>Party: *Defendant* ALL PHASE ROOFING, INC. | /3 |

| Date | Description | Additional Text | View / Pages |
|---|---|---|---|
| 05/22/2026 | **Notice of Confidential Information Within Court Filing** | | /3 |
| 05/20/2026 | **Per AOSC20-23 Amd12, Case is determined General** | | |
| 05/20/2026 | **Civil Cover Sheet** | | /4 |
| 05/20/2026 | **Complaint (eFiled)** | | /578 |

- Hearing(s) Total: 0

**There is no Hearing information available for this case.**

- Related Case(s) Total: 0

**There is no related case information available for this case.**

## Brenda D. Forman

### Clerk of Court

Broward County
17th Judicial Circuit

MORE ABOUT THE CLERK (/ABOUTUS/ABOUTTHEOFFICE#ABOUTTHECLERK) ›

Find us on Facebook (https://www.facebook.com/browardclerkofcourts/)

## Connect with Us

COURTHOUSE LOCATIONS (/ABOUTUS/HOURSANDLOCATIONS#COURTHOUSELOCATIONS) ›

CONTACT US (/ABOUTUS/ABOUTTHEOFFICE#CONTACTUS) ›

DISCLAIMER AGREEMENT (/GENERALINFORMATION/MISCELLANEOUS#DISCLAIMERAGREEMENT) ›

CLERK DIRECTORY (/ABOUTUS/HOURSANDLOCATIONS#CLERKDIRECTORY) ›

Case Number: CACE-26-008429 Division: 21
Filing # 248640855 E-Filed 05/20/2026 03:05:02 PM

IN THE CIRCUIT COURT OF THE 17th JUDICIAL CIRCUIT OF FLORIDA
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.: ______________

**CLASS REPRESENTATION**

**JURY TRIAL DEMAND**

MIA D. JONES, on behalf of herself and all others similarly situated,

Plaintiff,

v.

LENNAR HOMES, LLC; ALL PHASE ROOFING, INC.; OSCAR AIR CONDITIONING INC.; A B C DRYWALL, CORPORATION; and BUILDER SERVICES GROUP, INC. d/b/a GALE INSULATION,

Defendants.
_________________________________/

**Related Case to Existing Case No. CACE 25-003574 (Haimes, J.)**

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

# **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Individual Plaintiff, and proposed Class Plaintiff Mia D. Jones (the "Class Plaintiff"),[1] sues Defendants, Lennar Homes, LLC ("Lennar"), All Phase Roofing, Inc. ("All Phase"), Oscar Air Conditioning Inc. ("Oscar Air"), A B C Drywall, Corporation ("ABC"), and Builder Services Group, Inc. d/b/a Gale Insulation ("Gale") (all Defendants other than Lennar are referred to as the "Subcontractor Defendants" or "Subcontractors").

**CLASS INTRODUCTION**

1. This proposed class action is brought individually by Ms. Jones, and as the proposed class representative, for all members of the Seminole Tribe of Florida ("STOF"), their families, and their invitees, who: (1) occupied homes (hereinafter the "Homes" or "Subject Residences") that were purchased directly by STOF from Lennar, (2) constructed by Lennar and its subcontractors on Tribal Residential Lands, and (3) who sustained injury to their person or property because those homes were designed and constructed in a manner which caused systemic water intrusion, water damage, moisture intrusion, and excess humidity resulting in mold growth and dust mite proliferation.

2. To be clear, this Class Complaint seeks to certify only specific, individual questions that are all common to Class Plaintiff, and each of the proposed class members (such as whether all Homes have construction defects), but each individual Class Member will still have to prove that Lennar's and the Subcontractors' actions proximately caused their own damages and the extent of such damages.

[1] This action is directly related to *Seminole Tribe of Florida v. Lennar Homes, LLC*, Case No. CACE 25003574 (Fla. 17th Jud. Cir. Ct., Broward Cty.) (the "STOF Action"), which arises from the identical residential development, involves the same primary Defendant (Lennar), and concerns overlapping allegations regarding common design and construction defects, moisture intrusion, mold-related conditions, and Lennar's knowledge and conduct. Class Plaintiff respectfully requests that, although this case seeks only to recover the personal injury and personal property damages sustained by Class Plaintiff and the class which may not be recovered in the pending STOF Action, that this case be designated as related to the STOF Action.



NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY





NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

3. The failed Lennar Tribe Project was undoubtedly the largest Native American housing disaster, involving over 466 defective homes and over 1,000 individual Tribe members that all now need to be relocated, medically monitored and treated for specific mold related damages. STOF spent over thirty years creating the necessary legal platforms so that they could even seek to develop hundreds of homes on tribal land for all of their members. To date, STOF has already paid Lennar many hundreds of millions of dollars for these defective homes and are currently dealing with over 1,000 members that all resided in these defective homes and all need to be relocated and medically monitored.

4. Over the past two years, experts have already tested and inspected the defective Homes and found they permitted water intrusion, trapped humidity, and chronic indoor dampness, creating conditions conducive to mold growth, dust-mite amplification, contamination of personal belongings, loss of use, displacement, and bodily injury.

5. The defective Homes were supposed to provide safety, stability, and the opportunity for all class members to live in sound housing within Seminole communities. Instead, occupants were forced to live in homes exhibiting recurring ghosting, moisture staining, elevated humidity, microbial growth, damage to furniture and clothing, and worsening respiratory and allergic symptoms affecting children, elders, and medically vulnerable residents.

6. Plaintiff alleges that these conditions did not arise from isolated workmanship errors in a handful of houses. They arose from common and repeated failures in the design, construction, installation, supervision, quality control, and close-out of Homes built across the Development, including defects in roofing systems, building envelopes, attic ventilation, insulation, air sealing, and HVAC design and installation. Based upon specific evidence and documents, Plaintiff will explain at trial how Lennar rushed Homes toward closing before they were ready, used subcontractors who were not properly qualified for critical scopes of work, and

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

ignored known moisture and mold risks associated with the construction methods employed in hot-humid South Florida conditions. All of this was done because Lennar again, as they have in many prior residential projects, put their own profits and their stock price over the safety of class members.

7. As a result of these defects, over 1,000 STOF tribal members have already been forced to relocate, or will soon be required to relocate, including over 900 Class Members who lived in Leased Homes and Rent-to-own Homes, pending remediation or reconstruction of their defective Lennar Homes.

## TRIBE MEMBERS REQUIRED TO RELOCATE LENNAR HOMES

| Lennar Homes Members per Community | | | | |
|---|---|---|---|---|
| Commmunity | Owners | Rent-To-Own | Renters | Total Members |
| HW Seminole Park | 69 | 51 | 278 | 398 |
| HW RV Hideaway | 24 | 0 | 0 | 24 |
| HW-Eight Clans | 9 | 0 | 0 | 9 |
| BC-Mabbel T Frank | 17 | 12 | 128 | 157 |
| BC The Groves | 0 | 0 | 133 | 133 |
| BR Flowing Well | 25 | 8 | 170 | 203 |
| Lakeland All Lennar | 41 | 52 | 72 | 165 |
| | | | GRAND TOTAL | 1089 |

8. This Class Action is separate from the Action brought by the Seminole Tribe of Florida itself and pending before thus Court in the Complex Business Division. Plaintiff here does not sue on behalf of the Tribe, and does not seek to recover any of the Tribe's own damages. Plaintiff instead seeks only relief for her own personal injury, pain and suffering, personal property, and loss of use damages, directly caused by the Defendants' conduct.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

## PREDICATE FACTS IN COMMON WITH THE PENDING STOF ACTION

9. This Action arises out of the negligent and defective development, design, manufacture, construction, installation, supervision and maintenance of 466 homes (out of a contemplated 643 homes) built for STOF's tribal members on land owned by STOF across four reservations throughout Florida (the "Development") by Lennar and its subcontractors (the "Subject Residences").

10. The claims sound in contract, tort and violation of Florida Statutes. The conduct alleged against Lennar and the Subcontractors rises to the level of gross negligence and intentional misconduct that was a reckless disregard for the life of these injured Class members.

11. The Development served seven (7) different Seminole Tribe Reservations (the "Reservations"), including the Mabel T. Frank Residential Development (Big Cypress Reservation) ("Mabel T"); the Lakeland Residential Development (Lakeland Reservation) ("Lakeland"); the Seminole Park Housing Development (Hollywood Reservation) ("Seminole Park"); the Groves Housing Development (Big Cypress Reservation) (the "Groves"); the Townhomes at RV Hideaway (Hollywood Reservation) ("RV Hideaway"); the Eight Clans Townhomes (Hollywood Reservation) ("Eight Clans"); and the Flowing Well Housing Development (Brighton Reservation) ("Flowing Well").

12. Historically, "chickee" is the word that the Seminoles use for "house."[2] In the 1830s, the Indian Removal Act led to the displacement of the Seminoles who were fleeing from U.S. troops seeking to displace them and take their land. Due to this, traditional stationary houses gave way to an easier- and faster-to-build, disposable shelter—***the chickee.***

---

[2] https://www.semtribe.com/culture/chickee



NOT AN OFFICIAL COPY PUBLIC ACCESS - NOT AN OFFICIAL COPY



13. Nearly 200 years later, no longer relegated to residing in chickee shelters, in late 2019, the Development was initiated by STOF to help its constituent members realize their dreams of living in a brand-new home within STOF tribal residential land. The Development was the largest residential development ever undertaken by a Native American tribe in the United States. STOF put the project out to bid among reputable developers and ultimately chose Lennar to take on this project.

14. STOF's dream to develop safe, high-quality housing on its reservations for the benefit and access of its tribal members was therefore entrusted to Lennar—the company whose "Core Values" are supposedly "Quality, Value, and Integrity." However, as this Complaint will show, Lennar has acted without integrity, without providing quality and without providing fair value to STOF tribal members. Pursuant to the Community Development Agreement ("CDA") between STOF and Lennar, 100 homes were directly purchased by tribal members from Lennar, while the remainder (366) were purchased by STOF from Lennar.

15. With respect to the 100 direct-purchased homes, STOF provided 50-year leases ("Homesite Leases") to the purchasing tribe member for use of the Tribe-owned land beneath the home site. Of the 366 homes that STOF purchased from Lennar, STOF leased 278 of those homes

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

to tribal members on a rental basis (the "Leased Homes"). This action does not involve STOF members who directly purchased their homes from Lennar.

16. In addition, STOF provided 88 rent-to-own homes to tribal members who would ultimately take ownership of the homes after fulfilling their rental obligations (the "Rent-to-own Homes"). For the 366 homes that were rented to tribal members, STOF entered into residential leases with the tribe members who took residence in those homes (the "Residential Leases"). Over 900 STOF members reside in the Leased Homes and Rent-to-own Homes.

17. All Subject Residences, including the Leased Homes and Rent-to-own Homes, are unsafe and uninhabitable as a direct result of design and construction-related defects in the dwellings set forth in detail below, and are the responsibility of all of Defendants jointly and severally.

18. Ongoing inspections of the defective Lennar homes have ***already confirmed*** that the Subject Residences are rife with significant design and construction-related defects that have caused property damage and health risks to its residents, including, but not limited to, issues with the building envelope, electrical, mechanical, ventilation and roofing systems which have resulted in, among other things, (a) visible mold; (b) excess humidity, moisture and water intrusion; (c) elevated mold spores in the breathing zones of the Subject Residences; and (d) elevated dust mite particles within the breathing zones of the Subject Residences. STOF has produced and continues to produce professional consultants' reports of defect issues that STOF continues to learn about on a near-daily basis.

19. Regarding the health-related claims in particular, the mold, dust mites and other indoor air quality issues caused by the defects in the Subject Residences have caused adverse health consequences for the families living in the Subject Residences, including, but not limited to, the following:

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

(a) allergic rhinitis symptoms, including, but not limited to, post-nasal drip, runny and/or stuffy nose, sneezing, cough, headaches, light-headedness, sore throat, fatigue, allergic shiners and/or irritated eyes;

(b) chronic sinusitis symptoms including, but not limited to, fever, chills, aches and pain, sinus pressure, sinus congestion, chronic cough, difficulty breathing, fatigue, ear pain, headache and/or general malaise;

(c) symptoms of asthma onset or aggravation, including, but not limited to, coughing, wheezing, chest pain and tightness, shortness of breath, difficulty sleeping or exercising and/or asthma attacks; and/or

(d) symptoms of allergic bronchopulmonary aspergillosis, hypersensitivity pneumonitis, and similar lung diseases, including, but not limited to, wheezing and shortness of breath, cough, often with bloody mucus, fever, chills, chest pain or tightness, muscle and joint pain, fatigue, malaise, loss of appetite, weight loss, respiratory failure and/or lung scarring.

20. The preceding symptoms are consistent with exposure to elevated respirable levels of toxic and/or allergenic mold spores and/or dust mite particles in water-damaged indoor environments.

21. In addition to the self-evident health consequences of these symptoms, they also cause poor sleep, decreased productivity, missed work or school, and pain and suffering, among other life consequences. As a result, families residing in the Subject Homes have been forced to live in unhealthy, dangerous conditions unless and until they are relocated at STOF's expense, resulting in their constructive eviction, and, whether relocated or not, have been significantly impaired in their use and enjoyment of their homes. All of the above are damages that STOF Tribe members have already incurred, continue to incur daily, and/or will soon incur.

22. As for the harm and damages to individual Class members, those families living in the Leased Homes and Rent-to-own Homes bring their portion of this case as a class action pursuant to Florida Rule of Civil Procedure 1.220. The Class Plaintiff and/or putative class members in this case are: (1) current and former tenants and invitees residing in the Leased Homes and Rent-to-own Homes; and (2) current and former owners and invitees of Rent-to-own Homes which were originally owned by STOF and then sold by STOF to tribal members.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

## PARTIES

23. **Named Plaintiff Mia D. Jones** is an adult resident of 3191 Big Oak Ln., Hollywood, Florida 32021, and was a renter at the Hollywood Reservation during the relevant period. Her claims arise from the same course of conduct, the same exposure, and the same resulting harms alleged herein on behalf of the proposed Class of Lennar defective home residents. While renting at the Hollywood Reservation, Ms. Jones' person and property were exposed to the hazardous conditions alleged in this Complaint. That exposure was not isolated to her unit or unique to her circumstances, but occurred in the same setting and manner as the exposure experienced by other renters and occupants within the proposed Class.

24. As a result of that exposure, Ms. Jones suffered persistent physical symptoms, including allergic rhinitis. Ms. Jones has suffered the same type of injury and damage alleged on behalf of the proposed Class, including physical illness and the resulting need for medical attention, and her claims are therefore typical of the claims of other Class members who were exposed to the same conditions at the Hollywood Reservation in particular, and the other Reservations generally. Ms. Jones seeks relief for injuries and damages caused by the same alleged misconduct that injured and damaged other members of the proposed Class. Her interests are aligned with those of the Class, and she is an appropriate representative of persons who rented or resided in one of the Subject Residences and suffered harm from the exposure alleged herein.

25. More specifically, on February 27, 2025, Building Forensics Group ("BFG"), retained on behalf of the Seminole Tribe of Florida, inspected 3191 Big Oak Lane to assess reported moisture-related issues. BFG's March 10, 2025, preliminary investigation found that the unit contained construction deficiencies in derogation of the Florida Building Code, and that those deficiencies resulted in moisture damage.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

26. In particular, BFG identified multiple deficiencies in the air barrier at the ceiling/attic interface, including unsealed or improperly sealed penetrations through the drywall ceiling, including penetrations associated with HVAC supply ductwork, HVAC register boots, ceiling-mounted light fixtures and fans, bathroom exhaust fans, smoke detectors, and internet hubs. BFG also identified unsealed joints in the metal-framed partition top plates, unsealed electrical, plumbing, and exhaust penetrations through those top plates, visible signs of condensation or past condensation, and attic insulation thickness insufficient to achieve the R-30 value required by the Florida Building Code.

27. BFG later performed a preliminary indoor air quality assessment of 3191 Big Oak Lane and, in its April 23, 2025 report, documented staining and ghosting at certain ceiling penetrations; suspect mold on the ceiling and walls in the laundry room; attic ductwork with visual signs of condensation and suspect mold growth; suspect mold on attic drywall; suspect mold on the air-handler cooling coil; and suspect mold in the air-handler closet.

28. BFG further reported that lab results indicated a negative impact on indoor air quality in the home. BFG further concluded that the type and quantities of mold spores identified in the air caused indoor air quality concerns. Because of the conditions observed at 3191 Big Oak Lane at the time, BFG, at minimum, recommended remediation of the ceiling penetrations, walls and ceilings, attic areas and attic portions of the HVAC system, the air-handling unit, and a remediation-level deep cleaning of the home.

29. Once BFG and STOF's other consultants determined that the issues seen in this particular home were pervasive and widespread throughout the Development, it became clear that far more extensive remediation and re-construction of the homes was necessary.

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

30. BFG further warned that unless the underlying conditions resulting in the observed mold and moisture damage were corrected, the mold and moisture damage would continue to negatively impact the home's indoor air quality.

31. Plaintiff Jones alleges that the conditions documented by BFG at 3191 Big Oak Lane were manifestations of the same recurring roof, attic, air-barrier, insulation, HVAC, ducting, and moisture-control failures alleged throughout all Homes designed and constructed by Lennar and its Subcontractors. As a direct and proximate result of those conditions, Plaintiff Jones was exposed to unsafe indoor environmental conditions, suffered interference with the use and enjoyment of the home, and sustained bodily injury and damages to her personal property.

32. **Lennar Homes, LLC,** is a Florida limited liability company with its principal place of business at 5505 Waterford District Drive, Miami, Florida 33126. Lennar Homes LLC is a wholly owned subsidiary of Lennar Corporation. Lennar and the Subcontractor Defendants were responsible for the design, development and construction of the homes at issue in this case.

33. Lennar participated in the design of the homes and served as the developer and licensed general contractor (as defined in Fla. Stat. 489.105(3)(a)). As the developer and general contractor of the Subject Residences, Lennar entered into contracts with the Subcontractor Defendants pursuant to which the Subcontractor Defendants were responsible for designated portions of the design, construction, installation, supervision and maintenance of each of the Subject Residences.

34. As a matter of law, Lennar also remained liable for the errors, omissions and commissions by the Subcontractor Defendants that caused or contributed to the damages of the Class Plaintiff.

35. The Subcontractor Defendants performed work at the Development as follows:

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

**Lakeland**

36. **Insulation Subcontractor** – Builder Services Group, Inc. d/b/a Gale Insulation, 475 N. Williamson Blvd., Daytona Beach, FL 32114.

**Seminole Park**

37. **Roof Subcontractor** – All Phase Roofing, Inc., 1313 South Killian Drive, Lake Park, FL 33403.

38. **HVAC/Mechanical Subcontractor** – Oscar Air Conditioning Inc., 6540 N.W. 84 Avenue, Miami, FL 33166.

39. **Drywall/Framing Subcontractor** – A B C Drywall, Corporation, 5447 N.W. 24th Street, Suite 1, Margate, FL 33063.

40. **Insulation Subcontractor** – Builder Services Group, Inc. d/b/a Gale Insulation, 475 N. Williamson Blvd., Daytona Beach, FL 32114.

**Groves**

41. **Roof Subcontractor** – All Phase Roofing, Inc., 1313 South Killian Drive, Lake Park, FL 33403.

42. **HVAC/Mechanical Subcontractor** – Oscar Air Conditioning Inc., 6540 N.W. 84 Avenue, Miami, FL 33166.

43. **Drywall/Framing Subcontractor** – A B C Drywall, Corporation, 5447 N.W. 24th Street, Suite 1, Margate, FL 33063.

44. **Insulation Subcontractor** – Builder Services Group, Inc. d/b/a Gale Insulation, 475 N. Williamson Blvd., Daytona Beach, FL 32114.

**RV Hideaway**

45. **Roof Subcontractor** – All Phase Roofing, Inc., 1313 South Killian Drive, Lake Park, FL 33403.

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

46. **HVAC/Mechanical Subcontractor** – Oscar Air Conditioning, Inc., 6540 N.W. 84 Avenue, Miami, FL 33166.

47. **Drywall/Framing Subcontractor** – A B C Drywall, Corporation, 5447 N.W. 24th Street, Suite 1, Margate, FL 33063.

48. **Insulation Subcontractor** – Builder Services Group, Inc. d/b/a Gale Insulation, 475 N. Williamson Blvd., Daytona Beach, FL 32114.

**Eight Clans**

49. **Roof Subcontractor** – All Phase Roofing, Inc., 1313 South Killian Drive, Lake Park, FL 33403.

50. **HVAC/Mechanical Subcontractor** – Oscar Air Conditioning, Inc., 6540 N.W. 84 Avenue, Miami, FL 33166.

51. **Drywall/Framing Subcontractor** – A B C Drywall, Corporation, 5447 N.W. 24th Street, Suite 1, Margate, FL 33063.

52. **Insulation Subcontractor** – Builder Services Group, Inc. d/b/a Gale Insulation, 475 N. Williamson Blvd., Daytona Beach, FL 32114.

**Flowing Well**

53. **Roof Subcontractor** – All Phase Roofing, Inc., 1313 South Killian Drive, Lake Park, FL 33403.

54. **Drywall/Framing Subcontractor** – A B C Drywall, Corporation, 5447 N.W. 24th Street, Suite 1, Margate, FL 33063; MTY Construction, LLC, 4334 Cuthbert Avenue, North Port, FL 34287.

55. **Insulation Subcontractor** –Builder Services Group, Inc. d/b/a Gale Insulation, 475 N. Williamson Blvd., Daytona Beach, FL 32114.

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

56. **Defendant All Phase** is a for profit corporation, organized under the laws of the State of Florida, whose principal place of business is located at 1313 South Killian Drive, Lake Park, FL 33403.

57. At all times mentioned herein, All Phase was, and remains today, engaged in the business of performing roofing design, construction, installation and maintenance. Lennar either entered into a contract with All Phase or caused All Phase to act as, and perform all duties of, the roofing subcontractor responsible for the design, construction, installation and/or maintenance of the roof and all related fixtures and/or appurtenances installed at certain of the Subject Residences, including the roof vents.

58. By virtue of being the roofing subcontractor for certain of the Subject Residences, All Phase is a proper party defendant and liable for the conduct of its employees and/or subcontractors herein. Upon information and belief, all of All Phase's employees and/or subcontractors working on the Subject Residences were hired by, paid by and/or employed by All Phase. All Phase is therefore vicariously liable for the conduct of its employees and/or subcontractors in the performance of their duties in connection with the work they performed at the Subject Residences.

59. **Defendant Oscar Air** is a for-profit corporation, organized under the laws of the State of Florida, whose principal place of business is located at 6540 N.W. 84 Avenue, Miami, FL 33166. At all times mentioned herein, Oscar Air was, and remains today, engaged in the business of, among other things, performing HVAC system installation, repair, and maintenance in newly-constructed buildings including single family homes and town homes.

60. Lennar either entered into a contract with Oscar Air or caused Oscar Air to act as, and perform all duties of, the HVAC subcontractor responsible for the design, construction,

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

installation and/or maintenance of the HVAC system and all related fixtures and/or appurtenances installed at certain of the Subject Residences.

61. By virtue of being the HVAC subcontractor for certain of the Subject Residences, Oscar Air is a proper party defendant and liable for the conduct of its employees and/or subcontractors herein. Upon information and belief, all of Oscar Air's employees and/or subcontractors working on the Subject Residences were hired by, paid by and/or employed by Oscar Air. Oscar Air is therefore vicariously liable for the conduct of its employees and/or subcontractors in the performance of their duties in connection with the work they performed at the Subject Residences.

62. **Defendant ABC** is a for profit corporation, organized under the laws of the State of Florida, whose principal place of business is located at 5447 N.W. 24th Street, Suite 1, Margate, FL 33063. At all times mentioned herein, ABC was, and remains today, engaged in the business of, among other things, performing drywall installation, repair, and maintenance in newly-constructed buildings including single family homes and town homes.

63. Lennar either entered into a contract with ABC or caused ABC to act as, and perform all duties of, the drywall subcontractor responsible for the design, construction, installation and/or maintenance of the drywall installed at certain of the Subject Residences.

64. By virtue of being the drywall subcontractor for certain of the Subject Residences, ABC is a proper party defendant and liable for the conduct of its employees and/or subcontractors herein. Upon information and belief, all of ABC's employees and/or subcontractors working on the Subject Residences were hired by, paid by and/or employed by ABC. ABC is therefore vicariously liable for the conduct of its employees and/or subcontractors in the performance of their duties in connection with the work they performed at the Subject Residences.

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

65. **Defendant Gale** is a for profit corporation, organized under the laws of the State of Florida, whose principal place of business is located at 475 North Williamson Blvd., Daytona Beach, FL 32114. At all times mentioned herein, Gale was, and remains today, engaged in the business of, among other things, designing, constructing, installing, and/or performing repairs and maintenance on attic, wall and ceiling insulation in single family homes and town homes.

66. Lennar either entered into a contract with Gale or caused Gale to act as, and perform all duties of, the insulation contractor responsible for the design, construction, installation and/or maintenance of attic, wall and ceiling insulation at certain of the Subject Residences. By virtue of being the insulation subcontractor at certain of the Subject Residences, Gale is a proper party defendant and liable for the conduct of its employees and/or subcontractors herein. Upon information and belief, all of Gale's employees and/or subcontractors working on the Subject Residences were hired by, paid by and/or employed by Gale. Gale is therefore vicariously liable for the conduct of its employees and/or subcontractors in the performance of their duties in connection with the work they performed on the Subject Residences.

## JURISDICTION AND VENUE

67. This Court has subject matter jurisdiction over the dispute because the amount in controversy, exclusive of attorney's fees, costs and interest, exceeds $50,000.

68. This Court has personal jurisdiction over Lennar and the Subcontractor Defendants because Lennar is a Florida limited liability company based in Miami-Dade County and most, if not all, of the Subcontractor Defendants are corporations or limited liability companies incorporated in or having their principal place of business in the State of Florida.

69. Much of the real property that is the subject of this Action is located in Broward County.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

70. Venue is proper in Broward County, Florida, pursuant to Sections 47.011 and/or 47.041, Fla. Stat., because one or more causes of action accrued here; Broward County is the domicile of the Class Plaintiff and certain of the Defendants; many of the acts and/or omissions giving rise to this Complaint and each cause of action took place and accrued in Broward County; and because Broward County is the situs of much of the real property at issue and the location of much of the Defendants' improper conduct.

71. This action is distinct from any separate action brought by STOF concerning the CDA, tribal property interests, completion of construction, or remediation of tribal-owned improvements. Plaintiff here seeks recovery only for her own bodily injuries, damages to her personal property, loss of use, displacement, and related relief, and expressly disclaims any intent to obtain duplicative recovery for losses belonging to STOF. All conditions precedent to the filing of this Action have occurred or have otherwise been waived.

**CLASS REPRESENTATION ALLEGATIONS**

72. Plaintiff seeks certification under Florida Rule of Civil Procedure 1.220(d)(4) of ***particular common issues*** suitable for class-wide adjudication. Plaintiff also pleads, and will establish, the requirements of Rules 1.220(a), 1.220(b)(1)(B), and 1.220(b)(3), with issue certification under Rule 1.220(d)(4) serving as the appropriate mechanism for resolving the common issues identified below.

73. The class is defined as follows:

> ***All natural persons who are or were occupants of Leased Homes and Rent-to-own Homes in the Development.***

74. Excluded from the proposed Issue Class are Defendants; any parent, subsidiary, affiliate, predecessor, successor, officer, director, member, manager, employee, agent, or legal representative of any Defendant; any entity in which any Defendant has or had a controlling



NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

interest; the judicial officers assigned to this action and the members of their immediate families; any mediator assigned to this action; and any person who timely and validly requests exclusion from any class certified under Rule 1.220(b)(3), to the extent opt-out rights are applicable.

75. Plaintiff expressly reserves the right to amend, refine, narrow, broaden, divide, or otherwise modify the proposed class definition and any proposed issue subclasses as discovery proceeds, as expert analysis develops, and as the evidentiary record concerning common proof, home configurations, trade scopes, reservation-specific conditions, time periods, and other case-management considerations becomes more fully developed.

76. The members of the proposed Issue Class are so numerous that separate joinder is impracticable. The proposed Issue Class consists of over 900 occupants dispersed across multiple reservations and developments, and the identity and residence history of affected occupants can be determined through Defendants' and STOF's project, leasing, and occupancy records.

77. Class Plaintiff and most, if not all, class members are Florida citizens, and Class Plaintiff's claims raise questions of law and fact that are common to the claims of each member of the class. Such questions include, but are not limited to, the following:

a. whether one or more common design, construction, installation, supervision, and quality-control practices by Lennar and the Subcontractor Defendants caused water intrusion, water damage, moisture intrusion, and/or excess humidity which resulted in the growth of mold and/or the proliferation of dust mites in the Subject Residences;

b. whether roofs installed by All Phase Roofing materially deviated from applicable product approvals, notices of approval, plans, specifications, and accepted installation requirements;

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

c. whether one or more of Defendants used common attic, insulation, air-sealing, mechanical, ducting, flashing, and envelope practices that were defective or code-noncompliant in the Subject Residences;

d. whether Lennar, as developer, builder, licensed general contractor, permit holder, and supervisor of subcontractors violated common duties to occupants of the Subject Residences;

e. whether Defendants had common knowledge, before and during the Development, of the moisture, humidity, and mold risks associated with the design and construction methods used in the Subject Residences;

f. whether Defendants breached duties imposed by the Florida Building Code, industry standards, plans and specifications, manufacturer requirements, and common-law duties of reasonable care; and

g. whether STOF members were intended third-party beneficiaries of the Community Development Agreement.

78. Class Plaintiff's claims are typical of the claims of the proposed Issue Class because Class Plaintiff, like absent class members, occupied home designed and built by Lennar and the Subcontractor Defendants in the Development and was subjected to the same overall course of conduct, the same common defect mechanisms, and the same general legal theories concerning Defendants' duties, knowledge, code compliance, and breach. Class Plaintiff's claims and the Class's claims arise from the same essential practices and proof even though the nature and extent of individual injury, exposure, and damages may vary.

79. Class Plaintiff will fairly and adequately represent the class members. Class Plaintiff is a tribal member who is a current and/or former occupant of a Leased Home or Rent-to-

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

Own Home. Class Plaintiff has retained counsel who are experienced in bringing class actions, in bringing mold and dust mite actions and in representing members of the Seminole Tribe.

80. This action should be maintained as a class action pursuant to Florida Rule of Civil Procedure 1.220(b)(1)(B) in that the prosecution of separate claims would create a risk of inconsistent adjudications affecting class members in the identical situations which Defendants would contend are dispositive of the interests of other class members or would substantially impair the ability of other, non-party potential class members to protect their interests.

81. Alternatively, this action should be maintained as a class pursuant to Florida Rule of Civil Procedure 1.220(b)(3). There are questions of law and fact common to the class, and those questions predominate over any questions affecting only individual class members.

82. A class action is superior for the fair and efficient adjudication of the class members' claims. The class members' rights will not likely be vindicated in the absence of a class action. A class action would be manageability and administratively feasible.

83. Plaintiff does not seek class-wide adjudication, in the first instance, of individualized bodily-injury causation, individualized exposure, or individualized damages. Those matters, to the extent necessary, can be determined in subsequent individualized proceedings after resolution of the common issues suitable for class treatment.

84. Issue certification under Rule 1.220(d)(4) is therefore appropriate as to the common issues identified above. Resolution of those issues on a class basis will materially advance the litigation for all class members, promote efficiency, conserve judicial resources, and provide a fair and manageable structure for later proceedings concerning individual causation and damages.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A. STOF Endeavors to Complete the Largest Residential Development Project Ever by a Native American Tribe

85. STOF owns and controls all "Tribal Residential Land" within several Indian reservations located in Florida: the Hollywood Reservation in Broward County ("Hollywood"); the Brighton Seminole Reservation in Glades County ("Brighton"); the Big Cypress Seminole Reservation in southeastern Hendry County and Western Broward County ("Big Cypress"); the Ft. Pierce Reservation in St. Lucie County ("Ft. Pierce"); the Tampa Reservation in Hillsborough County ("Tampa"); the Lakeland Reservation in Lake County ("Lakeland"); and the Immokalee Seminole Reservation in Collier County ("Immokalee").

86. In late 2019, STOF endeavored to help its constituent members realize their dreams of living in a brand-new home by facilitating the development of communities within these Tribal Residential Lands for tribe members to purchase and/or lease such homes.

87. This project endeavored to be the largest residential development ever undertaken by a Native American tribe in the United States. STOF put the project out to bid among reputable developers and ultimately chose Lennar to take on this project. Lennar Corp. is the second-largest homebuilder in the country. Its homebuilding practice accounts for the "most substantial part of [its] business." *See* Steven Gabor Deposition Transcript ("**Gabor Tr.**"), attached hereto as **Exhibit 1**, at Ex. 31(Lennar's 2025 Annual Report). It holds itself out as a premier builder.

88. In 2018 alone, Lennar Corp. had accepted approximately 45,826 new home orders and reported more than $20 billion in revenue. In 2025, Lennar generated $ 32 billion in revenues, roughly 94% of its consolidated revenues. Gabor Tr. at Ex. 31.

89. Lennar provides "quarterly reports to Wall Street" who "look[s] at [Lennar] on a quarterly basis." *See id*. at 198:14-20. Lennar is required to meet specified performance quotas.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

*Id*. at 193:10-14 ("*Is there a certain quota which needs to be built every quarter for Lennar? We have projections that we -- that we have to hit*.").

90. Lennar provides investors with a "range" of the numbers they anticipate making based on the number of homes closed within a period of time and its employees know that their numbers should be "within that range." *Id*. at 205:24-25; *see also id*. at 206:1-2; *id*. at 193:12-13 ("*We have projections that we -- that we have to hit*.").

91. For some Lennar employees, bonuses and incentives are tied to the number of homes that are built within that time frame. *Id*. at 194:22-25, 105:1; *see also id*. at 195:3 ("*I'm tied to the financial performance of the company*."). Lennar's necessity to meet these financial projections was integrated in the project it undertook for STOF. *Id*. at 195:22-25, 196:1-3. ("*Was there a certain quota for this project that anyone at Lennar was supposed to try to meet, this project? Yes, we had a sequence of construction. We had a plan of starts and closings assigned to this project*.").

92. The development of these communities was not a mere business venture. For STOF and its tribal members, access to safe, quality housing represented the fulfillment of a goal that could not have been imagined at the time STOF established its tribal Constitution in 1957. The Tribe and its members placed a great deal of confidence and trust in Lennar to accomplish this incredibly meaningful and important task.

## B. <u>STOF and Lennar Enter Into the Community Development Agreement</u>

93. To memorialize the terms and scope of STOF's retention of Lennar as the developer of the project, STOF and Lennar negotiated and entered into the Community Development Agreement ("CDA"). The CDA was intended to be the exclusive governing document for the design and construction of the new homes built on STOF's reservations by Lennar and the Subcontractor Defendants.

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

94. On September 10, 2019, STOF entered into the CDA with Lennar. A copy, as amended, is attached as **Exhibit 2** (the "**CDA**").

95. As the exclusive builder and general contractor, Lennar agreed under Section 8.01 of the CDA to develop, design and build home types approved by STOF. STOF selected these home types from Lennar's "Florida Home Plan Library" of previously designed homes. Article XI of the CDA required Lennar to develop the land and sell homes in each community in a "manner similar to the operation of Lennar's communities outside tribal lands within the state of Florida."

96. Under Section 8.04 of the CDA, Lennar assumed responsibility for the selection of all subcontractors. The CDA contained an exhibit enumerating Lennar subcontractors who would be deemed to be pre-approved by STOF. However, Lennar was required to obtain the approval of STOF should Lennar wish to use any subcontractors not on the pre-approved list.

97. Section 13.04 of the CDA incorporated the Florida Building Code as the building code governing Lennar's construction of the homes. The CDA does not contain an arbitration provision. Rather, it contains an anti-arbitration provision.

**C. <u>Lennar Rushed to Complete Homes and Meet Projections</u>**

98. Lennar must "close" on a home in order to get paid. Gabor Tr. at 235:24-25, 236:1 ("*If you closed a home, it would count towards the projections. If the home didn't close, it wouldn't count towards the projections.*"); *id*. at 255:24-25 ("*We get paid on the closing, not the CO, not the TCO. We get paid on the closing.*").

99. Lennar would ask the Tribe to purchase a home before it had been issued a certificate of occupancy. *See id*. at Ex. 23 (August 30, 2022 Email from Cecilio Collado to Steve Gabor: "*The 15 homes that you are requesting we purchase don't have a CO. I will not be having any conversations about closing any home without a CO being issued.*").

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

100. Through the construction process, Lennar was "trying to keep the homes moving at all times." *See id*. at 228:23-24. In November 2021, STOF informed Lennar that "the six homes slated to close in the Mabel T Frank development [were] not quite ready" because the homes had a series of items pending, including but not limited to, air quality tests that were not yet performed, the Building Department's final inspections that needed to be performed, and multiple other tasks that were not yet completed, such as sod, landscaping, and appliances that needed to be installed. *Id*. at Ex. 21 (November 17, 2021 Email from Wendy Larson to Steve Gabor).

101. This was a common occurrence with these homes. *See id*. at 217:4-5 ("*So we asked the Tribe to close the homes prior to getting power*"); *id*. at Ex. 25 (August 31, 2022 Email from Darin McMurray, Regional Vice President Southwest Florida for Lennar, to Derek Koger: "*I don't need cash tonight but I do need a signed HUDs on these 9 homes above and I ask u to reconsidered and close these 9 homes. . . again I ask for your help we will get these homes finished if there are additional list. . .*").

102. Lennar also requested STOF to close on homes before air quality tests had been done. *See id*. at 216:19-25 ("*Well, this says the air quality tests aren't complete yet? That is correct. So why would you close a home before the air quality tests are complete*?..."). *See also id.* at 217:7-19.

103. Lennar would push to get the homes officially closed by their quarterly deadlines to have those numbers reported. *See id*. at 200:15-16; 200:18-21 ("*Is that the projected number that Lennar tells their investors each quarter? . . . Phil is in southeast Florida, which has their own projections in southeast Florida that roll up to the company's projections. So yes, this is in regards to the overall projections of the company.*").[3]

[3] *See also id*. at Ex. 18 (May 3, 2021 Email from Philip Serrate to James Rabideau: "***James, our quarter end is here and we must hit the homes we projected***"); Ex. 20 (May 23, 2022 Email from



NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

104. In accordance with its corporate policy, Lennar pushed STOF to close on the homes. *See id*. at Ex. 24 (May 24, 2022 Email from Steve Gabor to David Burgueno: "*None of these are pushing to June. They all must close in May*."); *see also id*. at Ex. 23 (August 30, 2022 Email from Cecilio Collado, Senior Project Manager of Construction Management at Seminole Tribe of Florida, to Steve Gabor: "*My team, housing, and the building department have been working feverishly the last couple of weeks to help your team meet your quarterly goals.*").

105. Lennar's pressure to accelerate closings before certificates of occupancy were issued and before final testing was complete was not a mere scheduling dispute. It is apparent that Lennar prioritized production targets and cash realization over completion, quality control, and verification that the homes were safe, code-compliant, and suitable for occupancy in Florida's hot-humid climate. Plaintiff alleges that this pressure contributed directly to the delivery of homes with unresolved moisture-control, roofing, envelope, and mechanical deficiencies that later manifested in chronic humidity, water intrusion, mold growth, dust mite contamination, and occupant harm.

**D. <u>Lennar Failed to Hire Qualified Subcontractors for the Roof Installations</u>**

106. Before the Development, Lennar had never "done a metal roof in the state of Florida." *Id*. at 151:15-16; *see also id*. at 152:6-7 ("I'm not aware of Lennar building metal roofs on residential homes."); *id*. at 148:2-15 ("So Lennar doesn't typically install metal roofs. I don't have knowledge Lennar installing metal roofs. But it's my understanding the Tribe picked the product that Lennar was building through the -- Lennar's plan library. And we mad[e] modifications to that project or product based on what the Tribe wanted, such as impact windows and metal roofs. Okay. So Lennar did not have in their library of plans any plans for homes with metal roofs? So in our library of plans, you can have different specifications on a home. Lennar

Bruce Grundt to James Rabideau, Rick Morales, and Luis Rioseco: "***We must close the 24 homes by May 31 (our fiscal quarter)***").



NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

doesn't build homes with metal roofs, and we didn't have a plan that had a metal roof that we're currently building. But we built that plan.").

107. Lennar nonetheless agreed to install metal roofs for STOF, and that it would hire "qualified people to perform the work." *Id*. at 149:11-12. Lennar chose All Phase Roofing for the task. But Lennar failed to conduct any reasonable due diligence to verify whether All Phase Roofing possessed the requisite skill, training, personnel, or equipment necessary to properly perform the specialized work of installing a metal roof. *Id*. at 86:7 – 87:6. Lennar since has admitted: "I don't know how many metal roofs All Phase Roofing has installed. I don't know that." *Id*.

**E. <u>The CDA Contains a Provision Indemnifying STOF and Its Members</u>**

108. Section 15.02 of the CDA contains an indemnity provision requiring Lennar to indemnify and hold harmless STOF and its Members from, among other things, any claim, liability, loss, damage, cost or expense arising out of the negligence or willful misconduct of Lennar.

109. Indemnification is required for, among other things, death, bodily or personal injury to persons, injury or damage to tangible property, including the loss of use therefrom, and construction defects. As a matter of law, Lennar is vicariously liable to STOF and its members for the negligence of its subcontractors. Thus, the negligence of Lennar's subcontractors would also trigger Lennar's indemnification obligations under Section 15.02.

**F. <u>Tribal Members Are Express Third-Party Beneficiaries Under the CDA</u>**

110. Each of the tribal members, including Class Plaintiff, are express third-party beneficiaries of the CDA. STOF and Lennar intended that the CDA primarily and directly benefit the tribal members. The CDA expressly states that through the efforts of STOF and Lennar, the Tribal Residential Lands would "develop into communities *for the benefit of members of STOF*



NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

("Members"), including some homes which will be offered to Members for rental, and other homes which will be conveyed to Members (each, a "Home")." (emphasis added).

111. STOF and Lennar knew and intended that the units would be purchased or rented exclusively by members of the Seminole Tribe of Florida.

## G. The Project Grows Over Time

112. The Development required long-range planning. STOF identified portions of tribal lands for development in accordance with the CDA. STOF and Lennar collaborated on the number and type of homes to be included in the community; site improvements to the community such as landscaping, signage and amenities; side plans and budgets for projected costs of completion; and the number and model of community homes to be built in each community.

113. The CDA originally had a five-year term and covered three "Initial Communities" in which Lennar would build homes and develop infrastructure: the "Mable T Property" within the Big Cypress Reservation; the "Seminole Park" property within the Hollywood Reservation; and the "Lakeland Property" within the Lakeland Reservation. The CDA was amended a total of five times over the next five years to incorporate additional projects and increased scopes of work in Lakeland, Brighton, Hollywood, Big Cypress and Immokalee. *See* **Exhibit 2**.

## H. The Breakdown of the Pool of Homes

114. 466 of the homes built by Lennar were sold.

115. Of those, 278 comprised the Leased Homes.

116. 88 comprised the Rent-to-own Homes. 100 homes were sold by Lennar directly to tribal members. For all homes, STOF retained ownership of the underlying land. For the direct-purchased homes, STOF provided tribal members with a 50-year lease for that land. For the Leased Homes and Rent-to-own Homes, STOF also provided tribal members with rental leases and retained ownership of the underlying land as well as the homes constructed above that land.

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

## I. The Subject Residences Contain Significant Global Defects

117. STOF and its members' dream development has become a nightmare due to fundamental errors and significant defects in the design and construction of the Subject Residences built by Lennar and its subcontractors.

118. Again, Lennar served as the developer, licensed general contractor, and builder for the construction of the project. Together with its Subcontractors, Lennar designed, developed and constructed the various communities and homes for the use of STOF's and its constituent tribal members to use as Subject Residences, including pulling the necessary permits for and supervising the construction of the units.

119. The aforementioned construction defects enumerated above are not only the result of Lennar's and their Subcontractors' negligence, but also constitute material violations of the Florida Building Code, permitted plans and specifications, manufacturer's recommendations and instructions, building and construction practices, industry standards, governmental codes and restrictions, various warranties implied in law, and ultimately, Lennar's CDA.

120. The homes are materially defective in numerous aspects. The systemic construction and design defects in the homes include, but are not limited to, defects in building envelopes, roofing systems, structural systems, venting and ducting systems, windows, ceilings, fixtures, waterproofing and other components and elements of the buildings and common areas.

121. These include, but are not limited to:

i. Faulty design and construction of the vented attic system, in violation of the Florida building code;

ii. Leakage sites along the attic planes with corresponding humid air infiltration;

iii. Improperly sized HVAC units;

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

iv. Air leakage pathways resulting from improper sealing around furring strips, block walls and ceiling junctions, contributing significantly to moisture intrusion issues in excess of the allowance provided for by the Florida Energy Code;

v. Roof defects such as inconsistent metal fastening patterns; missing VersaShield fire-resistance slip sheets; lack of standard product approval stamps on the underside of the metal panels; missing butyl tape sealant between the metal panels; missing butyl tape sealant between metal panels and "Zee" closures; no sealant between the ridge and hip section overlaps; failure of the majority of metal panel fasteners to penetrate wood decking as required by NOA; lack of sealant around pipe base as a secondary water barrier; improper installation of metal flashing to the wall return; missing pop rivets to the trim (ridges, hips, flashings); de-bonded modified metal membrane at the end of the cricket; inconsistent installation of pop rivets; and improperly installed gutter attachment hangers. Gabor Tr. at 75:12-18 ("Lennar has acknowledged a roofing concern with one of the roofers, All Phase Roofing, and we've acknowledged that there's a technical deviation to the attachments that that roofing contractor installed the roofs to and it wasn't per the -- the notice of approval."); *id.* at 77:16-18 ("We found a technical deviation to the product approval as it relates to the attachment in the roofs installed by All Phase Roofing."); *id.* at 79:2-4 ("Yes, there was a technical deviation to the product approval and Lennar's agreed to replace all the roofs with that deviation."); *id.* at 96:19-21 ("We've agreed to replace the whole roof system on the roofs that All Phase Roofing installed because of the technical deviation."); *id.* at 126:2-

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

5 ("I'm saying in regards to All Phase Roofing, we were going to replace all those roofs, and we agreed to replace all those roofs. So we would address everything in this report."); *id.* at 118:17-18 ("…It did create concern which is why we agreed to replace all the roofs installed by All Phase Roofing."). Lennar hired a consultant who agreed on the multiple roof defects noted by STOF. *See id*. at 118:10-12 ("We investigated after we saw this report, and we came to the determination that we would replace all the roofs that were installed by All Phase Roofing."); *id.* at 121:9-11 ("We concurred that there was a technical deviation in regards to the attachment, which is why we agreed to replace the roofs.");

vi. Missing or improperly installed stucco and screen vents; and

vii. Flooring defects. *See, e.g.*, Gabor Tr. at 177:10-12 ("We -- we saw a concern with floor tile. We saw some isolated instances where the floor tile lifted and we agreed to replace that floor tile."); *id.* at 187:8-10 ("This is a inspection that the Tribe completed, and had concerns in regards to the penetrations.").

122. The preceding list is not intended to be complete or exhaustive, as additional inspections and assessments have been, and will continue to be, undertaken by STOF's consultants, and the results of those inspections and assessments will be reduced to additional reports.

123. The common defect pathways identified above operated together rather than in isolation. Roof-system failures permitted water entry; envelope and flashing deficiencies permitted additional moisture intrusion; attic, insulation, and air-barrier failures allowed humid air migration and condensation; and HVAC and duct defects impaired moisture control and pressure balancing. In a hot-humid environment, those combined failures predictably elevated indoor relative

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

humidity, wetted building materials, prolonged drying times, and created repeated conditions conducive to mold amplification and dust-mite proliferation within occupied homes.

**J. <u>Consequent Effects of the Systemic Defects on the Subject Residences</u>**

124. The excess humidity, water and moisture caused by the preceding conduct led to mold growth and/or dust mite proliferation in interstitial wall cavities, on the paper coverings of gypsum wall board and, upon information and belief, paper-facing of vapor barriers, on baseboards, upon portions of gypsum wall board and wood framing, and additionally in other locations within the Subject Residences including roofs, walls, paint, sheathing, framing and other components. *See* Gabor Tr. at 192:10 (Lennar's corporate representative admitting that "mold could be bad"); *see also id*. at 18:7-8 ("We have seen some signs of mold but we haven't seen it across all homes."); *id.* at 19:6-7 ("There's isolated situations where we've seen mold in some of the homes."). Lennar was aware of the Tribe's concerns as to health complications (and other risks) due to the presence of mold. *See id.* at 190:21-25, 191:1 ("So the tribal members were very concerned about mold. And when they saw the wood on the construction site during the construction process, any signs of mold had them concerned, and they wanted any wood that appeared to have any conditions of mold addressed."). As time wore on, the growing mold began to sporelate and emit spores which, in turn, traversed into the ambient air within the Subject Residences contaminating the furniture, clothing and possessions and permeating the air that they breathed.

125. Similarly, particles and by-products from the proliferating dust mites were respirable and traversed into the ambient air within the Subject Residences.

126. As a direct and proximate result of the defects and conduct set forth above, the Subject Residences were defective, damaged and not reasonably fit for continued habitation. In addition, the mold and mite infestation has contaminated the furniture, clothing and other personal

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

property within the Subject Residences. As a proximate result of the defects and conduct set forth above, STOF and tribal members have incurred damages for injury and/or destruction, in whole or in material part, to personal property maintained within the Subject Residences, and the loss of use of said property.

127. As a further and proximate result of the above, STOF and their members have been required to employ engineers, architects, industrial hygienists and environmental specialists in an effort to diagnose the defects in the Subject Residences and, as a further and proximate result of the above, have been and will be required to employ medical and microbiological experts in the testing, clean-up and/or remediation of the microbiological contamination within the Subject Residences, therein requiring industry-standard remediation of the Subject Residences, including, but not limited to, proper microbial cleaning of all of the occupants' personal property, including furniture, clothing, books, papers and other personal possessions.

128. The water and moisture intrusion, water damage and resulting mold and mite proliferation in the Subject Residences did not occur as a result of any actions undertaken by, or any inaction of, STOF or its members. The water and moisture intrusion, water damage and resultant mold and mite proliferation in the Subject Residences were proximately caused by latent defects which were not discovered until recently. STOF and Tribe members became aware of the nature and degree of the defects and deficiencies only after inspections were performed by expert consultants.

129. STOF has hired inspectors who continue to examine and find further evidence of these defects. It is believed that all 466 homes already built by Lennar have varying degrees of construction defects of the type outlined above. For many of the homes, experts have determined that the roofing issues are so severe so as to render the roofs unrepairable and requiring full replacement. Also, one manifestation of the air and moisture-intrusion defects plaguing the units

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

constructed by Lennar is "ghosting" around interior light fixtures, HVAC registers, and other ceiling penetrations. Ghosting, also referred to as "thermal tracking," is the buildup of particulates due to moisture intrusion, and is often a powerful catalyst for the formation and buildup of more dangerous biological elements such as mold.

130. Indeed, STOF's worst fears in this regard have been realized, as extensive mold growth can be observed throughout numerous locations in the Subject Residences.







NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

131. A vast percentage of the homes built by Lennar have already manifested issues with mold or ghosting. For some of the homes, the problems were so severe that the Certificate of Occupancy for each has been revoked, and Tribe members and their families are now faced with the prospect of being displaced from their homes and relocated for an unknown amount of time.

132. Not only were the Subject Residences rendered unlivable, but occupants, including children and the elderly, have endured adverse health consequences consistent with exposure to indoor toxic and/or allergenic mold and dust mites.

133. These occupants have suffered, and continue to suffer, from several of these health consequences. As a further and proximate result of the above, tribal members were required to and did employ physicians and other caregivers to examine, treat and care for them, their children and the elderly, and have STOF and/or the Tribe members have incurred, or will incur, additional medical expenses. Upon information and belief, tribal members, including children and the elderly, will incur additional future medical expenses as a result of the Defendants' conduct, the exact amount of which is presently unknown.

**K. <u>The Health Consequences of Mold Exposure</u>**

134. Mold is a fungus which reproduces by creating spores or microscopic cells that generate in large numbers often in chains that easily disperse into the air. If adequate moisture is present when a mold spore lands on a suitable food source, such as drywall, it begins to grow.

135. The growing mold spore emits an extension known as a hypha, which signifies the beginning of a mold colony. As a hypha grows it elongates and splits, creating a network of hyphae known as a mycelium. Within days, a single spore can produce a mater mold colony containing millions of spores. When certain species of mold grow and process nutrients, they produce chemicals called mycotoxins. Several mold species, including Stachybotrys, Aspergillus and

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

Penicillium, produce a wide variety of mycotoxins which are poisonous or toxic to virtually all persons who come in contact with them.

136. Mycotoxins attack the nervous, respiratory and muscular systems and can enter the body either via ingestion, inhalation or direct skin contact and can lodge in the digestive tract, lungs or brain. Inhalation is known to be an even more potent route of exposure than ingestion. Symptoms of mycotoxin exposure can include upper respiratory infections, coughs, sore throats, headaches, nausea, Fybromyalgia, fatigue, hemorrhaging, convulsions, skin irritation, cancer, and organ and tissue damage, including liver, kidney and neurological disease.

137. One type of Aspergillus, Aspergillus Flavus, produces aflatoxins, which are notoriously potent animal carcinogens. Aspergillus is even more potent than Stachybotrys, largely considered to be the most dangerous mold. While Penicillium is not believed to be capable of producing aflatoxins, Penicillium can produce more than 100 different classes of mycotoxins.

138. Apart from producing mycotoxins, mold spores cause allergic reactions in persons heavily exposed to high concentrations of localized spores. Allergic symptoms include runny noses, watery eyes, itching, skin irritation, chronic sinus infections, asthma and more serious lung diseases.

**L. <u>The Health Consequences of Dust Mite Exposure</u>**

139. Dust mites are microscopic creatures that are not visible to the naked eye. Female dust mites are generally between 200 to 500um in size, with males being smaller. They prefer warm, moist surroundings close to sources of food. Dust mites belong to the kingdom of animals; phylum, Arthropoda; class, Arachnida; and group, Astigmata; with three genera (Dermatophagoides, Euroglyphus, and Blomia) important for humans indoors.

140. The mites most commonly found in house-dust in homes worldwide are *D. farina*, *D. pteronyssinus, E. maynei*, and *B. tropicalis*. In the Unites States, all of these dust mites may be

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

found indoors, but *D. Farinae* (Der fl) and *D. pteronyssinus* (Der pl) are found most frequently. Since adequate food (e.g., human skin flakes) is generally available, it is the moisture and/or relative humidity of a given location that determines mite prevalence.

141. Moisture and ambient relative humidity influence the rate at which feeding mites produce allergens and its accumulation in dust. Lowering indoor humidity can reduce mite population density over time because mites gradually dehydrate and die below 50% relative humidity. Hypersensitivity diseases caused by allergens from mites that live indoors constitute a major health problem in the U.S. and elsewhere.

142. Dust mite allergens are considered to be the major biological agent for the development of asthma in susceptible individuals. They not only aggravate the problem in susceptible individuals, but also cause susceptible children to develop asthma. House dust mite allergen is the inhaled substance that actually triggers an attack by causing an allergic reaction.

143. Dust mite allergens are proteins, which come from the digestive tract of mites and are found at high levels in mite feces. A dust mite fecal pellet, containing partially digested food and digestive enzymes, is ~10 to 35um in diameter and contain allergens (protein) called *Der p 1, Der f 1* and mite group 2. These allergens (proteins), when inhaled, attach to sensitized cells in the air passages causing hay fever and asthma, and aggravate atopic dermatitis in people who are susceptible to this problem. Approximately 85% of asthmatics are allergic to dust mite allergens.

**M. <u>Indoor Environmental Consequences of Chronic Moisture Intrusion</u>**

144. Chronic water intrusion, elevated indoor humidity, and persistently damp building materials are well-recognized conditions that can support mold growth and dust-mite amplification in residential structures. Plaintiff alleges that the Subject Residences experienced such conditions because of the common defect mechanisms described above. Mold growth in occupied residences can occur on drywall, paper facings, framing, finishes, insulation-facing materials, and other

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

cellulose-containing or dust-accumulating surfaces when sufficient moisture is present over time. Dust mites likewise thrive in warm, humid environments and produce allergens that accumulate in interior dust and soft goods.

145. Airborne mold constituents, spores, fragments, and dust-mite allergens can become part of the indoor breathing environment within water-damaged homes. Exposure to those indoor contaminants is associated with allergic, respiratory, sinus, skin, and hypersensitivity-related symptoms, including rhinitis, sinusitis, asthma symptoms or exacerbations, cough, wheeze, upper-airway irritation, dermatitis, and related medically recognized conditions, particularly in susceptible individuals.

146. Plaintiff alleges that children, elders, atopic individuals, immunocompromised individuals, and residents with preexisting respiratory or allergic conditions are especially vulnerable to adverse consequences from chronic indoor dampness, mold exposure, and dust-mite allergen exposure.

147. Plaintiff will establish the nature of the environmental conditions in the Subject Residences, the exposure pathways at issue, and the types of health consequences reasonably associated with those conditions through competent expert testimony, environmental assessment, industrial hygiene evidence, and medical proof.

## <u>N. As a Result of Defendants' Actions, Class Plaintiff and Class Members Have Incurred Damages</u>

148. The construction and design related issues have directly damaged Class members. As a direct and proximate result of Defendants' conduct, Plaintiff and other similarly situated occupants have sustained losses including, without limitation, bodily injury; aggravation of preexisting respiratory, allergic, dermatologic, and related conditions; pain and suffering, mental anguish, loss of capacity for enjoyment of life, and/or aggravation of pre-existing conditions; contamination, cleaning, remediation, loss, and replacement of personal property; loss of use and



NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

enjoyment of their homes; disruption and displacement; medical expenses; expenses of environmental and medical evaluation; and other incidental and consequential damages according to proof.

149. Plaintiff further alleges that these injuries and losses were reasonably foreseeable consequences of placing occupants into homes with recurring moisture-intrusion, humidity-control, roofing, envelope, and mechanical defects in a hot-humid environment.

## O. STOF Terminates Lennar

150. Section 13.01 entitles STOF to terminate the agreement in the event of any default by Lennar. As a result of the ongoing construction and design issues, and after providing Lennar with notice and an opportunity to cure it defaults, STOF terminated the CDA and prohibited Lennar from further construction activities on Tribal Residential Lands.

151. Section 13.01 of the CDA required Lennar to assign all of its rights, contracts and agreements to allow STOF to complete the project.

## P. Lennar's Intentional Course of Conduct in Constructing Rushed Homes for Profit




***Lennar Corporation Reports $7.33 Billion Revenue in Q1, February 2024.***

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

152. Unfortunately, this case is another example of a multi-billion-dollar conglomerate taking advantage of its trusting customers. Lennar Corp. has a market cap of $33.949 billion.[4] To date, Lennar Corp. has constructed more than one million new homes for families all over the country. Over 53,000 of those homes were finished in 2020 alone. Lennar Corp. has intentionally prioritized financial growth and investor confidence over the quality of the product it is selling.

153. Indeed, Lennar publicly embraces this model. As a public company, Lennar Corp. is required to file annual "Form 10-K" reports with the SEC. In Lennar Corp.'s 2024 Annual Report, they state, "Our construction playbook has three primary areas of focus: lowering construction costs, reducing cycle time and achieving even flow production."[5]

154. Lennar Corp.'s purposeful focus on "lowering construction costs" and "reducing cycle time" in the interests of financial growth has led to the common defects in the Subject Residences enumerated herein. Lennar is aware that lower construction costs are a recipe for defective construction, especially in harsher climates like Florida where tropical storms, hurricanes, and high temperature and humidity are catalysts for water intrusion, moisture intrusion, and mold. According to Robert Knowles, president and founder of the National Association of Homeowners and licensed professional engineer, avoidable defects are caused by business practices that focus on building and selling quickly, with minimal concern for repeat business or quality control.[6] He stated, "There is no bonus for building the house to code, for quality . . . There's only bonuses for speed . . . and volume." *Id.*

155. Lennar's own public statements and sworn corporate testimony support Plaintiff's allegation that speed, cost control, and production volume materially influenced how this project

---

[4] https://finance.yahoo.com/quote/LEN/

[5] https://investors.lennar.com/~/media/Files/L/Lennar-IR-V3/documents/annual-reports/annual-report-2024.pdf.

[6] https://hntrbrk.com/homebuilders/

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

was executed. Lennar reported to investors that its construction model focused on lowering construction costs, reducing cycle time, and achieving even-flow production, while its project leadership acknowledged internal pressure to meet projected starts and closings. Plaintiff alleges these incentives mattered on this project because Lennar was pressing to move homes through closing even when testing, inspections, and completion work remained outstanding.

**(1) <u>Being "Lennared"</u>**

> "You have to start value-engineering every component of the home, which means making compromises, not in quality, but in the way that you actually configure the homes."
>
> *- Lennar Corp. Co-CEO Stuart Miller.*[7]

156. The issues that STOF and its members are facing with the Subject Residences are not unique to its specific developments.

157. Lennar has faced allegations of negligent and defective development, design, manufacture, and construction in many communities throughout the Country, and in Florida, resulting in the same types of defects as in the Subject Residences.

158. Some upset homeowners have even coined a term for this pattern of conduct – "Being Lennared."[8]

**(2) Lennar Had Prior Knowledge of These Defects From Their Own Experience in South Florida and, Despite <u>Such Prior Knowledge, Purposely Failed to Correct Them</u>**

159. On February 10, 2017, Lennar announced the acquisition of WCI Communities, Inc. ("WCI"), which they termed a "premier lifestyle community developer and luxury homebuilder of single and multi-family homes . . ."

---

[7] https://www.youtube.com/watch?v=JK-JhBk4S-0

[8] https://parklandnews.net/resident-slams-city-for-not-doing-its-job-are-you-being-lennared-p1031-179.htm



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

160. Lennar's President, Richard Beckwitt, was quoted at the time saying "we anticipate a very smooth transition for current WCI homebuyers. We are looking forward to working with the talented associates from WCI to enhance our homebuilding operations and ancillary businesses to maximize the opportunities from our combined leading market position in Florida."

161. Upon information and belief, Lennar was already in the due diligence, investigative stage of this acquisition by mid-December of 2016.

162. As of February 10, 2017, WCI had built and developed multiple residential communities in South Florida, including, and especially, in Parkland, Florida.

163. By this time, WCI was well aware of excess humidity and mold development in homes they had built containing vented attics.

164. On December 21, 2016, during the due diligence period and just seven weeks prior to WCI's acquisition announcement, WCI submitted a Petition to the Florida Building Commission seeking approval for a supplemental dehumidification system and "other measures that include attic venting strategies" to combat excess humidity and mold growth in WCI-built homes in Parkland.

165. In the Petition, WCI states that the rationale for permitting a dehumidification system is to combat "**the seriousness of the potential hazard to occupant health caused by mold and humidity as well as the damage to property** . . ." (emphasis supplied).

166. The Petition attaches a supporting letter from Dr. Joseph Lstiburek of Building Science Corporation, explaining that current building practices with vented attics result in excess humidity and mold growth:

> The existing Florida Building Code is causing problems relating to mold in closets and bathrooms when builders install R-38 attic insulation and the existing Florida Building Code is standing in the way of easy engineering solutions to the very problems that it is causing.

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

> **In vented attics increasing the thermal resistance from R-30 to R-38 when coupled with tile roofs lead to significantly colder gypsum board ceilings that are located under the attic insulation. This reduction in ceiling temperature is leading to an increase in the relative humidity of the air adjacent the ceiling leading to mold. The problem is manifesting itself in closet ceilings and bathroom ceilings**.
>
> Closets have no thermal load and therefore have no need of conditioning and therefore have no air change and therefore have no mechanism of removing moisture. Providing supply air to closets makes the problems worse as it makes the closets colder leading to more mold.
>
> Bathrooms have higher levels of moisture and also have inadequate moisture removal. Exhaust ventilation does not remove enough moisture and leads to an overall increase in moisture in the residence as a result of inducing the infiltration of exterior hot humid air. Exhaust ventilation addresses moisture issues in cold climates in bathrooms but does not address moisture issues in hot humid climates. Providing increased supply air to bathrooms makes the problems worse as it makes the bathrooms colder leading to more mold.

WCI Petition, Attachment A, p. 1 (emphasis supplied).

167. All Parkland homes built under the WCI emblem after February 10, 2017 with vented attics and without supplemental dehumidification were actually built by Lennar, which owned WCI. Pursuant to the December 21, 2016 Petition, WCI/Lennar was building or were planning to build more than 300 homes in the Development known as "Heron Bay," and 522 homes in the development known as "Parkland Bay." By February 10, 2017, Lennar was well aware of the excess humidity and mold risks of building these homes with vented attics and without supplemental dehumidification. Despite full knowledge of these risks, the Subject Residences were purposely built by Lennar with vented attics and without supplemental dehumidification systems, exactly as the WCI homes had been built prior to WCI's December 21, 2016 Petition.

168. As a result, the Subject Residences are suffering from the same chronic and systemic humidity and mold problem emblematic of the WCI, and later Lennar, homes built in Parkland with vented attics and without supplemental dehumidification. The preceding facts evidence a widespread pattern of intentional conduct, separate and apart from Lennar's contractual

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

obligations, to construct homes of lesser quality, prone to systemic defects, for the sake of maximizing profits.

169. Plaintiff alleges the WCI/Parkland facts as evidence that Lennar had notice of moisture, humidity, and mold risks associated with materially similar design and construction choices in South Florida conditions and that preventive measures were known, available, and feasible. Plaintiff does not offer those facts as improper propensity evidence, but as proof of prior knowledge, foreseeability, and failure to take appropriate corrective measures on the Development.

## Q. <u>Timeliness of the Plaintiff's Claims</u>

170. Plaintiff's causes of action herein are timely for one or more of the following reasons. The conduct of Defendants set forth above constituted continuing torts as to which the governing limitations period does not begin to run until the tortious conduct ceases.

171. Plaintiff neither knew, nor reasonably should have known, that the conduct of Defendants was the cause of the personal injuries she has sustained until only recently, and, in any event, well within the governing limitations periods. Plaintiff knew little, if anything, about mold or dust mites and, more importantly, did not associate her ongoing health symptoms with any moisture or water intrusion sources in the Subject Residences, much less the elevated presence of mold and dust mites therein. Plaintiff did not have notice or knowledge that a cause of action accrued in her favor until only recently, and, in any event, well within the governing limitations periods.

172. The "moment of trauma," being the ill effect, damage or injury sustained by the Plaintiff and the "moment of realization" of Plaintiff's injuries did not occur until only recently, and, in any event, well within the governing limitations periods.

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

173. The defects in the design and construction of the Subject Residences were latent and unknown to the Plaintiff and, therefore, the applicable limitations periods constitute no bar to recovery for injuries arising from such latent defects.

174. All conditions precedent to the bringing of this lawsuit have been met, excused, or otherwise waived.

175. As a result of the Lennar's conduct, STOF tribal members have been required to retain the services of the undersigned counsel to represent its interests in this action and are obligated to pay a reasonable fee for their services.

**R. Other Comparable Litigations Demonstrate the Need for, and Feasibility of, the Relief Sought Herein**

***In re Chinese-Manufactured Drywall Products Liability Litigation***

176. *In re Chinese-Manufactured Drywall Products Liability Litigation*, MDL No. 2047 (E.D. La.), involved toxic building materials, specifically defective drywall, that emitted sulfur compounds, causing corrosion, property damage and health symptoms.

177. The MDL court approved hybrid settlements, including damages for past harm plus uniform remediation protocols (such as the removal/replacement of drywall, HVAC and wiring) under court supervision.

***Baez v. New York City Hous. Auth., Case No. 13-CV-08916-WHP (S.D.N.Y.)***

178. *Baez* was brought by public housing tenants who suffered asthma because of mold and moisture in their New York City Housing Authority apartments.[9]

[9] No. 1:13-cv-08916-WHP, (S.D.N.Y), ECF 1.



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

179. The court in *Baez* approved a settlement with a special master, independent data analyst, independent mold analyst, periodic reporting, strict remediation timelines and a standard procedure, as well as public reporting.[10]

**CAUSES OF ACTION BROUGHT BY THE CLASS PLAINTIFF AGAINST LENNAR AND THE SUBCONTRACTOR DEFENDANTS**

**COUNT I.**

**CIVIL LIABILITY FOR VIOLATIONS OF THE FLORIDA BUILDING CODE UNDER FLA. STAT. § 553.84**

180. Class Plaintiff re-alleges and re-asserts all paragraphs preceding Count I as though fully set forth herein.

181. This is an action against Lennar and its Subcontractors for civil liability pursuant to Fla. Stat 553.84, against the persons and entities who committed violations of the Florida Building Code in connection with the design, construction, installation, supervision, and delivery of the Subject Residences.

182. Plaintiff alleges that those violations were not isolated, but were repeated across materially similar homes and trades and caused or materially contributed to recurring moisture intrusion, elevated humidity, contamination, property damage, loss of use, and bodily injury.

183. Under this statute, the Class Plaintiff has a private cause of action for any violation of the Florida Building Code and Part IV of Ch. 553, Fla. Stat.

184. Lennar, as developer, licensed general contractor, permit holder, and supervisor of the work, was under a statutory, non-delegable duty to the Tribe's members, their families, and their invitees as the occupants of certain of the homes to ensure that the construction complied with, among other things, the Florida Building Code.

[10] *See* Modified Am. Stipulation and Order of Settlement, No. 1:13-cv-08916-WHP, ECF 220.



NOT AN OFFICIAL COPY PUBLIC ACCESS – NOT AN OFFICIAL COPY

185. The Subcontractor Defendants were under a statutory duty to the Tribe's members, their families, and their invitees as the occupants of certain of the homes to ensure that the construction complied with, among other things, the Florida Building Code.

186. In allowing, causing, and/or failing to prevent the defective conditions observed throughout the units, Lennar and its Subcontractors committed numerous violations of the Florida Building Code.

187. Lennar and its Subcontractors knew, or should have known, that these violations existed. These code violations have, among other things, allowed water and moisture to intrude beyond and through the roof systems and building envelopes of the units, which has caused, and will continue to cause, damage to the homes themselves and to the personal property and health of the residents thereof.

188. As a direct and proximate result of the aforementioned violations of the Florida Building Code, Class Plaintiff has incurred damages and will continue to incur such damages.

189. These damages include, but are not limited to, personal injuries to Class Plaintiff who has suffered significant injuries, pain and suffering, mental anguish, loss of capacity for enjoyment of life, aggravation of pre-existing conditions and medical expenses.

**WHEREFORE**, Class Plaintiff demands judgment against Lennar and the Subcontractor Defendants for her damages and any additional relief the Court deems just and proper, which includes the following:

a. The costs of remediating or replacing the damaged personal property, personal fixtures, furnishings and belongings installed and owned by the Class members;

b. Personal injuries to Class members who have suffered significant injuries, pain and suffering, mental anguish, loss of capacity for enjoyment of life, and/or aggravation of pre-existing conditions;

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

c. Loss of use damages; and

d. Incidental and consequential damages.

**COUNT II.**

**NEGLIGENCE**

190. Class Plaintiff re-alleges and re-asserts all paragraphs preceding Count I as though fully set forth herein.

191. As the developer, licensed general contractor and permit holder for the construction of the Homes, Lennar had a nondelegable duty to Tribe member renters of the Homes, their families, and their invitees, to exercise reasonable care—or in the case of professional tasks, to use the level of care a like professional in a similar situation would use—in the design, manufacture and construction of the homes, including with regarding to activities taken by subcontractors, and to ensure the design and construction of the homes complied with applicable building codes, manufacturers' recommendations and instructions, permitted plans and specifications and industry standards.

192. The Subcontractor Defendants had a duty to Tribe member renters of the Homes, their families, and their invitees, to exercise reasonable care—or in the case of professional tasks, to use the level of care a like professional in a similar situation would use—in the design, manufacture and construction of the homes, and to ensure the design and construction of the homes complied with applicable building codes, manufacturers' recommendations and instructions, permitted plans and specifications and industry standards.

193. Lennar and the Subcontractor Defendants breached these duties by failing to ensure that the homes and improvements were constructed in compliance with the Florida Building Code,

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

permitted plans and specifications, manufacturers' recommendations and instructions, industry standards and governmental codes and restrictions.

194. The Subcontractor Defendants' breaches of duty, broken down by trade, were as follows:

a. **Roof Subcontractor (All Phase)**:

defective, negligent and/or inadequate construction, installation and/or design, of the roof, and/or roofing components, including installation of roof vents; which led to chronic water intrusion and systemic humidity into the walls, columns, ceilings, interstitial cavities and/or drywall and baseboard of the Subject Residences which caused microbiological contamination in the form of the growth of toxic and/or allergenic fungi and dust mites which posed a serious health hazard to the occupants of the Subject Residences, have caused personal injury to occupants of the Subject Residences, and required evacuation of the occupants of the Subject Residences for the repair and remediation of this serious health hazard.

b. **HVAC/Mechanical Subcontractor (Oscar Air)**:

defective, negligent and/or inadequate construction, design, manufacture, and/or installation of air conditioning and ventilation components and/or fixtures; which led to chronic water intrusion into the walls, columns, ceilings, interstitial cavities and/or drywall and baseboard of the Subject Residences which caused microbiological contamination in the form of the growth of toxic and/or allergenic fungi and dust mites which posed a serious health hazard to the occupants of the Subject Residences, have caused personal injury to occupants of the Subject Residences, and required evacuation of the occupants of the Subject Residences for the repair and remediation of this serious health hazard.

c. **Drywall/Framing Subcontractor (ABC)**:

defective, negligent and/or inadequate construction and installation of drywall within the Subject Residences; which led to chronic water intrusion into the walls, columns, and building envelope which has caused and continues to cause microbiological contamination, including the growth of toxic and/or allergenic fungi and proliferation of dust mites which pose a serious health hazard to the occupants of the Subject Residences, have caused personal injury to occupants of the Subject Residences, and requires evacuation of the occupants of the Subject Residences for the repair and remediation of this serious health hazard.

d. **Insulation Subcontractor (Gale)**:

defective, negligent and/or inadequate construction, installation, and/or application of attic, wall, and ceiling insulation in the Subject Residences; which led to chronic water intrusion into the walls, columns, ceilings, interstitial cavities and/or drywall

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

> and baseboard of the Subject Residences which caused microbiological contamination in the form of the growth of toxic and/or allergenic fungi and dust mites which posed a serious health hazard to the occupants of the Subject Residences, have caused personal injury to occupants of the Subject Residences, and required evacuation of the occupants of the Subject Residences for the repair and remediation of this serious health hazard.

195. As a direct and proximate result of Lennar's and the Subcontractor Defendants' breaches of duty, the Subject Residences were plagued with significant defects that have caused substantial damage to the Subject Residences, including among other things, allowing water and moisture to intrude beyond the roof systems and building envelopes of the units, which has caused and will continue to cause damage to the Subject Residences themselves and to the personal property and health of the residents thereof. The resulting damages from Lennar's and the Subcontractor Defendants' failure to exercise a reasonable standard of care and diligence were foreseeable. All the defects and conditions were latent and not visible to the Individual Class Plaintiff. The above recital is not exhaustive. Class Plaintiff is continuing her investigation. Additional negligence may exist and Plaintiff will amend this Complaint at such time as additional negligence becomes known.

196. No contractual limitation exists which, under the terms of any contract or under the economic loss rule, would preclude the assertion of the foregoing claim and damage with respect to the Class Plaintiff. To the extent any contractual limitation purported to limit, or preclude altogether, Plaintiff's ability to assert the foregoing claim, any such limitation would be voidable for failing to leave the Plaintiff with a cognizable remedy pursuant to Article I, Section 21 of the Florida Constitution and governing common law including *Holland v. Mayes,* 19 So.2d 709 (1944) and *Stewart v. Gilliam,* 271 So.2d 466 (4th DCA 1972).

197. As a direct and proximate result of the foregoing, the Plaintiff has been damaged in an amount to be determined at trial, which amount includes, but is not limited to, personal injuries

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

to the Plaintiff who has suffered significant injuries, pain and suffering, mental anguish, loss of capacity for enjoyment of life, aggravation or pre-existing condition and medical expenses.

198. The foregoing breaches of duty were both the legal and factual cause of the aforementioned damages.

**WHEREFORE**, Class Plaintiff demands judgment against Lennar and the Subcontractor Defendants for her damages and any additional relief the Court deems just and proper, which includes the following:

a. The costs of remediating or replacing the damaged personal property, personal fixtures, furnishings and belongings installed and owned by the Class members;

b. Personal injuries to Class members who have suffered significant injuries, pain and suffering, mental anguish, loss of capacity for enjoyment of life, and/or aggravation of pre-existing conditions;

c. Loss of use damages; and

d. Incidental and consequential damages.

## COUNT III.

## BREACH OF IMPLIED WARRANTY OF CONSTRUCTABILITY THROUGH FAILURE TO CONSTRUCT IN A WORKMANLIKE MANNER

199. Class Plaintiff re-alleges and re-asserts all paragraphs preceding Count I as though fully set forth herein.

200. As the developer, licensed general contractor and permit holder for the construction of the Homes, Lennar impliedly warranted to STOF, the Class Plaintiff, and the occupants thereof that the buildings and improvements comprising the Homes were designed and constructed with good workmanship, design, engineering and construction practices.

201. As subcontractors hired by Lennar to design, construct, and install the Subject Residences, the Subcontractor Defendants impliedly warranted to STOF and the Class Plaintiff

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

occupants thereof that the buildings and improvements comprising the Subject Residences were designed and constructed with good workmanship, design, engineering and construction practices.

202. Lennar and its subcontractors breached the implied warranty of constructability by failing to design or construct the Subject Residences in accordance with (a) the requirements of the applicable building codes, (b) proper and approved construction plans and specifications, (c) good workmanship and/or (d) design, engineering and construction practices.

203. These failures resulted in the Subject Residences failing to meet ordinary, normal standards reasonably to be expected of living quarters of comparable kind and quality, and being unfit for the particular purpose for which they were sold to STOF and leased to the Class Plaintiff or sold directly to Class Plaintiff.

204. As a direct and proximate result of the aforementioned breaches of the implied warranty, Individual Class Plaintiff has incurred damages including: personal injuries to the Class Plaintiff who has suffered significant injuries, pain and suffering, mental anguish, loss of capacity for enjoyment of life, aggravation of pre-existing conditions and medical expenses.

**WHEREFORE**, Class Plaintiff demands judgment against Lennar and the Subcontractor Defendants for her damages and any additional relief the Court deems just and proper, which includes the following:

a. The costs of remediating or replacing the damaged personal property, personal fixtures, furnishings and belongings installed and owned by the Class members;

b. Personal injuries to Class members who have suffered significant injuries, pain and suffering, mental anguish, loss of capacity for enjoyment of life, and/or aggravation of pre-existing conditions;

c. Loss of use damages; and

d. Incidental and consequential damages.

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

## COUNT IV.

## BREACH OF IMPLIED WARRANTY OF HABITABILITY

205. Class Plaintiff re-alleges and re-asserts all paragraphs preceding Count I as though fully set forth herein.

206. As the developer, licensed general contractor and permit holder for the construction of the Homes, Lennar impliedly warranted to STOF and the Class Plaintiff occupants thereof that the buildings and improvements comprising the Homes were designed and constructed with good workmanship, design, engineering and construction practices.

207. As subcontractors hired by Lennar to design, construct, and install the Subject Residences, the Subcontractor Defendants impliedly warranted to STOF and the Class Plaintiff occupants thereof that the buildings and improvements comprising the Subject Residences were designed and constructed with good workmanship, design, engineering and construction practices.

208. Lennar and its subcontractors breached the implied warranty of habitability by failing to design or construct the Subject Residences in accordance with (a) the requirements of the applicable building codes, (b) proper and approved construction plans and specifications, (c) good workmanship and/or (d) design, engineering and construction practices.

209. These failures resulted in the Subject Residences failing to meet ordinary, normal standards reasonably to be expected of living quarters of comparable kind and quality, and being unfit for the particular purpose for which they were sold to STOF and leased to the Class members and Class Plaintiff or sold directly to Class members.

210. These defects constitute a breach of Lennar's and the Subcontractor Defendants' implied warranty of fitness and merchantability, also known as the implied warranty of habitability.

211. Plaintiff has been damaged as a result.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

212. As a direct and proximate result of Lennar's breaches of the implied warranty of habitability, Class Plaintiff has incurred damages including: Personal injuries to the Class Plaintiff who has suffered significant injuries, pain and suffering, mental anguish, loss of capacity for enjoyment of life, aggravation of pre-existing conditions and medical expenses.

**WHEREFORE**, Class Plaintiff demands judgment against Lennar and the Subcontractor Defendants for her damages and any additional relief the Court deems just and proper, which includes the following:

a. The costs of remediating or replacing the damaged personal property, personal fixtures, furnishings and belongings installed and owned by the Class members;

b. Personal injuries to Class members who have suffered significant injuries, pain and suffering, mental anguish, loss of capacity for enjoyment of life, and/or aggravation of pre-existing conditions;

c. Loss of use damages; and

d. Incidental and consequential damages.

**COUNT V.**

**CONTRACTUAL INDEMNITY**
**(AGAINST LENNAR ONLY)**

213. Class Plaintiff re-alleges and re-asserts all paragraphs preceding Count I as though fully set forth herein.

214. In Section 15.02 of the CDA Lennar expressly agreed to indemnify STOF's individual members from, among other things, any damages arising out of or resulting from the negligence or willful misconduct of Lennar, including construction defects, regardless of whether caused in part by STOF.

215. Expressly indemnified are personal injuries and property damages.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

216. Individual Class Plaintiff has incurred damages including damages to her personal property and personal injuries to the Class Plaintiff who has suffered significant injuries, pain and suffering, mental anguish, loss of capacity for enjoyment of life, aggravation of pre-existing conditions and medical expenses.

217. The losses and damages that have been and continue to be incurred by individual STOF tribal members fall squarely within Lennar's indemnity obligations as provided in paragraph Article XV, Section 15.02 of the CDA.

218. As a direct and proximate result of Lennar's conduct, STOF and its members have incurred damages that Lennar must indemnify, including:

a. The costs of remediating or replacing the damaged personal property, personal fixtures, furnishings and belongings installed and owned by the Tribe members;

b. Personal injuries to Tribe members who have suffered significant injuries, pain and suffering, mental anguish, loss of capacity for enjoyment of life, and/or aggravation of pre-existing conditions;

c. Loss of use damages; and

d. Incidental and consequential damages.

**WHEREFORE**, Class Plaintiff demands judgment against Lennar for their damages and any additional relief the Court deems just and proper.

**<u>JURY TRIAL DEMAND</u>**

Class Plaintiff hereby demands trial by jury on all claims so triable in this Action.

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

**THE MOSKOWITZ LAW FIRM PLLC**

By: */s/Adam M. Moskowitz*_________
Adam M. Moskowitz, Esq.
http://www.moskowitz-law.com
Adam M. Moskowitz
Florida Bar No. 984280
adam@moskowitz-law.com
Joseph M. Kaye
Florida Bar No. 117520
joseph@moskowitz-law.com
Leo A. Wiesinger
Florida Bar No. 1058780
leo@moskowitz-law.com
P.O. Box 653409
Miami, FL 33175
Office: (305) 740-1423
Direct: (786) 309-9561

**CONRAD & SCHERER, LLP**

633 South Federal Highway
Fort Lauderdale, FL 33301
Tel: (954) 462-5500
Fax: (954) 463-9244

By: */s/ William R Scherer*_______________
William R. Scherer, Esq.
Florida Bar No. 169454
Email: wscherer@conradscherer.com
ekreiling@conradscherer.com
jlira@conradscherer.com
eservice@conradscherer.com

**LEVINE KELLOGG LEHMAN SCHNEIDER & GROSSMAN, LLP**
100 Southeast Second Street
Miami Tower, 36th Floor
Miami, FL 33131
Tel: (305) 403-8788
Fax: (305) 403-8789
Jason K. Kellogg P.A.
Florida Bar. No. 0578401
Email: jk@lklsg.com
Secondary Email: ame@lklsg.com

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

**SMITH CURRIE OLES LLP**
101 Northeast Third Avenue
Suite 1910
Fort Lauderdale, FL 33301
Tel: (954) 761-8700
Fax: (954) 524-6927
Joseph R. Young, Esq.
Florida Bar No. 92168
Email: jryoung@smithcurrie.com
Secondary Email: lcherubin@smithcurrie.com

**SCOTT N. GELFAND, P.A.**
1073 Hillsboro Mile
Suite 6-N
Hillsboro Beach, FL 33062
Tel: (954) 255-7900
Fax: (954) 255-7905
Scott N. Gelfanc
Florida Bar. No. 0538711
Email: scott@gelfandpa.com
Secondary Email: daniela@gelfandpa.com

*Counsel for individual Class Plaintiff*

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

# Exhibit 1

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

80 [redacted]

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

# Exhibit 1-18

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

# Exhibit 1-20

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

# Exhibit 1-21

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

# Exhibit 1-23

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

LOT [redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

LOT [redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

LOT [redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

LOT [redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

- Completed EPL Display Card

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

LOT [redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

LOT [redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

LOT [redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

LOT [redacted]

- [redacted]
- [redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

# Exhibit 1-24

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

LOT [redacted]

- [redacted]

LOT [redacted]

- [redacted]

LOT [redacted]

- [redacted]

LOT [redacted]

- [redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

LC [redacted]

LC [redacted]

Th [redacted]

<i [redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

**Fro** [redacted]
**Ser** [redacted]
**To:** [redacted]
**Cc:** [redacted]
Ray [redacted]
Ma [redacted]
**Sub** [redacted]

CAU [redacted]
you [redacted]

As [redacted]
of [redacted]
sur [redacted]
we [redacted]

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

# Exhibit 1-25

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

# Exhibit 1-31

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

☑ [redacted]

☐ [redacted]

☐ [redacted]

☑ [redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[redacted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

# Exhibit 2

# COMMUNITY DEVELOPMENT AGREEMENT

**THIS COMMUNITY DEVELOPMENT AGREEMENT** (the "**Agreement**") is made on ____________________, 2019 (the "**Effective Date**") by **LENNAR HOMES, LLC**, a Florida limited liability company ("**Builder**") and the **SEMINOLE TRIBE OF FLORIDA**, a federally-recognized American Indian tribe ("**STOF**").

A. STOF is the beneficial owner of the tribal lands in the State of Florida known as the Hollywood, Big Cypress, Brighton and Immokalee Reservations as well as the Lakeland and Ft. Pierce Trust lands (collectively, "**Tribal Lands**") further described on **Exhibit A**.

B. Builder is a wholly-owned subsidiary of Lennar Corporation, a publicly traded company based in Miami, Florida, and is an experienced land developer and homebuilder.

C. The Tribal Lands include the land described on **Exhibit B**, which STOF believes is suitable for residential development as of the Effective Date (the "**Tribal Residential Lands**"), and which STOF wishes to develop into communities for the benefit of members of STOF ("**Members**"), including some homes which will be offered to Members for rental, and other homes which will be conveyed to Members (each, a "**Home**").

D. STOF has established certain procedures for determining which of its Members are qualified to rent or to acquire Homes ("**Qualification Procedures**").

E. STOF and Builder wish to collaborate to meet STOF's desire to develop residential communities. Accordingly, STOF and Builder wish to enter into this Agreement to facilitate Builder's development of such communities, on the terms set forth herein.

**NOW, THEREFORE**, for good and valuable consideration, STOF and Builder agree as follows.

## ARTICLE I
## RECITALS

The foregoing recitals are correct and are incorporated into this Agreement.

## ARTICLE II
## REPRESENTATIONS

**Section 2.01** **STOF**. STOF represents and warrants to Builder as follows. All representations in this Agreement shall be true and correct on the Effective Date and at all times throughout the Term of this Agreement, as defined in Article III.

(A) Tribal Lands Suitable for Residential Development. The Tribal Residential Lands are suitable for residential development as of the Effective Date.

(B) Development. All Tribal Lands designated as Tribal Residential Land are controlled by STOF in a manner that allows development with no need for further authorization other than the Approvals, as defined in Section 6.02.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

(C) Authority. The execution, delivery and performance by STOF of this Agreement and the obligations contained herein, including the waiver of sovereign immunity, have been duly authorized by all necessary Tribal governmental and other action, and do not require any consent or approval not heretofore obtained of any Tribal officer or Tribal body. The resolution which serves as evidence of the Tribe's approval and waiver of sovereign immunity is attached as **Exhibit C** (the "**Resolution**").

(D) Execution. The person executing this Agreement on behalf of STOF has the lawful right, power, authority and capacity to bind STOF to the terms hereof and consummate the transactions contemplated by this Agreement.

**Section 2.02 Builder**. Builder represents and warrants to STOF as follows. All representations in this Agreement shall be true and correct on the Effective Date and at all times throughout the Term of this Agreement.

(A) Authority. Builder has obtained all consents and authority required to enter into this Agreement and perform its obligations under this Agreement.

(B) Execution. The person executing this Agreement on behalf of Builder has the lawful right, power, authority and capacity to bind Builder to the terms hereof and consummate the transactions contemplated by this Agreement.

(C) Financial Ability. Builder has the financial ability to perform under this Agreement without obtaining mortgage financing.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

## ARTICLE III
## TERM

**Section 3.01 Term**. The term of this Agreement shall be five (5) years from the Effective Date (the "**Term**"), or such later date as is set forth in any Community Commencement Notice, as defined in Article V.

**Section 3.02 STOF Termination Right for Convenience**.

(A) Provided there does not then exist any uncured STOF's Default, as defined in Section 13.02, STOF shall have the right, from time to time, to terminate this Agreement for convenience at any time, upon thirty (30) days' advance written notice (an "**Early Termination Notice**") to Builder. Such termination may be given with respect to this Agreement as a whole, to any individual Community, as defined in Article V, or to multiple Communities; provided, however, that if STOF has previously issued a Community Commencement Notice for one of the Communities described in an Early Termination Notice, then STOF shall pay to Builder all Builder Costs, as defined in Section 3.02(B), incurred by Builder with respect to the specific Community or Communities which is/are the subject of the Community Commencement Notice through the date of the Early Termination Notice, plus, if work on Homes (as opposed to Infrastructure) in a Community identified in the Early Termination Notice has then commenced, an early termination fee equal to ONE HUNDRED THOUSAND DOLLARS ($100,000.00) for each such Community that is the subject of the Early Termination Notice where work on Homes has so commenced ("**Early Termination Fee**"). Such payment shall be made within thirty (30)

days after STOF's receipt of Builder's written demand, which shall be accompanied by an accounting of all Builder Costs and reasonable documentation with respect thereto.

(B) The term "**Builder Costs**" shall mean all costs incurred by Builder with respect to this Agreement, if this Agreement is terminated as a whole, or with respect to the applicable Community, if this Agreement is terminated as to an individual Community. Builder Costs shall consist of reasonably documented hard and soft development costs (if Builder is the Infrastructure Party, as defined in Article V), hard and soft construction costs, and sales and marketing costs.

(C) Upon STOF's issuance of an Early Termination Notice:

(i) STOF shall assume all liability with respect to the applicable Community Homes and/or Community Infrastructure not completed by Builder, and shall indemnify Builder with respect thereto.

(ii) STOF, not Builder, shall issue any warranty with respect to such Community Homes completed by STOF.

(iii) STOF and Builder shall cooperate with respect to the transfer of any permits applicable to the Community Homes or Community Infrastructure, as applicable, to STOF or another builder engaged by STOF.

(iv) Upon receipt of the Builder Costs and Early Termination Fee, Builder shall provide to STOF all drawings, plans and other materials (collectively, the "**Plans**") for construction of the Community Homes, as defined in Section 6.01, in the applicable Community, and for infrastructure development of the applicable Community if Builder is the Infrastructure Party, on the following terms and conditions:

(a) STOF shall have a license to use the Plans only with respect to such Community and only with respect to those Community Homes where Builder has commenced vertical construction or where there is a Member Home Purchase Agreement, as defined in Section 9.01(B), in effect.

(b) Builder shall have no liability with respect to the Plans, and STOF's use of the Plans shall constitute a release of Builder from all liability with respect thereto.

## ARTICLE IV
## EXCLUSIVE BUILDER

During the Term, Builder shall be the exclusive builder engaged by STOF to develop residential communities and build Homes on those portions of the Tribal Lands which are described in any Community Commencement Notice, and STOF shall not engage in a direct relationship with any other homebuilder for the development of communities and/or the construction of Homes within the Tribal Lands described in such Community Commencement Notice (the "**Exclusivity Provision**"). The Exclusivity Provision shall not apply to (i) a builder



NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

of a custom home contracted directly by an individual Member or (ii) the Homes in a Community with respect to which an Early Termination Notice has been issued.

## ARTICLE V
## COMMUNITIES

STOF is in the process of long-range planning of the residential development of the Tribal Residential Lands. As STOF makes such plans, STOF shall identify portions of the Tribal Residential Lands for development in accordance with this Agreement (each, a "**Community**"), by providing written notice to Builder, accompanied by a sketch and legal description of the applicable portion of the Tribal Residential Land (each, a "**Community Commencement Notice**"). Each Community Commencement Notice shall identify which party (STOF or Builder) is to plan, construct, and install the Community Infrastructure (the "**Infrastructure Party**").

## ARTICLE VI
## LAND DEVELOPMENT

**Section 6.01** **Community Planning**. After Builder's receipt of each Community Commencement Notice, STOF and Builder shall collaborate in good faith to agree on (A) the number and types of Homes to be built in such Community (the "**Community Homes**"), (B) the site improvements for the Community, to include, without limitation, grading, water, sewer, drainage, landscaping, amenities, signage, and road improvements necessary with respect to such Community (the "**Community Infrastructure**"), (C) the site plan and budget containing the projected costs for completion of such Community Infrastructure (the "**Community Infrastructure Documents**") and (D) the number of model Community Homes and speculative ("spec") Community Homes to be built in such Community.

**Section 6.02** **Approvals**. After the parties have agreed on the Community Infrastructure Documents, the Infrastructure Party shall use commercially reasonable efforts to obtain all Approvals with respect thereto. The term "**Approvals**" shall mean all final, non-appealable approvals, permits, agreements and consents from all applicable government authorities and/or from STOF, for the applicable Community Infrastructure, with all appeal periods expired and no appeals having been filed, so that upon Infrastructure Party's obtaining all Approvals for the applicable Community, Infrastructure Party will be able to install the Community Infrastructure, Builder will be able to build the Community Homes, and upon completion of construction, Builder will be able to obtain all certificates as are necessary to occupy each of the Community Homes. If Builder is the Infrastructure Party, then STOF shall cooperate with and shall not impede in any way Builder's efforts to obtain the Approvals, including facilitating the approval of STOF Tribal authorities and other applicable governmental authorities, and executing, within thirty (30) days after Builder's written request, all documents which are required to be executed by STOF in its capacity as the owner of the Community. If Builder is the Infrastructure Party and after all Approvals are received there are any increases to the previously approved budgets for costs of materials, then the parties shall use good faith efforts to adjust such budgets.



NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

**Section 6.03** <u>**Consultants**</u>. If Builder is the Infrastructure Party, then Builder shall select all consultants, engineers, planners, and such other experts as are necessary for the development of the applicable Community (each, a "<u>**Consultant**</u>"), subject to the approval of STOF, which shall not be unreasonably withheld, and subject to STOF's right to terminate a Consultant upon thirty (30) days' advance notice to Builder. STOF has approved the Consultants listed on <u>**Exhibit D**</u>. Builder shall enter into all contracts with Consultants (each, a "<u>**Consultant Contract**</u>"), but STOF shall be solely responsible for the payment of all amounts due to any Consultants. STOF has approved the form of Consultant Contract attached as <u>**Exhibit E**</u>. Builder shall manage the Consultants such that the Consultants complete all studies and plans, including but not limited to civil engineering plans for paving, drainage, water, and sewer systems, landscaping, photometrics, and the like, as needed to complete the Community Infrastructure.

**Section 6.04** <u>**Construction**</u>. After receipt of all Approvals and execution of all Consultant Contracts, the Infrastructure Party shall diligently pursue the construction of the Community Infrastructure.

**Section 6.05** <u>**Utility Services**</u>. STOF will provide electric, water, sewer, internet, cable, telephone, and all other utility service to each Community, at no cost to Builder. On behalf of STOF, Builder shall manage the design and installation of the foregoing if needed.

**Section 6.06** <u>**Cultural Resources**</u>. All Tribal Lands described in any Community Commencement Notice shall have first been surveyed and determined by STOF to be free of cultural resources and artifacts, or STOF shall have determined that treatment of any such items present on that portion of the Tribal Land has been agreed by all governmental bodies with authority to do so. Notwithstanding the foregoing, if any cultural resources or artifacts are discovered during the development of a Community, Builder will promptly notify STOF of such findings and shall immediately cease development of the infrastructure (if Builder is the Infrastructure Party) or construction of the Community Homes affected by the cultural resource or artifact. Thereafter, STOF will diligently investigate such findings, and STOF and Builder shall work together in good faith to promptly resume construction in a manner which protects such cultural resources and artifacts.

## ARTICLE VII
## <u>COST REIMBURSEMENT AND MANAGEMENT FEE FOR INFRASTRUCTURE</u>

**Section 7.01** <u>**Costs of Infrastructure**</u>. STOF shall be responsible for all costs to design, install, and construct all of the Community Infrastructure. If Builder is the Infrastructure Party, then Builder shall manage the construction process for the Community Infrastructure, including selection of contractors, bidding, preparing, and entering into all applicable contract documents (each, a "<u>**Construction Contract**</u>").

**Section 7.02** <u>**Reimbursement Procedure**</u>. If Builder is the Infrastructure Party, then Builder will sign the Construction Contracts; however, STOF shall be responsible for the costs to design, install, and construct the Community Infrastructure. Builder may advance money to cover such costs, and shall have the right to periodic reimbursements from STOF upon written request ("<u>**Reimbursement Requests**</u>"), but not more often than once per month, for all amounts incurred by Builder to complete the Community Infrastructure, plus the Management Fee, as

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

defined in Section 7.03 (the "**Reimbursement Amount**"). Each Reimbursement Request shall include typical affidavits, lien releases, inspection approval, and other reasonable back-up documentation. Builder shall deliver the Reimbursement Requests to STOF, and such Reimbursement Requests shall include the calculation of the applicable Reimbursement Amount and Management Fee, together with a copy of the subject draw request, if any, from the applicable Consultants and Contractors, and supporting documents including invoices and lien releases (as and if applicable) from all Consultants, Contractors, and payees from the date of the previous Reimbursement Request (except as to the first Reimbursement Request) through the date of the current Reimbursement Request.

**Section 7.03** **Management Fee**. If Builder is the Infrastructure Party, then the management fee to Builder (the "**Management Fee**") shall be equal to five percent (5%) of the total costs of construction of the Community Infrastructure.

**Section 7.04** **Timely Payment**. The Reimbursement Amount set forth in each Reimbursement Request shall be paid to Builder within thirty (30) days after delivery to STOF, unless STOF provides detailed written objections within such thirty (30) day period. In the event of such dispute (a "**Reimbursement Dispute**"), the parties shall work together in good faith to resolve the Reimbursement Dispute. If the parties are unable to resolve a Reimbursement Dispute within a further ten (10) day period, then the parties shall proceed to mediation in accordance with Section 13.04. In addition to all other remedies of Builder hereunder, any Reimbursement Amount not paid when due shall bear interest at the rate of twelve percent (12%) per annum from the date due to the date paid.

## ARTICLE VIII
## HOME CONSTRUCTION

**Section 8.01** **Home Types**. Prior to the Infrastructure Party's commencement of the Community Infrastructure Documents, Builder shall provide to STOF a list setting forth the types of Homes to be constructed in the applicable Community (the "**Home Types**") and preliminary proposed sales prices of each Home Type. The Home Types shall be selected from the wide assortment of Builder's then-current home plan library for homes within the State of Florida, and shall include one handicapped-accessible model. Builder shall not be required to design new or unique Home Types for any Community, except for a change to certain material specifications, such as metal roofs and impact windows. STOF shall have the right to approve the proposed Home Types in its reasonable discretion.

**Section 8.02** **Price List**. At least thirty (30) days prior to opening a Community for sales, Builder shall provide to STOF the final proposed prices of the Community Homes and the prices of available options (the "**Price List**"), which prices shall be generally in accordance with the preliminary proposed prices, subject to documented adjustments for then-current costs. The prices set forth in the Price List shall be subject to periodic escalation for unsold Homes based on documented increases in the cost of materials after the date of the Price List, provided that prices shall not increase for any Home during the term of any Member Home Purchase Agreement. For the purposes of this Section 8.02, Lease Pool Homes, as defined in Section 8.05, are considered to be sold Homes.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

**Section 8.03** **Permitting Process**. With respect to each Home, Builder shall submit to STOF's housing department a standard permit package which will include the items listed on **Exhibit F**, and STOF shall expedite the issuance of a building permit and any other required permits. After receipt of a building permit, Builder will diligently pursue construction and completion of the applicable Home.

**Section 8.04** **Models Homes and Spec Homes**. After installation of the Community Infrastructure, Builder shall commence construction of the number of model Homes and spec Homes in the applicable Community, as set forth in the Community Infrastructure Documents. The model Homes shall be Lease Pool Homes, provided that the Closing for any model Homes shall take place on the date on which the Closing occurs with respect to the last Home in the subject Community which is not a model. STOF will have the opportunity to designate any upgrades and / or options to be incorporated into the model from the options provided by Builder within the subject Community. STOF shall pay for the cost of furnishings and décor for the model. Builder shall make the model Homes available to Members from time to time to enable Members to meet with their lenders to review and sign applicable loan documentation.

**Section 8.05** **Lease Pool Homes and Member Homes**. In connection with the issuance of each Community Commencement Notice, STOF shall state the number of Homes to be built in such Community that will (A) be purchased by STOF for inclusion in STOF's pool of Homes available for lease by STOF to its Members ("**Lease Pool Homes**"), or (B) be purchased directly by individual Members ("**Member Homes**"). STOF may revise the mix of Lease Pool Homes and Member Homes in any Community upon reasonable notice to Builder, provided that if such change results in any increased permitting, planning, or administrative cost, then STOF shall pay such increased cost within thirty (30) days after STOF's receipt of Builder's written demand, which shall be accompanied by an accounting of such increased costs and reasonable documentation with respect thereto.

**Section 8.06** **Subcontractors**. Builder shall select all subcontractors as are necessary for the construction of the Homes for each Community (each, a "**Subcontractor**"), subject to the approval of STOF, which shall not be unreasonably withheld, and subject to STOF's right to terminate a Subcontractor upon thirty (30) days' advance notice to Builder. Within thirty (30) days after receiving each Community Commencement Notice, Builder shall provide to STOF a proposed list of contractors for the applicable Community. STOF shall notify Builder within ten (10) business days after receipt of such list if any of the Subcontractors on such list are not acceptable. If STOF fails to timely provide such notice, then the contractors on the list shall be deemed to have been approved by STOF.

**Section 8.07** **Home Completion Date**. Upon Builder's completion of construction of each Home, Builder shall send to STOF written certification that such Home is complete (each, a "**Completion Notice**"). Within seven (7) business days after receipt of a Completion Notice, STOF (with respect to each Lease Pool Home), the individual member (with respect to the applicable Member Home), the Tribal Inspector (as to all Homes) and, if applicable, a representative required by any lender making an insured loan with respect to the Home, shall inspect such Home with Builder, and the parties shall jointly prepare a punch list. Builder shall thereafter correct such punch list items. If STOF, the individual member, Tribal Inspector and the lender representative, as applicable, do not inspect within such seven (7) business day period,

then the Home shall be deemed complete. The Tribal Inspector shall issue a certificate of occupancy or equivalent certification of completeness of such Home. The "**Home Completion Date**" shall be the earlier of the following: (a) the date on which the Home is deemed complete, or (b) the date of the last of the inspections by STOF, the individual member, Tribal Inspector and the lender representative, as applicable (including the correction of all punch list items). Notwithstanding the foregoing, if the insured loan program pursuant to which a lender is providing financing for the purchase of the Home permits more than seven (7) business days to inspect, such lender's representative shall be afforded such reasonable additional time as permitted under the loan program.

**Section 8.08** **Indian Preference**. STOF supports Indian preference with regard to the submittal of bids for construction projects by firms that are at least 51% owned by Members, if the respective firm is qualified with regard to the project requirements. Accordingly, Builder agrees to afford the opportunity to those qualified Members who meet the applicable project requirements to bid for direct work to be performed as a subcontractor, and to enter into subcontracts on the same terms and conditions as other subcontractors of Builder for the project. As used herein, "qualified" means that a Member or member-owned firm can provide goods or services at competitive prices, has demonstrated skills and abilities to perform the task to be undertaken in a timely and acceptable manner, and can meet the application, licensing, and insurance requirements.

## ARTICLE IX
## CLOSINGS

**Section 9.01** **Closing**. Each of the conveyances described in this Section is referred to herein as a "**Closing**."

(A) Closings for Lease Pool Homes. Promptly after the issuance of each Community Commencement Notice, Builder and STOF shall execute a confirmation notice in the form attached as **Exhibit G** (each, a "**Lease Pool Home Confirmation Notice**") which shall set forth the applicable lot number, price, Home model, and options. Within five (5) business days after the Home Completion Date of a Lease Pool Home, the following shall occur: (i) Builder shall convey to STOF via bill of sale the Lease Pool Home and any personal property included with the Lease Pool Home, (ii) Builder shall provide to STOF a Home warranty consistent with the warranty then provided by Builder to its customers outside Tribal Lands within the State of Florida, (iii) Builder shall provide to STOF all manufacturer's warranties and operating manuals, (iv) if changes have occurred from the original permitted plans, then Builder shall provide to STOF a set of modified plans; and (v) STOF shall pay to Builder the amount due for the Lease Pool Home as set forth on the Price List in effect on the date the Lease Pool Home Confirmation Notice is executed.

(B) Closings for Member Homes. Builder shall market the Member Homes for occupancy only by Members who have qualified in accordance with the Qualification Procedures. STOF shall provide Builder with a list of Members who have satisfied the Qualification Procedures for the acquisition of a Member Home, as well as contact information for such Members. Builder shall enter into agreements with Members in the form attached as **Exhibit H** (each, a "**Member Home Purchase Agreement**") which shall provide, among other



NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

things, that within five (5) business days after the Home Completion Date of a Member Home, the following shall occur: (i) STOF and the Member shall enter into a homesite lease in accordance with STOF procedures, (ii) Builder shall convey to the Member via bill of sale the Member Home and any personal property included with the Member Home, (iii) Builder shall provide to the Member a Home warranty consistent with the warranty then provided by Builder to its customers outside Tribal Lands within the State of Florida, (iv) Builder shall provide to the Member all manufacturer's warranties and operating manuals, (v) if changes have occurred from the original permitted plans, then Builder shall provide to the Member a set of modified plans; (vi) the Member shall pay to Builder the amount due as set forth in the Member Home Purchase Agreement, and (vii) to the extent that a Member obtains a loan to finance the amount due, Builder and STOF will comply with the provisions of any applicable insured loan program, provided there is no cost to Builder.

(C) Closings for Unacquired Member Homes. Builder will provide to STOF a monthly report of the status of sales of all Member Homes. If any Member Home is not conveyed to a Member pursuant to Section 9.01(B) for any reason or no reason (other than a Builder's Default, as defined in Section 13.01) ("**Unacquired Member Home**"), then such Unacquired Member Home shall be treated as a Lease Pool Home, and STOF shall be obligated to acquire such Unacquired Member Home pursuant to Section 9.01(A) within one hundred eighty (180) days after the Home Completion Date of such Unacquired Member Home. The price to be paid for such Unacquired Member Home shall be as set forth on the Price List in effect on the Home Completion Date, plus the costs of any options or similar costs included in the Home, plus interest on such price at the rate of twelve percent (12%) per annum, from the thirty first (31st) day after the Home Completion Date through the date of Closing ("**Unacquired Member Home Interest**"); provided, however, if the Unacquired Member Home was the subject of a Member Home Purchase Agreement where the member then failed to timely close, if STOF purchases such Unacquired Member Home within thirty (30) days of the Home Completion Date, the purchase price shall be the purchase price set forth in the Member Home Purchase Agreement and any and all deposits paid by or on behalf of the Member and received by Builder shall be credited to STOF at closing. Notwithstanding the foregoing, STOF's obligation to acquire the Unacquired Member Home shall terminate if (i) a Member enters into a Member Home Purchase Agreement for the acquisition of an Unacquired Member Home, (ii) the Member Home Purchase Agreement includes the payment to Builder of the Unacquired Member Home Interest, and (iii) the closing under such Member Home Purchase Agreement occurs within one hundred eighty (180) days after the Home Completion Date of such Unacquired Member Home.

**Section 9.02** **Carrying Costs**. If Builder is delayed in the construction of any Home due to actions of STOF, including a delay under Section 6.06 (but as to a delay under Section 6.06, only to the extent same continues beyond thirty (30) days), then Builder shall so notify STOF, and STOF will reimburse Builder for carrying costs incurred by Builder during such applicable period of delay, at the rate of twelve percent (12%) per annum on all Builder Costs incurred, starting on the date on which Builder notifies STOF in writing of such delay (or on the 31st day after such notice as to a delay under Section 6.06). Such payment shall be made within thirty (30) days after STOF's receipt of Builder's written demand, which shall be accompanied by an accounting of all Builder Costs and reasonable documentation with respect thereto.

NOT AN OFFICIAL COPY

## ARTICLE X
## INITIAL COMMUNITIES

**Section 10.01** **Mable T Property**. The Tribal Residential Lands include, without limitation, the land known as the "**Mable T Property**" described on **Exhibit I**, within the Big Cypress Reservation. This Agreement shall constitute the Community Commencement Notice for the Mable T Property. Builder shall build on the Mable T Property thirty-two (32) Lease Pool Homes on the lots designated "Residences By Lennar" on **Exhibit I**. STOF shall be the Infrastructure Party for the Mable T Property.

**Section 10.02** **Seminole Park**. The Tribal Residential Lands include, without limitation, the land known as the "**Seminole Park Property**" described on **Exhibit J**, within the Hollywood Reservation. This Agreement shall constitute the Community Commencement Notice for the Seminole Park Property. Builder shall build on the Seminole Park Property forty-six (46) Member Homes on the lots designated "Residences Built By Lennar" on **Exhibit J**. STOF shall be the Infrastructure Party for the Seminole Park Property.

**Section 10.03** **Lakeland Property**. The Tribal Residential Lands include, without limitation, the land known as the "**Lakeland Property**" described on **Exhibit K**, within the Lakeland Trust lands. This Agreement shall constitute the Community Commencement Notice for the Lakeland Property. Builder shall build on the Lakeland Property thirty-seven (37) Member Homes on the lots designated "Residences Built By Lennar" on **Exhibit K**. STOF shall be the Infrastructure Party for the Lakeland Property.

**Section 10.04** **Tribal Development Option**. Exhibits I, J and K specifically designate certain lots as "Tribal Development Option" which lots (hereinafter referred to as the "**TDO Lots**") are in addition to the lots designated for Builder as described in Sections 10.01, 10.02 and 10.03. STOF alone shall have the right to construct homes for its Members on the TDO Lots. Unless a Community Commencement Notice expressly includes a designation releasing some or all of the TDO Lots from this right of STOF, the issuance of a Community Commencement Notice (including, but not limited to, those set forth in Sections 10.01, 10.02 and 10.03 set forth hereinabove), shall not be deemed to grant Builder any right to build Homes upon the TDO Lots. From time to time, STOF may, but shall not be obligated to, provide written notice to Builder specifying certain TDO Lots which are released from this restriction in order that Builder may construct Homes thereon. This right reserved to STOF with respect to TDO Lots shall apply to each Community included in this Agreement for which there are TDO Lots set forth on the site plan exhibit which shall accompany the Community Commencement Notice.

## ARTICLE XI
## COMMUNITY OPERATION

Builder shall develop the land and sell Homes in each Community in a manner similar to the operation of Builder's communities outside Tribal Lands within the State of Florida. There shall be no homeowners' or similar association in any Community unless STOF requires same, in which case the formation and operation of such association shall be at STOF's sole cost and



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

responsibility. In the absence of any association, all Community maintenance and operation costs shall be at STOF's sole cost and responsibility, and Builder will cooperate with the same.

## ARTICLE XII
## FORCE MAJEURE

If the performance by either party of any of its obligations hereunder is delayed by natural disaster, terrorist activity, war, labor dispute, governmental delay or other matter beyond the control of such party, without such party's fault or negligence, then the deadline for completion of such obligation shall be extended by a like number of days. The foregoing shall not apply to any obligation to pay money due hereunder.

## ARTICLE XIII
## DEFAULT, REMEDIES, AND MEDIATION

**Section 13.01** **Builder's Default**. In the event of any default by Builder ("**Builder's Default**"), STOF shall be entitled to terminate this Agreement. In the event of such termination, Builder shall assign to STOF, to the extent assignable and without any representation or warranty, all rights of Builder under the Approvals and under any plans, Consultant Contracts, Construction Contracts, and Member Home Purchase Agreements, such that STOF will be able to complete all Homes then under Construction. Alternatively, STOF shall have the right to require Builder to complete all Homes then under construction pursuant to the terms of this Agreement; upon completion and Closing of said Homes, this Agreement shall terminate and neither party shall have any further liability hereunder.

**Section 13.02** **STOF's Default**. In the event of any default by STOF ("**STOF's Default**"), Builder shall be entitled to terminate this Agreement and be fully reimbursed for all costs and expenses incurred through the date of termination, and to all remedies available at law or in equity, including without limitation, specific performance, injunctive relief and damages.

**Section 13.03** **Notice and Cure**. Builder shall take no action with respect to a STOF's Default, and STOF shall take no action with respect to a Builder's Default, until the non-defaulting party has given written notice to the defaulting party and the defaulting party has failed to cure the default within the applicable cure period. The cure period shall be (A) five (5) business days with respect to a failure by either party to perform its obligations with respect to a Closing, (B) two (2) business days with respect to STOF's execution of documents requested in connection with the Approval process in accordance with Section 6.02, (C) two (2) business days with respect to STOF's failure to pay a Reimbursement Amount, or (D) thirty (30) days with respect to all other obligations.

**Section 13.04** **Mediation**.

(A) Nothing contained in this Agreement shall be deemed or construed to constitute consent on the part of STOF or Builder to arbitrate any matter or dispute, and nothing contained herein shall be deemed or construed to constitute an obligation or intent on the part of STOF or Builder to arbitrate any matter or dispute whatsoever.



NOT AN OFFICIAL COPY — PUBLIC ACCESS — NOT AN OFFICIAL COPY

(B) This Agreement shall be governed by the laws of the State of Florida and by such laws of the United States of America as are applicable. Except as otherwise noted below, by referring to federal law and the laws of the State of Florida, this Agreement is not intended to, and does not: (i) incorporate any administrative or other dispute resolution procedure contained therein; (ii) subject STOF, Builder, or the Tribal Residential Lands to the jurisdiction of the State of Florida or its courts or administrative bodies; or (iii) grant the State of Florida jurisdiction over this Agreement. Any controversy or claim arising out of or relating to this Agreement or the alleged breach thereof shall be resolved in the manner set forth below.

(C) The parties shall first attempt to resolve any controversy or claim arising out of or relating to this Agreement, or the alleged breach thereof, by negotiating in good faith for a period not to exceed thirty (30) days with each other with a view toward resolving their dispute voluntarily. If the voluntary efforts of the parties at direct negotiations fail, the parties shall then submit the dispute to mediation, as set forth below:

(D) Such mediation shall take place within sixty (60) days after the failure of voluntary negotiations between the parties. Under no circumstances will the mediation operate as a waiver of tribal sovereign immunity. Mediation may be initiated by either party upon ten (10) days' written notice to the other party. All mediation proceedings shall be held at the Administrative Offices of STOF within the confines of Broward County in the State of Florida. Selection of the Mediator shall be subject to the mutual agreement of the parties. In the alternative, the Mediator shall be selected by a neutral third party. The Mediator shall be Board Certified in Construction law or a former member of the Florida judiciary with background in construction cases. The parties and the Mediator shall maintain strict confidentiality with respect to any mediation proceeding. Nothing that transpires during the mediation proceeding is intended in any way to affect the rights or prejudice the position of any of the parties to the dispute in any later litigation or other proceeding. The Mediator is authorized to end the mediation whenever further efforts at mediation would not reasonably contribute to a resolution of the dispute between the parties. A written report of the mediation process will not be prepared by the Mediator. There shall be no record, electronic or otherwise, of the mediation proceeding. The Mediator's fee or time charge rate will be established at the time of selection or appointment. The expenses of witnesses for either side, if any, shall be paid by the party providing such witnesses. All other expenses of the mediation, including required travel and other expenses of the Mediator or the cost of any proofs or expert advice produced at the direct request of the Mediator, shall be shared equally by the parties unless they agree otherwise. Neither party shall institute litigation nor other proceedings while the mediation proceeding is pending; however, a party may withdraw at any time from the mediation proceeding by providing written notice to the mediator and to the other party.

(E) Any written settlement agreement of the parties that emerges from mediation shall be final and binding once fully executed, and the contents of which shall be maintained in strict confidentiality. The mediation proceeding shall be deemed terminated if, and when: (i) the parties have not executed a written settlement agreement within forty-five (45) days following conclusion of the mediation formal meeting (which deadline may be extended by mutual agreement), or (ii) either party serves on the other party and on the Mediator written

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

notice of withdrawal from the proceeding. The Mediator shall apply all applicable laws and rules of procedure, if any, in conducting the mediation proceedings, and in assessing the respective positions of each party to the mediation in an effort to bring about a voluntary resolution of the dispute. In addition to the foregoing and except as noted below, nothing contained herein is intended to constitute a consent or agreement on the part of STOF or Builder to be subject to participate in any legal proceeding to resolve any controversy, claim or dispute arising out of or relating to this Agreement or any alleged breach thereof.

(F) If a dispute cannot be resolved as a result of mediation, then venue shall be proper in the U.S. District Court for the Southern District of Florida, Broward County Division; or the Florida Circuit Court for the 17th Judicial Circuit, both with applicable appellate jurisdiction thereafter if required.

(G) If either of the parties commences a lawsuit or other legal proceeding against the other party to enforce the provisions of this Agreement or as a result of the other party's alleged breach thereof, the non-prevailing party shall pay the reasonable attorneys' fees and court costs incurred by the prevailing party. If STOF is charged with a breach of this Agreement, and all other conditions precedent to the assertion of a claim or the filing of suit have been fully met, the complaint or charging document filed by Builder shall set forth each and every fact and shall include, by way of attachment, each and every document upon which its allegations of breach are predicated. Each and every factual allegation contained in the complaint or charging document must be verified under oath.

(H) It is understood and agreed that by executing this Agreement, STOF does not waive, limit or modify its sovereignty or its tribal sovereign immunity from suit or from the assertion of any claim against it in any court or tribunal whatsoever unless the Tribal Council of STOF duly enacts an ordinance or a resolution in legal session authorizing a limited waiver of tribal sovereign immunity which conforms, in form and in substance, to the requirements of Tribal Ordinance C-01-95 regarding tribal sovereign immunity. Any limited waiver of the sovereign immunity of STOF shall also be subject to the following:

(i) The limited waiver shall be based solely upon a claim that STOF has materially breached its obligations under the terms and conditions of this agreement.

(ii) The limited waiver may only be asserted by the party in direct privity with STOF. It shall not be assignable.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

(iii) The limited waiver shall not be effective unless and until the parties have first exhausted the dispute resolution procedures set forth in this Article XIII. The limited waiver shall be limited to actual damages which have been incurred through the date of any claim asserted. The limited waiver of tribal sovereign immunity shall not pertain to any claim for punitive damages.

## ARTICLE XIV
## INTENTIONALLY OMITTED

## ARTICLE XV
## INDEMNITY

**Section 15.01** **STOF Indemnities**. All work undertaken by STOF pursuant to this Agreement, shall be at the sole risk of STOF. STOF shall, to the fullest extent permitted by law, defend all claims through legal counsel reasonably satisfactory to Builder, and indemnify and hold Builder, its members and affiliated companies and each of their agents, employees and representatives (collectively referred to as "**Builder Indemnitees**") harmless from and against each and all of the following: any claim, liability, loss, damage, cost, expense, including attorneys' fees, awards, fines or judgments arising out of the negligence or willful misconduct of STOF in performing its obligations hereunder, including without limitation, death or bodily or personal injury to persons, injury or damage to tangible property, including the loss of use therefrom, construction defects, or other loss, damage or expense, regardless of whether it is caused in part by any of the Builder Indemnitees; provided, however, STOF shall not be obligated to indemnify the Builder Indemnitees with respect to damages which are ultimately determined to be due to the sole negligence or willful misconduct of any of the Builder Indemnitees or resulting from defects in design furnished by any of the Builder Indemnitees. STOF further hereby indemnifies and holds the Builder Indemnitees harmless from all injury, damage, loss, cost or expense, including, but not limited to, attorneys' fees and court costs resulting from the following:

(A) Consultant Contracts. All activities performed by third parties under the Consultant Contracts.

(B) Hazardous Substances. Except to the extent introduced by Builder or any subcontractor, the presence of any Hazardous Substances above, below, on, or within the Tribal Lands, and any (i) generation, recycling, reuse, sale, storage, handling, transport and/or disposal of any Hazardous Substance on Tribal Lands, or (b) failure by STOF to comply with any applicable local, state or federal environmental laws, regulations, ordinances or administrative or judicial orders relating to the generation, recycling, reuse, sale, storage, handling, transport and/or disposal of any Hazardous Substance. As used herein, the term "**Hazardous Substance**" means any substance or material defined or designated as a hazardous or toxic waste, material or substance, chemical contaminant, or other similar term, deemed to be such by any federal, state or local environmental statute, regulation or ordinance presently or hereafter in effect, as such statutes, regulations or ordinances may be amended from time to time.



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

**Section 15.02** **Builder Indemnities**. All work undertaken by Builder pursuant to this Agreement, shall be at the sole risk of Builder. Builder shall, to the fullest extent permitted by law, defend all claims through legal counsel reasonably satisfactory to STOF, and indemnify and hold STOF, its Members and affiliated companies and each of their agents, employees and representatives (collectively referred to as "**STOF Indemnitees**") harmless from and against each and all of the following: any claim, liability, loss, damage, cost, expense, including attorneys' fees, awards, fines or judgments arising out of the negligence or willful misconduct of Builder in performing its obligations hereunder, including without limitation, death or bodily or personal injury to persons, injury or damage to tangible property, including the loss of use therefrom, construction defects, or other loss, damage or expense, regardless of whether it is caused in part by any of the STOF Indemnitees; provided, however, Builder shall not be obligated to indemnify the STOF Indemnitees with respect to damages which are ultimately determined to be due to the sole negligence or willful misconduct of any of the STOF Indemnitees or resulting from defects in design furnished by any of the STOF Indemnitees.

## ARTICLE XVI
## NOTICE AND ADDRESSES

All notices required or desired to be given under this Agreement shall be in writing and either (a) hand-delivered, (b) sent by certified mail, return receipt requested, (c) sent via FedEx or similar overnight service, or (d) sent via electronic mail, so long as notice is also provided through either method (a), (b) or (c) as herein described. All notices shall be addressed to the party being noticed, and shall be deemed to have been given (i) when delivered, if by hand delivery, (ii) three (3) business days after deposit in a U.S. Post Office or official letter box, if sent by certified mail, (iii) one (1) business day after timely deposited in a FedEx or similar overnight service depository, or (iv) upon transmission by sender if sent via electronic mail. All notices shall be delivered or sent prepaid for the specified service by the party giving notice, and shall be addressed as follows:

STOF: SEMINOLE TRIBE OF FLORIDA
6365 Taft Street, Suite 3008A
Hollywood, Florida 33024
Telephone No.: (954) 966-6300, extension 10919
Attn: Executive Director of Tribal Community Development
E-Mail: dereckkoger@semtribe.com

Copy To: SEMINOLE TRIBE OF FLORIDA
6300 Stirling Road
Hollywood, Florida 33024
Telephone No.: (954) 967-3950
Attn: Tribal General Counsel
E-Mail: jimshore@semtribe.com

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

| | |
|---|---|
| BUILDER: | LENNAR HOMES, LLC<br>99 SE Mizner Boulevard, Suite 120<br>Boca Raton, Florida 33432<br>Telephone No.: (561) 998-9200<br>Attn: Fred B. Rothman, Regional President<br>E-Mail: fred.rothman@lennar.com |
| Copy To: | LENNAR CORPORATION<br>700 NW 107th Avenue - 4th Floor<br>Miami, Florida 33172<br>Attn: General Counsel<br>E-Mail: mark.sustana@Builder.com |
| Copy To: | GREENBERG TRAURIG, P. A.<br>777 South Flagler Drive, Suite 300 East<br>West Palm Beach, Florida 33401<br>Telephone No.: (561) 650-7924<br>Attn: Laurie L. Gildan<br>E-Mail: GildanL@GTLaw.com |

or to any other address hereafter designated by any of the parties, from time to time, in writing and otherwise in the manner set forth herein for giving notice. The respective attorneys for STOF and Builder are hereby authorized to give any notice pursuant to this Agreement on behalf of their respective clients.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

## ARTICLE XVII
## MISCELLANEOUS PROVISIONS.

**Section 17.01** **Insurance**. Throughout the Term of this Agreement, Builder shall provide insurance as set forth on **Exhibit L**.

**Section 17.02** **Amendments**. No amendment to this Agreement shall bind any of the parties unless and until such amendment is in writing and executed by Builder and STOF.

**Section 17.03** **Entire Agreement**. This Agreement, together with any exhibits attached, constitutes the entire agreement between the parties and no prior written documents, and no prior or contemporary oral statements, representations, promises, or understandings not embodied in this Agreement shall be of any force or effect.

**Section 17.04** **Assignment**. Neither Builder nor STOF may assign this Agreement, except that Builder shall have the right to assign its rights and/or obligations in this Agreement to any entity controlled by or under common control with Buyer, or to an entity which succeeds to Buyer in any merger or acquisition, without recourse, whereupon Buyer shall be released from its obligations hereunder.

**Section 17.05** **Interpretation**. Captions and section headings contained in this Agreement are for convenience and reference only; in no way do they define, describe, extend or limit the scope or intent of this Agreement or any provision hereof. The terms and provisions of

this Agreement have been fully negotiated between the parties and each party has been afforded the opportunity to engage, if such party desires, legal counsel to assist in the preparation, negotiation, and drafting of this Agreement. Accordingly, the terms and provisions of this Agreement shall not be interpreted for or against either STOF or Builder as the drafting party.

**Section 17.06** **Representations**. All representations, warranties and covenants set forth herein are material and of the essence to this Agreement.

**Section 17.07** **Waiver**. No waiver of any provision of this Agreement shall be effective unless it is in writing signed by the party against whom it is asserted, and any waiver of any provision of this Agreement shall be applicable only to the specific instance to which it is related and shall not be deemed to be a continuing or future waiver as to such provision or a waiver as to any other provision.

**Section 17.08** **Severability**. The invalidity or unenforceability of any provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision was omitted.

**Section 17.09** **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same Agreement. To facilitate execution and delivery of this Agreement, the parties may execute and exchange executed counterparts by e-mail in a PDF file to the other party or to the other party's counsel. Signatures in a PDF file shall have the same legal effect as original signatures.

**Section 17.10** **Radon Gas**. In compliance with §404.056, Florida Statutes, Builder is hereby made aware of the following: RADON GAS IS A NATURALLY OCCURRING RADIOACTIVE GAS THAT, WHEN IT HAS ACCUMULATED IN A BUILDING IN SUFFICIENT QUANTITIES, MAY PRESENT HEALTH RISKS TO PERSONS WHO ARE EXPOSED TO IT OVER TIME. LEVELS OF RADON THAT EXCEED FEDERAL AND STATE GUIDELINES HAVE BEEN FOUND IN BUILDINGS IN FLORIDA. ADDITIONAL INFORMATION REGARDING RADON AND RADON TESTING MAY BE OBTAINED FROM YOUR COUNTY PUBLIC HEALTH UNIT.

**Section 17.11** **WAIVER OF TRIAL BY JURY**. BUILDER AND STOF HEREBY EXPRESSLY COVENANT AND AGREE TO WAIVE THE RIGHT TO TRIAL BY JURY IN CONNECTION WITH ANY LITIGATION OR JUDICIAL PROCEEDING RELATING TO, DIRECTLY OR INDIRECTLY, OR CONCERNING THIS AGREEMENT OR THE CONDUCT, OMISSION, ACTION, OBLIGATION, DUTY, RIGHT, BENEFIT, PRIVILEGE OR LIABILITY OF A PARTY HEREUNDER TO THE FULL EXTENT PERMITTED BY LAW. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN AND IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY BUILDER AND STOF. BUILDER AND STOF HAVE HAD AN OPPORTUNITY TO SEEK LEGAL COUNSEL CONCERNING THIS WAIVER. THIS WAIVER IS INTENDED TO AND DOES ENCOMPASS EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A JURY TRIAL WOULD OTHERWISE ACCRUE. BUILDER AND STOF FURTHER CERTIFY AND REPRESENT TO EACH OTHER THAT NO PARTY, REPRESENTATIVE

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

OR AGENT OF BUILDER OR STOF (INCLUDING, BUT NOT LIMITED TO, THEIR RESPECTIVE COUNSEL) HAS REPRESENTED, EXPRESSLY OR OTHERWISE TO BUILDER OR STOF OR TO ANY AGENT OR REPRESENTATIVE OF BUILDER OR STOF (INCLUDING, BUT NOT LIMITED TO, THEIR RESPECTIVE COUNSEL) THAT THEY WILL NOT SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL. THIS WAIVER SHALL APPLY TO THIS AGREEMENT AND ANY FUTURE AMENDMENTS, SUPPLEMENTS OR MODIFICATIONS OF THIS AGREEMENT.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

**LENNAR HOMES, LLC,** a Florida limited liability company

By: ______________________
Print Name: JIM BAROUSET
Title: VICE PRESIDENT

Date: ______________, 2019

______________________
Print Name: Jason Whiteman

______________________
Print Name:

WITNESSES:

**SEMINOLE TRIBE OF FLORIDA**

______________________
Print Name:

Christopher L. Billie
Print Name:

By: ______________________
Print Name: MARCELLUS W. OSCEOLA, JR
Title: CHAIRMAN

Date: 9/10/19, 2019

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

# EXHIBIT A

Depiction of Tribal Lands

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY




Map Legend

Reservation Boundary

2016 Aerial

# Hollywood Reservation
Exhibit A

0 280 560 1,120
Feet

The information shown on this Map is provided by the Seminole Tribe of Florida GIS Department. Map information is believed to be accurate but accuracy is not guaranteed. Any discrepancies should be reported to the Seminole Tribe of Florida GIS Department.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY




NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

Map Legend

Reservation Boundary

2017 Aerial

# Big Cypress Reservation

## Exhibit A

The information shown on this map is provided by the Seminole Tribe of Florida G.I.S Department. Map information is believed to be accurate but accuracy is not guaranteed. Any discrepancies should be reported to the Seminole Tribe of Florida GIS Department




NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

**Map Legend**

Reservation Boundary

2018 Aerial

# Brighton Reservation

## Exhibit A

# Immokalee Reservation

## Exhibit A




**Map Legend**

Reservation Boundary

2018 Aerial

The information shown on this map is provided by the Seminole Tribe of Florida GIS Department. Map information is believed to be accurate but accuracy is not guaranteed. Any discrepancies should be reported to the Seminole Tribe of Florida GIS Department.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY




NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

**Map Legend**

Reservation Boundary

# Lakeland Reservation

## Exhibit A




NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

**EXHIBIT B**

Depiction of Tribal Residential Lands

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY




**Map Legend**
- Streets
- Future Residential Area
- Reservation Boundary

2018 Aerial Imagery

# Hollywood Reservation
## Exhibit B
Tribal Residential Lands

N W E

0 250 500 1,000
Feet

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY


The Groves
Mabel T Frank Housing Area
Location Map
Map Legend
Streets
Reservation Boundary
Mabel T Frank Housing Area
The Groves
2017 Aerial Imagery
Big Cypress Reservation
Exhibit B
Tribal Residential Lands
NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY




Map Legend

Streets

Reservation Boundary

Primary Name

Flowing Well Pasture Area

Knots Landing Rental Community

2018 Aerial Imagery

# Brighton Reservation

## Exhibit B

## Tribal Residential Lands

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY




NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

**EXHIBIT C**

Tribal Authorizing Resolution

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

**EXHIBIT D**

Approved Consultants

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

| Name | Principal/Owner Name | Phone Number | Address | City | State | Zip | Email Address |
|---|---|---|---|---|---|---|---|
| A-1 Roof Trusses Ltd | Larry Keith | 772-409-1010 | 4451 St. Lucie | Fort Pierce | FL | 34946 | larry.keith@a1truss.com |
| ABC Drywall Corp | Mike & Tanya | 954-684-7278 | 5447 NW 24th St | Margate | FL | 33063 | abcdrywallcorp@bellsouth.net |
| | Rick | 954-971-0065 | | | | | rick_abc@bellsouth.net |
| Abrite Electric Corp. | Marianela Rodriguez | 786-295-1602 | 20404 SW 133 Ave | Miami | FL | 33177 | abriteelectric@gmail.com |
| AC Quality Electric LLC | Alan Capps | 954-294-0101 | 2307 NW 115 Avenue | Coral Springs | FL | 33065 | al@acqualityelectric.com |
| Accents Fence | Danny O. Torres | 786-251-0375 | 1085 East 28 Street | Hialeah | FL | 33013 | accent2010@hotmail.com |
| Action Sod of Miami Corporation | Barby Lopez | 305-216-2333 | 5700 SW 23 Avenue | Miami | FL | 33183 | actionsod@actionsod.com |
| Advantage Pest Related Se | | 954-968-7717 | | | | | |
| Al-Flex Exterminators Inc | | 305-552-0141 | | | | | |
| All American Doors, Inc | Luis Torrens | 786-229-6946 | 8155 NW 93 Stre | Miami | FL | 33166 | sales_ar@allamericandoors.com |
| | Alberto Rodriguez | 305-496-1085 | 8155 NW 93 Stre | Miami | FL | 33166 | sales_ar@allamericandoors.com |
| All Dade Fences, Inc | Ilsis Ortega | 305-826-2535 | 2720 W 78th St. | Hialeah | FL | 33016 | [illegible]@alldade.com |
| All Phase Roofing | James Boatright | 561-588-8782 | 601 Whitney Avenue Ste 1 | Lantana | FL | 33462 | [illegible]@allphaseroofinginc.com |
| American Stairs | Jamil Mikati | 772-286-2082 | | | | | americanstairs@bellsouth.net |
| Arnold J. Electric, Inc. | Arnold Delgado | 786-355-4471 | 4604 SW 159 Ave | Miami | FL | 33185 | arnaldodelgado1965@gmail.com |
| | Arnold Delgado JR | 786-251-2905 | | | | | |
| Artemisa Fence & Ornamental Corp | Marlene Valdes | 305-221-0214 | 1111 Lincoln Rd | Miami Beach | FL | 33139 | marlene@artemisafence.com |
| Artistic Glass & Mirror of Miami Inc | Manuel Hernandez | 305-216-4864 | 13275 SW 136 St | Miami | FL | 33186 | artisticglass@bellsouth.net |
| | Mercedes | 305-216-4981 | | | | | |
| Atlantic Flooring Group Inc | Alejandro Henriquez | 305-343-1816 | 8317 Sw 84th Te | Miami | FL | 33143 | alex@atlanticflooringgroup.com |
| Avatar Enterprises o S Florida | Kenneth Mistico | 305-757-3958 | 1212 NE 91 Stre | Miami | FL | 33138 | avaclean@yahoo.com |
| Beyond Reliable LLC. | Monica Perez | 954-410-6444 | 16000 Pines Blvd | Pembroke Pines | FL | 33082 | beyondreliable18@gmail.com |
| Big Plumbing Co. | Abraham Latras | 305-821-2880 | | | | | bigplumbingcorp@gmail.com |
| Brick Paver Group Inc | Jose Fernandez | 305-554-6570 | 350 W Park Driv | Miami | FL | 33172 | jose@brickpavergrp.com |
| Broten Garage Door & Gate | John DeMarco | 954-946-5555 | | | | | john@broten.com |
| Builders First Source | Dominic Williams | 561-798-1840 | | | | | dominic.williams@bldr.com |
| Capri Construction Corp | Jorge Llauro | 305-216-2127 | 12331 Sw 132 Co | Miami | FL | 33186 | jllauro@capriconstruction.net |
| Carpenter Contractors of America | Jim Dyer | 863-294-6449 | 3900 Avenue G | Winter Haven | FL | 33880 | jimd@carpentercontractors.com |
| Carpets by Mr. Jason Inc | Howard Siegel | 954-973-4990 | 2054 Mears Park | Margate | FL | 33063 | Howard@carpetsbymrjason.com |
| Central Air Control | Rene A. Alvarez | 305-822-1551 | 2651 W 79th Street | Hialeah | FL | 33016 | renealvarez@centralaircontrol.com |
| Charol Drywall Inc. | Enrique Carranza | 305-748-9020 | | | | | charol_drywall@yahoo.com |
| Cheeky Monkey Cleaning Service | | 305-829-8540 | | | | | |
| Classic Cultured Marble Inc | Sailesh Patel | 561-848-4635 | 8300 Currency D | West Palm Beach | FL | 33404 | s8300@aol.com |
| Creative Painting Waterproofing | Rafi Cohen | 954-444-7008 | 5055 Stillwater Terr. | Cooper City | FL | 33330 | creativepntg@aol.com |
| Crown Roofing, LLC. | Guildor J. Geneau | 855-276-9856 | 8724 Spruce Hills Court | Lakewood Ranch | FL | 34202 | admin@crownrfs.com |
| Custom Craft Inc | Roberto Aguilar | 305-965-3487 | | | | | marbleandgranite10@yahoo.com |
| Dade Truss | Jose Jurado | 305-592-8245 | 8401 NW 74 Ave | Miami | FL | 33166 | josej@bcg.bz |
| Decora USA Painting | Juan Guzman | 305-345-8025 | | | | | decora_usa@yahoo.com |
| Diligent Lawn And Pest Control | Hu Montague | 800-487-8190 | 3500 NW Boca Raton Blvd #714 | Boca Raton | FL | 33431 | hu@diligentpest.com |
| Distinctive Kitchens and Baths Inc | Adam Canter | 561-997-9400 | 1217 Clint Moor | Boca Raton | FL | 33487-2718 | ac105@aol.com |
| Dixie Landscape Co., Inc | Sue Reamer | 305-884-5700 | 12950 NW 113 Ct | Medley | FL | 33178 | sreamer@dixielandscape.com |
| Dixie Estimator ----> | Chris Catron | | | | | | ccatron@dixielandscape.com |
| | Robert | 305-216-5251 | | | | | |
| | Mike | 772-216-0246 | | | | | |
| DTC Stairs | Salvador Jurado | 305-592-8245 | 6401 NW 74th Av | Miami | FL | 33166 | mikej@bcg.bz |
| Eagle Lighting Distributors Inc | Karen | 954-725-7988 | 3001 SW 15th St | Deerfield Beach | FL | 33442 | karen@eaglelighting.net |
| Edge In Stone LLC | Alex Garcia | 305-623-9000 | | | | | alex_eis@bellsouth.net |
| Electric Connection | | 561-586-6499 | | | | | |
| Empire Electric Maintenance & Service Inc | Antonio Hernandez | 305-264-9982 | 1041 SW 67 Ave | Miami | FL | 33144 | tony@empireelectric.net |
| Excel Equipment 1, LLC | Mark Gibbons | 954-749-5507 | 4495 SW 67th Te | Davie | FL | 33314 | excelequipment1@aol.com |
| Firematic Sprinklers, Inc. | Jose Perez | 305-970-6656 | 9334 NW 13 ST #18 | Doral | FL | 33172 | bids@firematicinc.com |

4/8/2019 3:53 PM

G:\Land Acquisition\1. Deals Under Review\Seminole Tribe of Florida\Vendor List\DAH Vendor List 4.3.19_.xlsx

NOT AN OFFICIAL COPY

| Name | Prinicipal/Owner Name | Phone Number | Address | City | State | Zip | Email Address |
|---|---|---|---|---|---|---|---|
| Floor Technologies, Inc | Christopher M. Henry | 305-818-8530 | 11911 W Okeechobee Rd | Hialeah Gardens | FL | 33018 | shenry@floortechnologies.com |
| Fox Electric Enterprises Inc | Michael Varela | 305-556-1700 | 2691 W 81 Stree | Hialeah | FL | 33016 | michael@foxelectric.us |
| Franceschi Marble & Granite Inc | | 772-467-1414 | | | | | |
| Gale Insulation | Dave Fiene | 305-625-8397 | 3601A Cross Roa | Ft Pierce | FL | 34945 | galeinsulation@mascocs.com |
| General Stair Corp. | Ada Blanco | 305-599-0290 | 690 West 83 Str | Hialeah | FL | 33014 | ablanco@generalstair.com |
| GND Millwork Corp | Noel Gonzalez | 305-970-3910 | 23285 SW 131 St | Miami | FL | 33186 | ndg1986@hotmail.com |
| Guardian Hurricane Protection Product | Pablo Ramos | 305-805-7050 | 760 W. 27th St. | Hialeah | FL | 33010 | guardianshutters@aol.com |
| Guttersmith | Rhea Smith | 561-369-8797 | 744 Rider Road | Boynton Beach | FL | 33435 | GUTTERSMITH@BELLSOUTH.NET |
| Heritage Carpet & Tile Inc | Randy Smith | 561-424-9090 | 2200 Corporate | Boynton Beach | FL | 33426 | rsmith@heritageflooring.com |
| | Jamie Rickel | 954-520-8662 | 2200 Corporate | Boynton Beach | FL | 33426 | jrickel@heritageflooring.com |
| Inhoome | Robert Larreal | 305-599-3320 | 10803 NW 29 St. | Doral | FL | 33172 | contact@inhoome.com |
| Installed Building Products of Miami | Bert Albelat | 305-693-8980 | 12805 NW 115 Ave B107 | Medley | FL | 33178 | bert.albelat@installed.net |
| Jimenez Concrete Finishing | Miguel Madriz | 786-412-9976 | 14359 SW 176 Te | Miami | FL | 33177 | jimenezconcretefinish@gmail.com |
| J & M Underground Engineering | | 305-345-4002 | | | | | |
| JML Irrigation, Inc | Jose Guerra | 305-992-7866 | 16390 SW 278 St | Homestead | FL | 33031 | mailas@jmlirrigation.com |
| Kitchen Art - Ferguson ENT | | 954-753-3501 | | | | | |
| Larraco Enterprises, Inc | Jose Cardenal | 305-254-3559 | PO Box 562380 | Miami | FL | 33256-2380 | larracoinc@bellsouth.net |
| Latite Roofing & Sheet Metal, LLC | Chris Yankowich | 954-772-3446 | 2280 West Copans Road | Pompano Beach | FL | 33069 | barbaram@latite.com |
| Lawson Industries Inc | Harold W. Bailey | 305-696-8660 | 8601 NW 90th Street | Medley | FL | 33166 | David@lawsonwindows.com |
| Lindstrom Air Condition | Craig Sanscrainte | 954-420-0064 | | | | | craigs@lindstromair.com |
| Leza's Plumbing Corp | Eric Leza | 786-251-6005 | 9448 N.W. 13 St | Miami | FL | 33172 | lezaeric@yahoo.com |
| Lupes Professional Cleaning | Lupe | 772-336-7226 | | | | | gadams515@yahoo.com |
| Merit Floors Inc | Todd Flegel | 305-887-7571 | 3024 NW 25th Av | Pompano Beach | FL | 33069 | todd@meritfloors.com |
| Mia Casa Home Design Center Corp | Antonio Caula | 786-275-4296 | 750 W 39 Place | Hialeah | FL | 33012 | anthonycv@miacasahomedesign.comcast |
| Miami Cable Connections Inc | William Leiser | 305-970-0520 | 14030 S.W. 140T | Miami | FL | 33186 | miamicable@bellsouth.net |
| Milclean USA LLC | Karina Pinto | 954-673-8999 | 257 Goolsby Blvd. | Deerfield Beach | FL | 33442 | karina@milcleanusa.com |
| Monogram Windows & Doors | Don Bronchick | 954-570-7117 | | | | | don@monogramwindows.com |
| Mowrey Elevator Company Inc | Timothy Mowrey SR | 954-581-8900 | 3380 SW 50 Ave | Davie | FL | 33328 | victor@mowreyelevator.com |
| MP Firestop ENT | Joaquin Puntonet | 786-267-4313 | 12360 SW 132 CT #215 | Miami | FL | 33186 | yaguiar@ucloss.net |
| Nautilus Marble-Lite Inc | Jose Gonzalez | 305-253-9815 | 14040 SW 139 Court | Miami | FL | 33186 | maridaligonzalez@hotmail.com |
| Oliva Pavers Enterprise Corp | Yadeny Oliva | 786-412-0037 | 15763 NW 80 Ave | Miami | FL | 33016 | olivabricking@bellsouth.net |
| Ortega Grading Inc | Addiel Ortega | 305-884-5560 | 535 West 26th S | Hialeah | FL | 33010 | ortegagrading@yahoo.com, |
| | Amada | 786-619-6185 | | | | | aperez@ortegagrading.com, |
| Oscar Air Conditioning | Daniel Puig | 786-236-6391 | 6540 N.W. 84th | Miami | FL | 33166 | oac@oscaraircondtioning.com |
| Phorcys Builders Corp | Pedro F Sanchez | 305-349-8834 | | | | | psanchez@phorcysbuilders.com |
| Prime Shell Inc | Chris Dimercurio | 305-232-8212 | | | | | chris@primeshellinc.com |
| Progressive Plastering Inc | | 954-596-1400 | | | | | |
| Reliable Services & AC | Gary Lucchese | 954-649-3074 | 7154 N University Drive #264 | Tamarac | FL | 33321 | reliableservicesandair@gmail.com |
| Ridgeway Plumbing Inc | Ken Depew | | | | | | karol@ridgewayplumbing.com |
| Rosen Materials, LLC | Drew Rosen | | 1371 Sawgrass Corporate Parkway | Sunrise | FL | 33323 | jmigliacci@rosenmaterials.com |
| Royal Fence & Equipment | Isidro Suarez | 305-607-8322 | 5500 NW 74 Ave | Miami | FL | 33166 | rmartinez@royalfencecorp.com |
| Royal Plastering Corp | Eddy N. Gil | | | | | | eddy@royalplastering.com |
| S & J Plastering, Inc | Jorge Sanchez | 305-278-2432 | 13656 S.W. 142nd Ave | Miami | FL | 33186 | sjplastering@bellsouth.net |
| Samada Fence | Sergio Samada | 305-770-6344 | 310 W 31 St | Hialeah | FL | 33012 | samada1@msn.com |
| Shell Systems Inc | Michael Palmieri | 561-988-2117 | 1087 NW 31st Ave | Pompano Beach | FL | 33069 | mikep@shellsystemsplastering.com |
| Signature Design Paving | Laila Rayani | 954-975-8646 | | | | | lailar@signaturedesignpavers.com |
| South Dade Lighting Inc | Donald Elliott | 305-233-8020 | P.O. Box 560965 | Miami | FL | 33156 | madam@south-dade.com |
| South Florida Stucco & Exteriors LLC | Shyla Presser | 305-335-5752 | | | | | southfloridastucco@gmail.com |
| Southwest Plumbing Service | Clinton Watson | 305-232-6203 | 12925 S.W. 134th Court | Miami | FL | 331865869 | |
| State-Line Products of South Florida | Juan Gonzalez | 954-971-0791 | 3021 NW 25th Ave | Pembroke Pines | FL | 33069 | |
| Sunshine Window MFG. Inc | Roman Cordova | 786-258-4177 | 1785 West 33 Pl | Hialeah | FL | 33012 | RGC212@BELLSOUTH.NET |



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

| Name | Pricincipal/Owner Name | Phone Number | Address | City | State | Zip | Email Address |
|---|---|---|---|---|---|---|---|
| Talca Elevator | Patrick Lalchandani | 407-816-9284 | 6130 Edgewater Dr. #D | Orlando | FL | 32810 | service@talcaelevator.com |
| TBRC Group LLC | Lincoln | 727-735-2961 | 6438 126th Ave | Largo | FL | 33773 | [illegible]@tbrcgroup.com |
| The Beautiful Mailbox Company | Seth | 954-792-6245 | | | | | |
| Universal World Contruction | Paul Blanchet | 954-629-1266 | | | | | waterviewinc@aol.com |
| US Brick & Block Systems LLC | James A. Bond | | 1800 NW 22nd St | Fort Lauderdale | FL | 33311 | jbond@brickamerica.com |
| Varona Concrete LLC | Carlos Varona | 305-525-3778 | 10400 SW 41 Str | Miami | FL | 33165 | varonaconcrete@yahoo.com |
| | Elizabeth | 786-873-6890 | | | | | |
| Victoria Roofing Inc | Rafael Ubeda | | 4220 SW 71 Ave | Miami | FL | 33155 | victoriaroofinginc@comcast.net |
| | Rudy | 305-772-0086 | | | | | rudy@victoriaroofinginc.com |
| Willmax Cleaning Services Inc | | 786-380-5814 | | | | | |
| | | | | | | | |
| | | | | | | | |

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

**EXHIBIT E**

**Form of Consultant Contract**

# GENERAL AGREEMENT FOR CONSULTANT SERVICES

**NO.**

**BETWEEN**

**"BUILDER"**

**Lennar Builder Name Here**
**Address Here**
**City, State, Zip Here**
**Phone Number Here**
**Fax Number Here**

**AND**

**"CONSULTANT"**

**Company Name Here**
**Address Here**
**City, State, Zip Here**
**Phone Number Here**
**Fax Number Here**
**State License Number Here**

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

[Insert Project Name Here]
[Insert Type of Work Here]
General Agreement for Consultant Services

| Consultant: | | | | | |
|---|---|---|---|---|---|
| Contract No.: | | | | | |
| Rel Cost Center | | | | | |
| **CSI Code#** | **Description Of Services** | **UOM** | **$ / Unit** | **Qty** | **Extended $'s** |
| | | LS | | | $ |
| | | LS | | | $ |
| **Contract Total** | | | | | $ |

Date:____________

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

**DISPUTE RESOLUTION. CONSULTANT IS ADVISED THAT THIS AGREEMENT REQUIRES CERTAIN DISPUTES BE RESOLVED BY ARBITRATION, AS MORE SPECIFICALLY SET FORTH IN SECTION 21 HEREIN.**

This General Agreement for Consultant Services ("Agreement") is entered into by and between **[Insert Lennar Builder's Name]**, a ________________, located at **[Insert Lennar Builder's Address]**, ("Builder") and **[Insert Consultant's Name]**, a ________________, located at [**Insert Consultant's Address**] ("Consultant") and shall govern any and all services performed by Consultant with regard to the Services (defined below) described in Exhibit "A," and any future engagements between Consultant and Builder, to be added to this Agreement from time to time. Builder and Consultant are individually or collectively referred to as a "Party" or the "Parties." Builder and Consultant hereby agree as follows:

1. General Description of Services. The services to be performed by Consultant ("Services") are described in the Summary Sheet attached as **Exhibit "A,"** which specifies the development project with respect to which Services are to be performed ("Project"); the exact nature and type of Services required; the compensation to be paid for such Services; the manner of payment of Consultant's Compensation; the specific time periods or dates upon which Services must be completed, including without limitation, start up and completion dates, dates of inspections, conferences or meetings; and any other additional information deemed necessary by Builder. A more detailed description of Consultant's Scope of Work is attached hereto as **Exhibit "B."** The Project is located on property titled in the name of the United States of America in trust for the benefit and use of the Seminole Tribe of Florida, a Federally Recognized Indian Tribe Under 25 U.S.C. §476 (herein referred to as "STOF"). Consultant agrees, warrants, and represents that it shall perform such Services required hereunder in accordance with the terms of this Agreement and, in connection therewith, shall render its professional opinions and advice and exercise its professional judgment commensurate with the best and highest standards of care and practice for licensed consultants performing similar services on projects of like size, scope and complexity located in the metropolitan area described on Exhibit A hereto (the "Standard of Care").

2. Addition/Modification of Services. The Services are not subject to modification or addition unless Consultant obtains a written approval of the modification/addition signed by Builder ("Change Order"). The contents of a written Change Order shall include at a minimum all of the following: (a) a description of the particular modification/addition to the Services; (b) the amount of any change in Consultant's Compensation (as defined below) resulting from the modification/addition; (c) any revisions in commencement, completion or delivery dates, if any, resulting from the modification; and (d) Builder's dated signature. Consultant shall not perform any modification/addition to the Services or incur any "Reimbursable Expenses" (as defined herein) with respect to such modification/addition until Consultant obtains a signed Change Order for such modification/addition. Notwithstanding the foregoing, a deductive Change Order by Builder shall be effective upon signature by Builder and delivery to Consultant.

3. Term of Agreement. The term of this Agreement shall commence on the date this Agreement and **Exhibit "A"** are executed by Consultant and Builder, and shall continue in effect until the date ("Termination Date") which is the first to occur of the following: (a) the date on which performance of the Services has been completed in accordance with this Agreement, or (b) the tenth (10th) calendar day after Consultant receives a written notice from Builder ("Termination Notice") terminating this Agreement, which termination may be with or without cause. If Builder terminates this Agreement without cause, Consultant shall be paid for all Services rendered in accordance with the terms of this Agreement up to the Termination Date.

4. Compensation. With the exception of the "Reimbursable Expenses" described below, and except as otherwise provided in any Change Order signed by Builder, Consultant shall be compensated ("Consultant's Compensation") on the basis specified in **Exhibit "A."** Except as otherwise provided in **Exhibit "A"** or any Change Order signed by Builder, Consultant's Compensation shall be paid monthly. If Consultant's compensation is determined on an hourly basis, then monthly payments shall be based on the number of consulting hours provided by Consultant for that month, times the specified hourly rate. Consultant shall provide Builder's accounting personnel with documentation, acceptable to Builder, reflecting the number of consulting hours or other relevant billing information for any month, which information shall be provided in a manner and at times specified by Builder from time to time. Consultant acknowledges and agrees that Consultant's failure to provide time and billing information, including lien waivers and releases as requested by Builder, in a prompt manner and in the form required by Builder may result in a delay in the payment of Consultant's Compensation and Consultant agrees that Builder shall have no liability or responsibility to Consultant for such delays in payment of Consultant's Compensation. Further, Consultant acknowledges that Builder utilizes the SupplyPro® scheduling system. Consultant agrees to subscribe to and to utilize SupplyPro® to send, receive and respond to notices and documents, and to use the same to initiate requests for payment. All costs of subscribing to, utilizing, and maintaining SupplyPro® for the Consultant shall be borne by Consultant. Consultant shall keep the Project free and clear of any liens, debt, or bond claims of any kind whatsoever related to Consultant's Services, except to the extent the same arise from failure of Builder to pay undisputed sums owed to Consultant ("Lien or Bond Claim"). In the event a Lien or Bond Claim is filed or threatened to be filed by any Lien Claimant, Consultant shall, at Builder's sole election, immediately settle and resolve such claim and obtain a full waiver and release of the Lien or Bond Claim from the lien claimant, or provide a statutory bond acceptable to Builder that will bond around or discharge such Lien or Bond Claim. Should Consultant fail to do so within two (2) business days, in addition to all



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

other rights, Builder may, without additional notice to Consultant, (A) settle, bond or discharge the Lien or Bond Claim in any manner Builder deems appropriate, and charge the costs thereof to Consultant, and/or (B) withhold further payments to Consultant under this Agreement or otherwise until Consultant has complied with its obligations herein. Nothing contained in the Agreement (except for lien waivers duly signed and acknowledged) shall restrict or limit Consultant's statutory right to file and record liens or stop notices for non-payment, if any, and notwithstanding any provision to the contrary, Consultant may take all steps reasonably necessary to preserve its lien and bond rights as permitted by law.

AT BUILDER'S ELECTION, CONSULTANT AGREES TO BE PAID ELECTRONICALLY BY BUILDER, EITHER THROUGH ITS ePAYABLES PROGRAM IF CONSULTANT CURRENTLY HAS A MERCHANT ID OR THE ACH CREDIT PROGRAM. WITH RESPECT TO THE ePAYABLES PROGRAM, CONSULTANT AGREES TO ENROLL IN BUILDER'S ePAYABLES PROGRAM, A GHOST CREDIT CARD PROGRAM OFFERED THROUGH BANK OF AMERICA OR ANY OTHER PROVIDER SELECTED BY BUILDER, AND TO ACCEPT PAYMENT FROM BUILDER THROUGH SUCH PROGRAM. CONSULTANT FURTHER AGREES THAT IT WILL NOT CHARGE BACK OR PASS THROUGH TO BUILDER ANY MISCELLANEOUS AND/OR CONVENIENCE FEES AS A RESULT OF ACCEPTING PAYMENTS VIA THIS METHOD. WITH RESPECT TO THE ACH PROGRAM, CONSULTANT AGREES TO ENROLL USING THE ACH CREDIT PROGRAM OFFERED THROUGH WESTERN UNION, OR ANY OTHER PROVIDER SELECTED BY BUILDER, AND TO ACCEPT PAYMENT FROM BUILDER VIA ACH CREDITS TO THE CONSULTANT'S BANK ACCOUNT INDICATED BY CONSULTANT ON THE WESTERN UNION SITE.

5. Reimbursable Costs. In addition to Consultant's Compensation, Builder shall reimburse Consultant the actual cost of reasonable expenses incurred by Consultant, solely in connection with Consultant's performance of the Services, which expenses are authorized by Builder herein or in any Change Order signed by Builder ("Reimbursable Expenses"). Consultant shall provide to Builder an itemization of all Reimbursable Expenses in the time and in the manner specified in **Exhibit "A"** or the applicable Change Order signed by Builder. Such itemization shall include supporting receipts and invoices if requested by Builder. Reimbursable Expenses shall include reasonable costs of food, travel, lodging, supplies, materials, publications and other items authorized by Builder in **Exhibit "A"** or the applicable Change Order signed by Builder, provided such costs or expenses are incurred by Consultant solely in performance of the Services. Consultant shall advise Builder, in writing, prior to incurring any expense or cost which would result in Consultant exceeding the amount specified for such line item expense or cost, or otherwise exceeding the amount of Reimbursable Expenses authorized in the aggregate as set forth in **Exhibit "A"** or the applicable Change Order signed by Builder ("Extraordinary Reimbursable Expenses"). Consultant shall only be reimbursed for Extraordinary Reimbursable Expenses if authorized in writing by Builder.

**6. INDEPENDENT CONTRACTOR STATUS. IN PROVIDING THE SERVICES, CONSULTANT IS ACTING AS AN INDEPENDENT CONTRACTOR AND THIS AGREEMENT IS NOT INTENDED TO, NOR DOES IT, CREATE ANY EMPLOYER-EMPLOYEE RELATIONSHIP, NOR SHALL IT BE CONSTRUED AS CREATING ANY JOINT VENTURE OR PARTNERSHIP BETWEEN BUILDER AND CONSULTANT. CONSULTANT IS SOLELY RESPONSIBLE FOR, AND SHALL**

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY